## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*: | Civil Action |
| JUSTIN FAHN, : | File No. _____ |
| : | |
| Plaintiffs, : | |
| : | **FILED UNDER SEAL** |
| : | **PURSUANT TO** |
| : | **31 U.S.C. § 3730(B)** |
| v. : | |
| : | DO NOT PLACE IN PRESS |
| GARDAWORLD FEDERAL : | BOX. |
| SERVICES, LLC, : | |
| and AEGIS DEFENSE SERVICES, LLC : | DO NOT ENTER ON |
| : | PACER. |
| Defendants. : | |
| : | JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiff Justin Fahn ("Relator") brings this action on behalf of the United States of America under the False Claims Act, 31 U.S.C. § 3729 *et seq*., to recover damages and civil monetary penalties arising from Defendant GardaWorld Federal Services, LLC ("Defendant GardaWorld") and Defendant Aegis Defense Services, LLC ("Defendant Aegis") falsely certifying to the United States that their employees – who protect the United States Embassy and other diplomatic facilities in Kabul, Afghanistan – satisfied the requisite physical fitness and training requirements.

## SUMMARY OF THE FALSE CLAIMS

1.      Since 2010, Defendant Aegis has received U.S. Department of State contracts under the Worldwide Protective Services Contract (known as the WPS and the WPS II) to provide security in Afghanistan.  In December 2018, Defendant Aegis, which is owned by Defendant GardaWorld, was awarded a contract ("the Contract") by the U.S. Department of State to provide security at the U.S. Embassy and other diplomatic facilities in Kabul, Afghanistan.

2.      Defendant Aegis and Defendant GardaWorld (hereinafter collectively referred to as "the Defendants") were required to meet various responsibilities under the Contract which were clearly listed in the Statement of Work.  These responsibilities included ensuring that their employees met specific prerequisites. One of these prerequisites was to ensure that "*[o]n not less than a semiannual basis, the Contractor shall conduct physical fitness testing for all Contractor personnel performing work under this contract and subject to the physical fitness standards established*" in the contract.  The physical fitness test is known as Physical Efficiency Battery ("PEB").

3.      In many instances, employees of the Defendants who were subject to the contract's physical fitness testing requirements either failed the requisite PEB or did not take the requisite PEB altogether.  Nonetheless, the Defendants certified to the U.S. Department of State these employees were qualified and billable under

the Contract.  In other instances, the Defendant failed to follow the required testing

procedures which are designed to ensure the integrity of the testing.  These

employees were also unqualified and therefore unbillable under the terms of the

Contract.

4.      In addition to physical fitness testing, the Contract required the

Defendants' employees to successfully complete training classes – both initial

training before they arrived in Afghanistan, as well as training while in

Afghanistan.  In many instances, the Defendants' employees did not complete the

required training.  These training classes included important topics such as "*Use of

Force*," "*Personnel Recoveries/Active Shooter*," and "*Explosive Counter*."

5.      In spite of the Defendants' knowledge that many of the employees

they hired to protect the U.S. Embassy and other diplomatic facilities were

unqualified, the Defendant billed the Government the full price for each and every

one of their unqualified employees.  To carry out their scheme, the Defendants

falsified their own records as well as reports submitted to the Government.  These

records and reports falsely state that the unqualified employees completed and

passed their PEBs and required training classes.

6.      If the Government had known that the Defendants were billing the

Government based on false statements and misrepresentation that their employees

were qualified, it would not have paid the Defendants' claims for the cost of the employees and would have acted to terminate the Defendants' contract.

7.     The Defendants' fraudulent conduct is systemic, ongoing in nature, and continues through today.  The Defendants' fraud has had significant consequences, as their failure to ensure that their employees are physically fit and properly trained has seriously jeopardized the safety of Department of State personnel and assets in Afghanistan.  The longer this fraud goes unaddressed, the longer Department of State personnel and assets remain exposed to potential security threats.

## THE COURT'S JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

9.     This action is not subject to 31 U.S.C. § 3730(b)(5)'s first-to-file restriction because the false claims allegations in this Complaint are not based on the facts underlying a pending FCA action.  Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s public disclosure limitations because the allegations and transaction in this action have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, in a

congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or in the news media.  Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator qualifies as an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B).

10.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  At all times relevant to this action, up to and including the date of this filing, the Defendants can be found in and have transacted business in the Middle District of Georgia.  Moreover, the Defendants have committed acts proscribed by § 3729 in the Middle District of Georgia.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the Defendants reside in the Middle District of Georgia in that it has contacts in the district that would be sufficient to subject it to personal jurisdiction if the district were a separate state.  At all times relevant to this action, the Defendants have regularly conducted substantial business within the Middle District of Georgia, maintained employees in the district, and trained their employees in the district.

Venue is also proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, transacted business, and have committed False Claims Act violations in the Middle District of Georgia.

### THE PARTIES

<u>DEFENDANT GARDWORLD AND DEFENDANT AEGIS</u>

12.     Defendant GardaWorld Federal Services, LLC is a security firm formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102.  Defendant GardaWorld Federal Services, LLC may be served with process on its registered agent, C T Corporation System, located at 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

13.     Defendant GardaWorld Federal Services, LLC is the cleared business of GardaWorld Security Corporation – a Canadian private security firm which is based in Montreal, Quebec, Canada and was founded in 1995.  Defendant GardaWorld Federal Services, LLC focuses on providing security and mission support services to the U.S. Government.

14.     Defendant Aegis Defense Services, LLC is a private military and security company founded in 2002.  In October 2015, Defendant Aegis Defense Services, LLC was purchased by GardaWorld.  Since the purchase, Defendant

Aegis Defense Services, LLC has transacted business as Defendant GardaWorld Federal Services, LLC.

15.     Defendant Aegis Defense Services, LLC is formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102.  Defendant Aegis Defense Services, LLC may be served with process on its registered agent, C T Corporation System, located at 289 S Culver Street, Lawrenceville, Georgia 30046.

16.     While the Defendants are headquartered in McLean, Virginia, their employees undergo initial training at a facility in Perry, Georgia before being deployed to Afghanistan.  Initial training spans more than thirty days and consists of classroom instruction as well as practical field application (which includes physical, tactical, and weapons training and testing).  The Defendants also maintain an office at the training facility with dedicated employees to oversee the training of new hires.  The training facility is located at 600 Perry Parkway, Perry, Georgia 31069 and is operated by Guardian Centers, LLC.  As described more fully herein, it is at this facility in Perry, Georgia where the Defendants claim their employees received mandatory training classes when, in fact, the employees did not.

RELATOR JUSTIN FAHN

17.     Relator Justin Fahn is a United States citizen and resident of the State

of Florida who resides at 6457 Welannee Boulevard, Laurel Hill, Florida 325687.

18.     Relator has been employed by the Defendants since September 2016.

Since February 2018, Relator has been a Unit Support Coordinator on the

Emergency Response Team in Kabul, Afghanistan.  In this role, Relator has both

administrative and tactical duties.  On the administrative side, Relator is

responsible for making sure that approximately 50 employees are current with

training and physical testing requirements under the terms of the Contract.

19.     Prior to his employment with the Defendants, Relator was a soldier in

the United States Army for 20 years.  He attained the rank of Sergeant First Class

and retired in June 2016.

20.     Relator has direct and independent knowledge of the Defendants'

fraudulent conduct as it relates to the physical fitness testing and training

requirements of their employees.  He acquired this first-hand knowledge of the

Defendants' fraudulent conduct during his employment with the Defendants.

21.     Relator brings this action under the qui tam provision of the federal

False Claims Act.  Relator shared all information with the United States prior to

filing suit under seal.  Relator complied with all statutory requirements placed on

qui tam relators.

## LEGAL AUTHORITY

### THE FALSE CLAIMS ACT
### (31 U.S.C. §§ 3729-3733)

22.     Relator has brought this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from the Defendants for the fraudulent conduct detailed herein.  The FCA provides that any person who knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment or approval is liable for (a) three times the amount of the damages sustained by the Government and (b) a civil penalty ranging from $5,500 to $11,000 for each such claim. *See*, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FACTUAL ALLEGATIONS

### THE CONTRACT

23.     The Bureau of Diplomatic Security ("DS") is the U.S. Department of State's law enforcement arm.  The primary role of DS is to provide a safe and secure environment for the United States to conduct its foreign policy. Specifically, DS develops and implements the security programs that protect personnel who work at U.S. diplomatic missions around the world.

24.     In September 2010, DS awarded the Worldwide Protective Services (WPS) contract – a multi-billion dollar, indefinite-delivery/indefinite-quantity contract – to eight contractors, including Defendant Aegis.  In February 2016, DS

awarded a follow-on contract, referred to as "WPS II," which is similar in scope and nature to WPS and was awarded to seven contractors, including the Defendants.

26.    These contracts require the contractor to plan, manage, and provide static guard security services, protective movement security services, emergency response teams, and explosive detection security services.

26.    Following the award of these contracts, DS released a number of task orders.  Task orders are individual contracts that DS puts into place to protect specific assets around the world.

27.    In 2011, DS awarded Task Order 10 under WPS to Defendant Aegis. Task Order 10 called on Defendant Aegis to provide static security services for the U.S. embassy and other diplomatic facilities within Kabul, Afghanistan (including Camp Alvarado, Camp Eggers, Camp Sullivan, and Camp Seitz).  The task order was for 1 year, with the base period of performance beginning June 15, 2012, and had four option years.

28.    Task Order 10 ended in December 2017, but it transitioned from the first WPS contract to WPS II.  Under WPS II, it has been divided into two task orders: one for static security and one for movement security.  These task orders – which includes Task Order 6 – were awarded to the Defendants and are currently active.

29.     Today, the Defendants have more than 1,000 employees in Afghanistan to carry out the purpose of these task orders.

30.     Relator is a Unit Support Coordinator for the Defendants under Task Order 6.  In this role, Relator is responsible for ensuring that approximately 50 of the Defendants' employees have passed requisite physical fitness testing and completed requisite training classes.

<u>PHYSICAL FITNESS TESTING REQUIREMENTS</u>

31.     The contracts awarded to the Defendants contain a Statement of Work ("SOW").  Section C.10.4.3 of the SOW concerns "*Physical Fitness Testing.*"

32.     Subsection A of C.10.4.3 states: "*On a not less than semiannual basis, the Contractor shall conduct physical fitness testing for all Contractor personnel performing work under this contract and subject to the physical fitness standards established in Attachment 1, 'Personnel and Canine Qualifications and Responsibilities.*'"[1]  It goes onto state: "*This requirement begins upon the individual's first billable day through the end of the three hundred [and] sixty five*

---

[1] Attachment 1 sets forth various job positions and the requirements for each job position, including completing a "*WPS Physical Readiness Test*" at a certain performance level and "*maintain[ing] that fitness level for the duration of his/her service on the task order.*"  Appendix N, which is also attached to the contract, is labeled "*DS Physical Readiness Testing Protocols and Standards*" and contains the components of the physical fitness tests that each employee must undergo.  This includes the number of push-ups, sit-ups, and the timing of a 1.5 mile run based on age and gender.

*(365) calendar days following, and then begins again on the first calendar day*

*following while the individual is still working on the TO.*"

33.     Subsection C states as follows: "*Deliverable – Weekly, by noon on*

*Friday of the previous week, the Contractor shall prepare and submit a 'Projected*

*Physical Fitness Qualification Schedule' in Microsoft Excel format that identifies,*

*at a minimum, the planned qualification dates, location, identity of the individual*

*being tested to DS/RSO COR and DS/OPO/WPS GTM.  When any changes are*

*made to this projected qualification schedule during the week of testing,*

*immediately inform (verbally) the aforementioned Government officials.*"  This

qualification schedule is referred to as "Weekly Field Report" or "WFR".

34.     Section F states as follows: "*Deliverable – Quarterly (January, April,*

*July, October), the Contractor shall accurately complete and submit (via email) a*

*"Physical Fitness Qualification Status Report" in the required format to*

*DS/OPO/WPS COR and GTM and DS/RSO COR.*"[2]

35.     The Contract explains: "*Contractor personnel who fail any portion of*

*the semiannual or Government-directed physical fitness testing shall be considered*

*unqualified to perform services under the contract until such time as they pass the*

*complete test.*"  *See*, Subsection G of SOW C.10.4.3.

---

[2] "COR" refers to Contracting Officer's Representative.  "GTM" refers to
Government Technical Monitor.

36.    DS also has regulations and standard operating procedures which require the Defendants to maintain documents verifying that employees properly underwent and passed physical fitness testing.

37.    The verifying documents include what is referred to as a "clean sheet" and a certification.  The clean sheet lists the employees' testing scores and is signed by a witness.  The certificate is signed by a Government Technical Monitor ("GTM") and affirms that the employee passed the PEB.

38.    The Defendants maintain the WFR, clean sheet, and certification in an electronic database.  The Defendants also maintain a spreadsheet which they refer to as a "PEB Tracker."  The PEB Tracker shows each employee, their PEB testing date, the testing scores, and the individual who verified that the employee took and passed the test.

39.    Since at least March of 2014, the Defendants have engaged in a systematic scheme to defraud the United States by falsely certifying that its employees have undergone and passed the mandatory physical fitness testing.

<u>EXAMPLES OF FRAUD INVOLVING PHYSICAL FITNESS TESTING</u>

40.    <u>Robert Smith</u>:  Employee Robert Smith ("Employee Smith") is the Operations Manager for the Defendants.  He is the highest-ranking and highest-paid employee in Afghanistan.  Employee Smith is ultimately in charge of ensuring

that the Defendants properly bill the United States for the services of their employees in Afghanistan.

41.    The PEB Tracker shows that Employee Smith underwent and passed a PEB on March 23, 2019, but there is no clean sheet or certification for this PEB. The PEB Tracker also states that Employee Smith's PEB was verified by "*Unknown*."  In other words, there is no proof that Employee Smith ever underwent or passed a PEB.

42.    Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Smith since at least March 23, 2019.

43.    <u>Robert Jenkins</u>: Employee Robert Jenkins ("Employee Jenkin") is the Deputy Operations Manager ("DOMSEC") and one of the Defendants' highest paid employees in Afghanistan.  Employee Jenkins substitutes as the Operations Manager when Employee Smith is on leave.

44.    The PEB Tracker shows that Employee Jenkins underwent and passed a PEB on March 23, 2019, but there is no clean sheet or certification for this PEB. The PEB Tracker also states that Employee Jenkins' PEB was verified by "*ITI*," which refers to another employee of the Defendants (an Integration and Training Instructor).  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Jenkins ever underwent and passed a PEB.

14

45.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Jenkins since at least March 23, 2019.

46.     <u>William "Don" Taylor</u>:  Employee William Taylor ("Employee Taylor") is the Training Manager and the head of the Defendants' training team in Afghanistan under Task Order 6. The training team is comprised of approximately 23 employees.  These employees are charged with the responsibility of making sure that the Defendants are in compliance with the training and testing requirements of the Contract.

47.     The PEB Tracker shows that Employee Taylor underwent and passed a PEB on March 23, 2019, but there is no WFR, clean sheet, or certification for this PEB.  The PEB Tracker also states that Employee Taylor's PEB was verified by "*ITI*," which refers to another employee of the Defendants.  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Taylor ever underwent and passed a PEB.

48.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Taylor since at least March 23, 2019.

49.     <u>Jose Martinez</u>:  Employee Jose Martinez ("Employee Martinez") is on the training team and is a firearms instructor.  Employee Martinez substitutes for Employee Taylor as the Training Manager when Employee Taylor is on leave.

50.     The PEB Tracker shows that Employee Martinez underwent and passed a PEB on December 25, 2019, but there is no WFR, clean sheet, or certification for this PEB.  The PEB Tracker also states that Employee Martinez's PEB was verified by "*Owens*," but there was no GTM named Owens at the time of the PEB.  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Martinez ever underwent a PEB.

51.     Even more concerning is the fact that Employee Martinez did not arrive in Afghanistan until December 30, 2019, and therefore, he could not have taken the PEB on December 25, 2019.

52.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Martinez since at least December 25, 2019.

53.     <u>Brian Bailey and Lewis Dooley</u>:  Employee Brian Bailey ("Employee Bailey") and employee Lewis Dooley ("Employee Dooley") are members of the training team and hold the title of Integration and Training Instructor.

54.     The PEB Tracker shows that Employee Bailey and Employee Dooley underwent and passed PEBs on June 19, 2019 and June 20, 2019, respectively. There is a clean sheet and a certification for each PEB, but there is no WFR.

55.     Interestingly, the clean sheet and certification for Employee Bailey's PEB are signed by Employee Dooley, and the clean sheet and certification for

Employee Dooley's PEB are signed by Employee Bailey.  There is no GTM signature for Employee Bailey's certification.

56.     Upon information and belief, Employee Bailey and Employee Dooley never took their required PEBs.  Rather, Employee Bailey and Employee Dooley forged the necessary paperwork for one another to suggest that they had taken and passed the PEB.

57.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Bailey and Employee Dooley since at least June 19, 2019.

57.     <u>Todd Shields</u>:  Employee Todd Shields ("Employee Shields") is an Administrative and Logistics Security Specialist.  One of Employee Shields' responsibilities is to prepare and maintain records so that billing is proper.

58.     The PEB Tracker shows that Employee Shields underwent and passed a PEB on February 25, 2020, but there is no clean sheet or certification for this PEB.  The PEB Tracker also states that Employee Shields' PEB was verified by "*Dooley*," an employee of the Defendants.  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Shields ever underwent and passed a PEB.

59.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Shields since at least February 25, 2020.

60.   <u>Bradley Jones</u>:  Employee Bradley Jones ("Employee Jones") provides information technology support.  The PEB Tracker shows that Employee Jones underwent and passed a PEB on June 11, 2019, but there is no WFR, clean sheet, or certification for this PEB.  The PEB Tracker also states that Employee Jones' PEB was verified by "*ITI*," which refers to another employee of the Defendants.  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Jones ever underwent a PEB.

61.   Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Jones since at least February 25, 2020.

62.   <u>Kristen Carter</u>:  The PEB Tracker shows that employee Kristen Carter ("Employee Carter") underwent and passed a PEB on October 27, 2019.  While a clean sheet and a certificate do exist, there is no WFR for Employee Carter's PEB.

63.   The certificate is signed by Employee Taylor, the Training Manager.  The PEB Tracker also states Employee Carter's PEB was verified by "*ITI*."  The certificate, however, is not signed by a GTM as is required.

64.   Upon information and belief, Employee Taylor conducted Employee Carter's PEB in private and forged her fitness test scores. It is well known that Employee Taylor and Employee Carter were having a romantic relationship at the time and that Employee Carter was trying to obtain a promotion.

65.     The clean sheet is signed by employee Johnny Gonzalez ("Employee Gonzalez").  Upon information and belief, Employee Taylor asked Employee Gonzalez to sign the clean sheet despite the fact that Employee Gonzalez did not witness the PEB.  Knowing that he did not witness Employee Carter's PEB and that the scores on the clean sheet were false, Employee Gonzalez nonetheless signed the clean sheet.

66.     The scores reflected on Employee Carter's clean sheet were excellent, and, as a result of the fabricated scores, Employee Carter received the promotion she was trying to obtain.

67.     Despite being unbillable, the Defendants have inappropriately billed the Government for Employee Carter since at least October 27, 2019.

68.     For each of the employees discussed above, the Defendants sent quarterly reports to the United States stating that the employees had properly and timely passed their PEBs.  The Defendants also created and maintained certifications stating that the employees had properly and timely passed their PEBs in case the United States ever conducted an audit in the future.  The statements contained within these certifications and reports were false, and the Defendants knew they were false.

69.     For each of the employees discussed above, the Defendants billed the Government for the time and services of the employees despite the fact that each employee was unbillable.

70.     In each instance of billing described above, the Defendants falsely certified that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

<u>TRAINING REQUIREMENTS</u>

71.     Section C.8.5.2.9 defines "*Training Services*."  Subsection (A) provides: "*The Contractor shall design and implement a training program for their candidates/personnel, incorporating the training and qualification requirements set forth in this contract, the TO, and Attachments 2, 'Training' and 3, 'Firearms Qualifications Standards,' as addressed in the Contractor's 'Training Management Plan...'*"[3]

72.     Subsection (F)(1)(a) provides: "*The Contractors shall:... Provide WPS II basic training... and ensure that all candidates successfully complete this training prior to their deployment to and starting work at the TO performance location*."

---

[3] Attachment 2 of the Contract contains a comprehensive list of classes employees are required to undergo and complete in order to be billable.

73.     Subsection (F)(1)(b) provides: "*Deliverable - Develop and use their own lesson plans or, when available, DS/OP/WPS-provided/approved lesson plans, which comply with the DS' training curriculum.... All Contractor developed lesson plans shall be electronically submitted to DS/OP/WPS for approval prior to use...*"

74.     Subsection (F)(1)(e) continues: "*Deliverable – Upon the completion of each course, submit (via email) a 'WPS II Basic Training Status Report' in the required Microsoft Excel format to DS/OPO/WPS.*"

75.     Subsections (F)(2) through (F)(14) provide other training requirements that the Defendants are required to ensure their employees undergo. These requirements include, but are not limited to, operations management training, tactical operations center training, security equipment training, annual in-service training for Protective Services Personnel (which requires the Contractor to ensure that these employees complete a minimum of sixteen hours of in-service training), annual in-service training for Guard Service Personnel (which requires the Contractor to ensure that these employees receive forty hours of in-service refresher training), weapons training and qualifications, and cultural awareness training.

76.     The annual in-service training, weapons training, and cultural awareness training all require the Defendants to submit a training class schedule to

the COR and GTM by noon on the Friday of the previous week before the class. To show that the Defendants are in compliance with the training requirements, the Defendants must also submit monthly or quarterly reports to the United States.

77.     Since at least March of 2014, the Defendants have engaged in a systematic scheme to defraud the U.S. Government by falsely certifying that their employees have undergone and completed required training classes.

<u>EXAMPLES OF FRAUD INVOLVING TRAINING CLASSES</u>

78.     On December 20, 2019, employee Bryan Bailey, an Integration and Training Instructor for the Defendants, sent an email to Relator with a list of employees "*that need training and need classes they were supposed to get while they went through initial training.*"

79.     The list included the names of 44 employees who were missing required training classes.

80.     For example, the attachment lists Jeffery Palmer ("Employee Palmer"), a Unit Support Coordinator assigned to the embassy in Kabul, as not having completed a class titled: "*Personnel recoveries (structures), Active Shooter PE.*"  Employee Palmer had been an employee of the Defendants and working in Afghanistan for more than five years.

81.     Despite being unbillable, the Defendants inappropriately billed the Government for Employee Palmer.

82.     As another example, the attachment lists Luis Rivera ("Employee Rivera"), a Protective Security Specialist, as not having completed the following classes: "*Deadly Force, PPE, Explosive Counter, Intel Brief, Vehicle Search, Enemy TTP, WAE, SUT, IMT, Land Nav, Cultural Awareness*."  Employee Rivera had been an employee of the Defendants and working in Afghanistan for approximately two years before he resigned in November 2019.

83.     Despite being unbillable, the Defendants inappropriately billed the Government for Employee Rivera.

84.     As another example, the attachment lists Patrick Fisher, a Guard Site Supervisor at the embassy, as not having completed the following classes: "*Use of Force/Force Continuum*."  Employee Fisher has been an employee of the Defendants and working in Afghanistan for approximately five years.

85.     Despite being unbillable, the Defendants inappropriately billed the Government for Employee Rivera.

86.     On March 7, 2020, Lewis Dooley, an Integration and Training Officer for the Defendants, sent an email to Relator with an attachment showing a list of 39 of the Defendants' employees who had not undergone the requisite training. The email explains: "*This training is high priority and needs to be completed by Tuesday 10 March.  This was another schoolhouse issue that needs correcting.*

*These guys are unbillable but per OM they are standing post.  So the sooner we get these guys through training the better*."

87.     As an example, the attachment lists Christopher Bass as not having completed "*IMT*" which stands for Individual Movement Technique.

88.     As another example, the attachment lists Matthew Wilkey as not having completed "*IMT & RET*."  RET stands for Room Entry Technique and is required in order to complete the 40 hours of annual training.

89.     Despite being unbillable, the Defendants inappropriately billed the Government for Employee Bass and Employee Wilkey.

90.     For each of the employees discussed above, the Defendants sent reports to the Government stating that the employees had taken the requisite training classes.  The Defendants also created and maintained certifications stating that the employees had taken and passed the requisite training classes in case the United States ever conducted an audit.  The statements contained within these certifications and reports were false, and the Defendants knew they were false.

91.     For each of the employees discussed above, the Defendants billed the Government for the time and services of the employees, despite the fact that each employee was unbillable.

92.     In each instance of billing, the Defendants were required to certify that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

93.     The Department of State believes that it is being protected by a private security force that is properly trained and physically fit.  Despite paying for it, the Department of State is not receiving such protection.  Consequently, the Defendants' fraudulent conduct has put the Department of State's personnel in Afghanistan at greater risk of being killed or wounded by terrorists, rioting mobs, and insurgents.

## COUNT I

### VIOLATION OF THE FALSE CLAIMS ACT:
### 31 U.S.C. § 3729(a)(1)(A)

94.     Relator re-alleges the allegations contained in Paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, to the United States, a false or fraudulent claim for payment or approval.

96.     Specifically, the Defendants submitted invoices for payment based upon the materially false representation that their employees had met the

qualifications of the Contract, including the requirements that their employees had taken and passed physical fitness tests and training classes.

97.    The Defendants presented their claims for payment knowing that they were materially false.

98.    The United States, unaware of the falsity of the claims made by the Defendants, and in reliance of the accuracy of these claims, paid and is continuing to pay for the services of the Defendants' unqualified employees.

99.    Had the United States known that the Defendants were violating the federal laws cited herein and/or that the claims the Defendant caused to be submitted to the United States failed to meet the criteria under the Contract, it would not have paid those claims.

100.   The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

### COUNT II

<u>VIOLATION OF THE FALSE CLAIMS ACT:</u>
<u>31 U.S.C. § 3729(a)(1)(B)</u>

101.   Relator re-alleges the allegations contained in Paragraphs 1 through 100 as if fully set forth herein.

102.   The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim submitted to the United States.

103.   Specifically, the Defendants made and used false records indicating that their employees had completed and passed required physical fitness tests and training classes to induce the United States to approve and to pay the Defendants' false claims.

104.   The United States was misled by the actions of the Defendants, and, as a result, paid the Defendants' false claims.

105.   The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, respectfully requests a trial by jury on all issues and that this Court award the following damages and all further relief as this Court deems equitable and just to the following parties and against the Defendants:

To the United States:

(A)   Three times the amount of actual damages which the United States has sustained as a result of the Defendant's conduct;

(B)    A civil penalty of not less than $5,500, and as much as $11,000, for every false of fraudulent claim, record, or statement the Defendants caused to be presented, made, or used to or with the United States.

(C)    Prejudgment interest;

(D)    All costs incurred in bringing this action.

To Relators:

(A)    The maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law;

(B)    Reimbursement for reasonable expenses which Relators incurred in connection with this action; and

(C)    An award of reasonable attorneys' fees and costs.

This 30th day of March, 2020.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson
Page A. Pate
Georgia Bar No.: 565899

Jess B. Johnson
Georgia Bar No.: 322066

Attorneys for Appellant

Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310