## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*: | |
| JUSTIN FAHN, | : |
| | : |
| Plaintiffs, | : |
| | : Civil Action |
| | : File No. 5:20-CV-00128-MTT |
| | : |
| v. | : |
| | : |
| GARDAWORLD FEDERAL | : |
| SERVICES, LLC, | : JURY TRIAL DEMANDED |
| and AEGIS DEFENSE SERVICES, LLC, : | |
| | : |
| Defendants. | : |
| | : |

## FIRST AMENDED COMPLAINT

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and the

Court's January 11, 2022 order (Doc. 41), Plaintiff Justin Fahn ("Relator Fahn")

hereby amends his Complaint filed on March 31, 2020 (Doc. 3) and brings this

action on behalf of the United States of America under the False Claims Act, 31

U.S.C. § 3729 *et seq*., to recover damages and civil monetary penalties arising

from Defendant GardaWorld Federal Services, LLC ("Defendant GardaWorld")

and Defendant Aegis Defense Services, LLC ("Defendant Aegis") falsely

certifying to the United States that their employees – who protected the United

States Embassy and other diplomatic facilities in Kabul, Afghanistan – satisfied the

requisite physical fitness and training requirements.

## SUMMARY OF THE FALSE CLAIMS

1.    Since 2010, Defendant Aegis has received U.S. Department of State

contracts under the Worldwide Protective Services Contract (known as the WPS

and the WPS II) to provide security in Afghanistan. Defendant Aegis, which is

owned by Defendant GardaWorld, was subsequently awarded a contract ("the

Contract") by the U.S. Department of State to provide security at the U.S. Embassy

and other diplomatic facilities in Kabul, Afghanistan.

2.    The Defendants hired Relator Fahn, a 20-year veteran of the U.S.

Army, in September 2016 and sent Relator Fahn to Afghanistan to defend the U.S.

Embassy in Kabul. Relator Fahn defended the embassy until its fall to the Taliban

in August 2021.

3.    As part of his job duties, Relator Fahn ensured that guards employed

by the Defendants met specific prerequisites required by the Contract. These

prerequisites, which were clearly listed in the Statement of Work, included passing

physical fitness tests and the successful completion of training classes.

4.    During the course of his employment with the Defendants, Relator

Fahn discovered that at least eight (8) employees had failed to take the required

physical fitness tests. Relator Fahn also discovered that at least ninety-one (91)

employees had not successfully completed training classes – both initial training before they arrived in Afghanistan, as well as training while in Afghanistan.

5.    Despite the Defendants' knowledge that these guards were unqualified to protect the U.S. Embassy and other diplomatic facilities, the Defendant billed the Government the full price for each and every one of their unqualified employees. To carry out their scheme, the Defendants falsified their own records as well as reports submitted to the Government. These records and reports falsely state and certify that the unqualified employees completed and passed their physical fitness tests and required training classes.

6.    If the Government had known that the Defendants were billing the Government based on false statements and misrepresentations that their employees were qualified, it would not have paid the Defendants' claims for the cost of the employees and would have acted to terminate the Defendants' contract.

7.    Since at least February 2018 through August 2021, the Defendants defrauded the Government by billing for guards who were unqualified under the terms of the Contract. The Defendants' fraud had significant consequences, as their failure to ensure that their employees were physically fit and properly trained seriously jeopardized the safety of Department of State personnel and assets in Afghanistan.

## THE COURT'S JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

9.      This action is not subject to 31 U.S.C. § 3730(b)(5)'s first-to-file restriction because the false claims allegations in this Complaint are not based on the facts underlying a pending FCA action. Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s public disclosure limitations because the allegations and transaction in this action have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or in the news media. Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator qualifies as an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B).

10.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in

which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. At all times relevant to this action, up to and including the date of this filing, the Defendants can be found in and have transacted business in the Middle District of Georgia. Moreover, the Defendants have committed acts proscribed by § 3729 in the Middle District of Georgia.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the Defendants reside in the Middle District of Georgia in that they have contacts in the district that would be sufficient to subject them to personal jurisdiction if the district were a separate state. At all times relevant to this action, the Defendants have regularly conducted substantial business within the Middle District of Georgia, maintained employees in the district, and trained their employees in the district.  Venue is also proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, have transacted business, and have committed False Claims Act violations in the Middle District of Georgia.

## THE PARTIES

### DEFENDANT GARDWORLD AND DEFENDANT AEGIS

12.    Defendant GardaWorld Federal Services, LLC is a security firm formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102. Defendant GardaWorld Federal Services, LLC may be served with process on its registered agent, C T

Corporation System, located at 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

13.    Defendant GardaWorld Federal Services, LLC is the cleared business of GardaWorld Security Corporation – a Canadian private security firm which is based in Montreal, Quebec, Canada and was founded in 1995. Defendant GardaWorld Federal Services, LLC focuses on providing security and mission support services to the U.S. Government.

14.    Defendant Aegis Defense Services, LLC is a private military and security company founded in 2002. In October 2015, Defendant Aegis Defense Services, LLC was purchased by GardaWorld. Since the purchase, Defendant Aegis Defense Services, LLC has transacted business as Defendant GardaWorld Federal Services, LLC.

15.    Defendant Aegis Defense Services, LLC is formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102. Defendant Aegis Defense Services, LLC may be served with process on its registered agent, C T Corporation System, located at 289 S Culver Street, Lawrenceville, Georgia 30046.

16.    While the Defendants are headquartered in McLean, Virginia, their employees undergo initial training at a facility in Perry, Georgia before being deployed to Afghanistan. Initial training spans more than thirty days and consists

of classroom instruction as well as practical field application (which includes physical, tactical, and weapons training and testing). The Defendants also maintain an office at the training facility with dedicated employees to oversee the training of new hires. The training facility is located at 600 Perry Parkway, Perry, Georgia 31069 and is operated by Guardian Centers, LLC. As described more fully herein, it is at this facility in Perry, Georgia where the Defendants claim their employees received mandatory training classes when, in fact, the employees did not.

RELATOR JUSTIN FAHN

17.    Relator Justin Fahn is a United States citizen and resident of the State of Florida who resides at 14 Mooney Road NE, Fort Walton Beach, Florida 32547.

18.    Relator Fahn has been employed by the Defendants since September 2016 to secure the U.S. embassy in Kabul, Afghanistan. From February 2018 to August 2021, Relator Fahn was a Unit Support Coordinator on the Emergency Response Team. In this role, Relator Fahn had both administrative and tactical duties. On the administrative side, Relator Fahn was responsible for making sure that approximately 50 of the Defendants' employees were current with training and physical testing requirements under the terms of the Contract.

19.    Prior to his employment with the Defendants, Relator Fahn was a soldier in the United States Army for 20 years. He attained the rank of Sergeant First Class and retired in June of 2016.

20.    Relator Fahn has direct and independent knowledge of the Defendants' fraudulent conduct as it relates to the physical fitness testing and training requirements of their employees. He acquired this first-hand knowledge of the Defendants' fraudulent conduct during his employment with the Defendants.

21.    Relator Fahn brings this action under the *qui tam* provision of the federal False Claims Act. He has complied with all statutory requirements placed on *qui tam* relators and qualifies as an original source.

22.    Prior to any public disclosure, Relator Fahn voluntarily disclosed to the Government the information on which the allegations and transactions set forth in his original Complaint and this Amended Complaint are based.

23.    The information described in Paragraph 22, including a copy of the original Complaint, was voluntarily disclosed by Relator Fahn to the Government on March 18, 2020 and March 26, 2020.

24.    Relator Fahn's knowledge is independent of and materially adds to any publicly disclosed allegations or transactions. Relator Fahn's knowledge of the fraud set forth in this Amended Complaint is first-hand because Relator Fahn discovered the fraud during and in the scope of his employment with the Defendants. One of Relator Fahn's job responsibilities was to ensure that the Defendants' employees were compliant with the Contract's physical fitness testing and training requirements in order to prevent the Government from being

improperly billed. As a member of the Defendants' compliance system, Relator Fahn had access to the Defendants' records and communications showing that many employees were unqualified, that the Defendants knew the employees were unqualified, that the Defendants nonetheless inappropriately billed the Government despite these employees being unbillable, and that the Defendants took steps to conceal the fraud by altering their own records to evade Government audits.

25.    Relator Fahn's knowledge also materially adds to any publicly disclosed allegations or transactions. As with any large government contract, the government conducted routine audits of the Defendants' records and billing to ensure compliance with the Contract. The Government, however, was unaware that the specific transactions outlined below were actually occurring in 2018, 2019, and 2020. In fact, the 2018 OIG "*Audit of the Bureau of Diplomatic Security's Invoice Review Process for Worldwide Protective Services Contracts*" does not even mention physical fitness testing requirements. (Doc. 36-10). The 2018 OIG audit also found the Defendants' training and training records to be in compliance based on its audit, explaining: "*OIG... visited the training facility in Perry, Georgia... OIG verified that the training information was recorded and documented... OIG reviewed training status reports and supporting documents, including... individual course training certificates, and attendance sheets. OIG also reviewed 28 recruit*

*training records at… the Perry, GA… training facilities and verified that training results were documented*."

26.    Relator Fahn has not simply provided limited detail to previously alleged schemes. He has provided numerous, specific, and detailed examples of fraud occurring in 2018, 2019, and 2020 of which the Government was unaware. He has also set forth the framework of the schemes, the employees involved, the dates the fraud occurred, how the Defendants were able to evade the Government's audits, and how the Defendants attempted to conceal the fraud.

27.    Moreover, even if the Government had been aware of the instances of fraud set forth below, there had been no public disclosure of it. Indeed, the Defendants admit that "*[t]he DS audit of GardaWorld's training records, which occurred in 2019, did not result in a public report*…" (Doc. 42, p. 17, n. 3).

## LEGAL AUTHORITY

### THE FALSE CLAIMS ACT
### (31 U.S.C. §§ 3729-3733)

28.    Relator has brought this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from the Defendants for the fraudulent conduct detailed herein.  The FCA provides that any person who knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment or approval is liable for (a) three times the amount of the damages sustained by the Government and (b) a civil penalty ranging from

$11,665 to $23,331for each such claim. *See*, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

## FACTUAL ALLEGATIONS

### THE CONTRACT

29.     The Bureau of Diplomatic Security ("DS") is the U.S. Department of State's law enforcement arm.  The primary role of DS is to provide a safe and secure environment for the United States to conduct its foreign policy. Specifically, DS develops and implements the security programs that protect personnel who work at U.S. diplomatic missions around the world.

30.     In September 2010, DS awarded the Worldwide Protective Services (WPS) contract – a multi-billion dollar, indefinite-delivery/indefinite-quantity contract – to eight contractors, including Defendant Aegis.  In February 2016, DS awarded a follow-on contract, referred to as "WPS II," which is similar in scope and nature to WPS and was awarded to seven contractors, including the Defendants.

31.     These contracts require the contractor to plan, manage, and provide static guard security services, protective movement security services, emergency response teams, and explosive detection security services.

32.     Following the award of these contracts, DS released a number of task orders.  Task orders are individual contracts that DS puts into place to protect specific assets around the world.

33.     In 2011, DS awarded Task Order 10 under WPS to Defendant Aegis. Task Order 10 called on Defendant Aegis to provide static security services for the U.S. embassy and other diplomatic facilities within Kabul, Afghanistan (including Camp Alvarado, Camp Eggers, Camp Sullivan, and Camp Seitz).  The task order was for 1 year, with the base period of performance beginning June 15, 2012, and had four option years.

34.     Task Order 10 ended in December 2017, but it transitioned from the first WPS contract to WPS II.  Under WPS II, it has been divided into two task orders: one for static security and one for movement security. These task orders – which includes Task Order 6 – were awarded to the Defendants.

35.     To receive payment from the Government for the labor of its employees, the Defendants were required to submit monthly invoices for each employee. Each employee was billed at a daily rate for the days worked. With each invoice, the Defendants were also required to submit muster sheets, which contained the names of the employees and the days the employees worked. The muster sheets were used to verify the amount of the invoice.

36.     To receive payment from the Government for the training of its employees, the Defendants submitted invoices for the training courses taken by each employee. The Contract also required the Defendants to submit certificates of course completion with the training invoices.

37.     The Contracting Officer (CO) was authorized by the United States to award contracts and to ensure that the Defendants were in compliance with the Contract's terms. The Contracting Officer delegated tasks to the Contracting Officer's Representative (COR), including the inspection of contract services and reviewing invoices. Government Technical Monitors (GTMs) were tasked with reviewing contract deliverables.[1]

38.     For each submitted invoice, the Defendants certified that each employee met the terms of the Contract, including the physical fitness testing requirements and training requirements.

39.     Prior to the surrender of the U.S. Embassy in August 2021, the Defendants had more than 1,000 employees in Afghanistan to carry out the purpose of these task orders. Relator Fahn was a Unit Support Coordinator for the Defendants under Task Order 6.

---

[1] While Relator Fahn learned of the information contained in Paragraphs 29 through 37 of this Amended Complaint through his employment, this background information about the Contract is also available to the public.

## PHYSICAL FITNESS TESTING REQUIREMENTS

40.     The contracts awarded to the Defendants contain a Statement of Work ("SOW"). Section C.10.4.3 of the SOW concerns "*Physical Fitness Testing*." The physical fitness test is known as Physical Efficiency Battery ("PEB").

41.     Subsection A of C.10.4.3 states: "████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ ███████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████████."

42.     Subsection C states as follows: "███████████████████ ████████████████████████████████████ ███████████████████████████████████

────────────────────
2 ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████

14



." This

qualification schedule is referred to as "Weekly Field Report" or "WFR".

43.     Section F states as follows: "

."[3]

44.     The Contract explains: "

."  *See*, Subsection G of SOW C.10.4.3.

45.     DS also has regulations and standard operating procedures which require the Defendants to maintain documents verifying that employees properly underwent and passed physical fitness testing.

46.     The verifying documents include a certification and what is referred to as a "clean sheet."  The certificate is signed by a witness and affirms that the

---

[3] "COR" refers to Contracting Officer's Representative. "GTM" refers to Government Technical Monitor.

employee passed the PEB. The clean sheet lists the employees' testing scores and is signed by a witness and a GTM. Every PEB must be witnessed and verified by a GTM.

47.    The Defendants maintained the WFRs, clean sheets, and certifications in an electronic database, and they were required to do so by the Contract. The Defendants also maintained a spreadsheet in the database which they refer to as a "PEB Tracker." The PEB Tracker shows each employee, their PEB testing date, the testing scores, and the individual who verified that the employee took and passed the test. The Contract required that the Government be allowed access to the database at any time to audit the Defendants' internal documents.

48.    Relator Fahn had access to this electronic database as he was responsible for making sure that the WFRs, clean sheets, and certifications for the 50 employees under his command were properly filled out and updated.

49.    Since at least March of 2019, the Defendants engaged in a systematic scheme to defraud the United States by falsely certifying that their employees had undergone and passed the mandatory physical fitness testing.

50.    This scheme was carried out by the highest-ranking employees of the Defendants in Afghanistan, including the Operations Manager, Deputy Operations Manager, and Training Manager. These employees had substantial authority, broad responsibility, and control over all of the Defendants' activities in Afghanistan.

These high-ranking employees, and their subordinates discussed below, were at all times acting within the scope of their authority and with the purpose of benefiting the Defendants.

51.    The Defendants benefitted from the scheme by receiving payment from the Government for the labor and services of unqualified employees, redirecting the time it would take to undergo testing to business-related matters, maintaining continuity of the management personnel, and avoiding the disruption that would be caused by a failed PEB.

52.    The employees discussed below were not easily replaceable by the Defendants. If one of the employees failed the physical fitness testing requirements, they would be removed from their post causing disruption in the Defendants' activities in Afghanistan. The Defendants would also have to expend significant time and money to replace the employee. These risks were removed by simply falsifying the PEB records.

53.    In 2019 and 2020, this fraudulent scheme was well-known to the Defendants' management personnel in Afghanistan, but the fraud was never reported the Government until Relator Fahn did so in March 2020.

54.    In June 2019, Relator Fahn, while working at the U.S. embassy, had a conversation with employee Nicholas Schneider ("Employee Schneider"), a Deputy Operations Manager. Employee Schneider told Relator Fahn that "*someone*

*needs to turn the training team guys in for falsifying documents*" and that

"*everyone knows they're doing it*."

55.    In early March 2020, Employee Schneider told Relator Fahn:

"*Somebody needs to report Don Taylor and Robert Smith for these fake ass PEBs*."

<u>EXAMPLES OF FRAUD INVOLVING PHYSICAL FITNESS TESTING</u>

56.    <u>Robert Smith</u>:  Employee Robert Smith ("Employee Smith") was the

Operations Manager for the Defendants. He was the highest-ranking and highest-

paid employee in Afghanistan. Employee Smith was ultimately in charge of all of

the Defendants' activities in Afghanistan, including ensuring that the Defendants

properly billed the United States for the services of their employees.

57.    The PEB Tracker showed that Employee Smith underwent and passed

a PEB on March 23, 2019, but there is no clean sheet or certification for this PEB.

The PEB Tracker also states that Employee Smith's PEB was verified by

"*Unknown*." Thus, there is no documentation or witness showing that Employee

Smith took the PEB.

58.    Had Employee Smith properly taken and passed a PEB, there would

have been a valid clean sheet and certification affirming such. The information in

the PEB Tracker for Employee Smith was inputted by the Defendants in an attempt

to conceal the fact that Employee Smith never took and passed a PEB on March

23, 2019.

59.    Despite the fact that Employee Smith never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2019, and each subsequent quarter, falsely certifying that Employee Smith had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Smith never took and passed the required PEB.

60.    Because Employee Smith never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

61.    Despite the fact that he was unbillable from at least March 23, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Smith's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Smith was billable for the number of days he worked that month.

62.    Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Smith's labor. In total, the Defendants billed for 123 days during this period: 9 days in March, 24 days in April, 3 days in May, 30 days in June, 31 days in July 2019, 14 days in August 2019, and 12 days in September 2019.

63.    For example, Employee Smith worked from April 1, 2019 through April 24, 2019, and the Defendants subsequently billed for 24 days for that month.

64.     At all times, Employee Smith was aware that he and the other

employees set forth in this section had not taken and passed the required PEBs and

were therefore unbillable. He nonetheless allowed for and directed the submission

of invoices to the Government for their labor as well as the creation of false

documents to conceal the fraud.

65.     <u>Robert Jenkins</u>: Employee Robert Jenkins ("Employee Jenkin") was

the Deputy Operations Manager ("DOMSEC"). He was the second highest-ranking

employee in Afghanistan behind Employee Smith. Employee Jenkins substituted

as the Operations Manager when Employee Smith was on leave, thereby

temporarily becoming the highest-ranking employee.

66.     The PEB Tracker shows that Employee Jenkins underwent and passed

a PEB on March 23, 2019. The tracker states that Employee Jenkins' PEB was

verified by "*ITI*," which refers to another employee of the Defendants (an

Integration and Training Instructor). The certification is signed by William Taylor,

the Training Team Manager, two days later. (*See*, Exhibit 1). But there is no clean

sheet associated with the PEB. The clean sheet is required to be signed by a GTM,

verifying that the PEB was taken and passed. In other words, there is no proof that

Employee Jenkins ever underwent and passed a PEB.

67.     Had Employee Jenkins properly taken and passed a PEB, there would

have been a valid clean sheet affirming such. The information in the PEB Tracker

and the certification were created by the Defendants in an attempt to conceal the fact that Employee Jenkins never took and passed a PEB on March 23, 2019.

68.     Despite the fact that Employee Jenkins never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2019, and each subsequent quarter, falsely certifying that Employee Jenkins had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Jenkins never took and passed the required PEB.

69.     Because Employee Jenkins never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

70.     Despite the fact that he was unbillable from at least March 23, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Jenkins' labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Jenkins was billable for the number of days worked that month.

71.     Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Jenkin's labor. In total, the Defendants' billed for 140 days during this period: 8 days in March, 27 days in April, 30 days in May, 26 days in June, 27 days in July 2019, 12 days in August 2019, and 10 days in September 2019.

72.     For example, Employee Jenkins worked from June 1, 2019 through June 30, 2019 except for Fridays, and the Defendants subsequently billed for 26 days for that month.

73.     At all times, Employee Jenkins was aware that he and the other employees set forth in this section had not taken and passed the required PEBs and were therefore unbillable. He nonetheless allowed for and directed the submission of invoices to the Government for their labor as well as the creation of false documents to conceal the fraud.

74.     <u>William "Don" Taylor</u>:  Employee William Taylor ("Employee Taylor") was the Training Manager and the head of the Defendants' training team in Afghanistan under Task Order 6. He was charged with the responsibility of making sure that the Defendants were in compliance with the training and testing requirements of the Contract. The training team was comprised of approximately 23 employees under Employee Taylor's command.

75.     The PEB Tracker shows that Employee Taylor underwent and passed a PEB on March 23, 2019, but there is no WFR or clean sheet. A clean sheet is required to be signed by a GTM, verifying that the PEB was taken and passed. In other words, there is no proof that Employee Taylor ever underwent and passed a PEB. Interestingly, there is a certification for this PEB, but it is signed by Employee Taylor (*See*, Exhibit 2). An employee cannot certify his own PEB. The

PEB Tracker also states that Employee Taylor's PEB was verified by "*ITI*," which refers to another employee of the Defendants.

76.    Had Employee Taylor properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Taylor was inputted by the Defendants in an attempt to conceal the fact that Employee Taylor never took and passed a PEB on March 23, 2019.

77.    Despite the fact that Employee Taylor never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2019, and each subsequent quarter, falsely certifying that Employee Taylor had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Taylor never took and passed the required PEB.

78.    Because Employee Taylor never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

79.    Despite the fact that he was unbillable from at least March 23, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Taylor's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Taylor was billable for the number of days worked that month.

80.    Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Taylor's labor. In total, the Defendants billed for 127 days during this period: 9 days in March, 24 days in April, 6 days in May, 26 days in June, 26 days in July, 26 days in August, and 10 days in September.

81.    For example, Employee Taylor worked from April 1, 2019 through April 24, 2019, and the Defendants subsequently billed for 24 days.

82.    At all times, Employee Taylor was aware that he and the other employees set forth in this section had not taken and passed the required PEBs and were therefore unbillable. He nonetheless allowed for and directed the submission of invoices to the Government for their labor as well as the creation of false documents to conceal the fraud.

83.    Brian Bailey and Lewis Dooley:  Employee Brian Bailey ("Employee Bailey") and employee Lewis Dooley ("Employee Dooley") were members of the training team and held the title of Integration and Training Instructor.

84.    The PEB Tracker shows that Employee Bailey and Employee Dooley underwent and passed PEBs on June 19, 2019 and June 20, 2019, respectively. There is a clean sheet and a certification for each PEB, but there is no WFR.

85.    Importantly, the clean sheet and certification for Employee Bailey's PEB are signed by Employee Dooley, and the clean sheet and certification for Employee Dooley's PEB are signed by Employee Bailey.

86.    Employee Bailey and Employee Dooley never took their required PEBs. Rather, Employee Bailey and Employee Dooley forged the necessary paperwork to conceal the fact that they never took and passed the PEB.

87.    Despite the fact that Employee Bailey and Employee Dooley never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in July 2019, and each subsequent quarter, falsely certifying that Employee Bailey and Employee Dooley had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Bailey and Employee Dooley never took and passed the required PEB.

88.    Because Employee Bailey and Employee Dooley never took and passed the required PEB, Employee Bailey and Employee Dooley were unbillable under the Contract and the Defendants knew they was unbillable.

89.    Despite the fact that they were unbillable from at least June 20, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Bailey's and Employee Dooley's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet

that falsely certified that Employee Bailey and Employee Dooley were billable for the number of days worked that month.

90.    Specifically, over the six-month period following the falsified PEB on June 19, 2019, the Defendants submitted monthly invoices to the Government for Employee Bailey's labor. In total, the Defendants billed for 139 days during that period: 11 days in June, 19 days in July, 4 days in August, 26 days in September, 27 days in October, 25 days in November, and 27 days in December.

91.    For example, Employee Bailey worked every day from July 1, 2019 through July 22, 2019 except for Fridays and the Defendants subsequently billed for 19 days.

92.    Over the six-month period following the falsified PEB on June 20, 2019, the Defendants submitted monthly invoices to the Government for Employee Dooley's labor. In total, the Defendants' billed for days 138 days during that period: 9 days in June, 27 days in July, 26 days in August, 16 days in September, 8 days in October, 25 days in November, and 27 days in December.

93.    For example, Employee Dooley worked every day in July 2019 except for Fridays and the Defendants subsequently billed for 27 days.

94.    Todd Shields:  Employee Todd Shields ("Employee Shields") was an Administrative and Logistics Security Specialist. One of Employee Shields' responsibilities was to prepare and maintain records so that billing was proper.

95.    The PEB Tracker shows that Employee Shields underwent and passed a PEB on February 25, 2020, but there is no clean sheet or certification for this PEB. The PEB Tracker also states that Employee Shields' PEB was verified by "*Dooley*," an employee of the Defendants.  A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Shields ever underwent and passed a PEB.

96.    Had Employee Shields properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Shields was inputted by the Defendants in an attempt to conceal the fact that Employee Shields never took and passed a PEB on February 25, 2020.

97.    Despite the fact that Employee Shields never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2020, and each subsequent quarter, falsely certifying that Employee Taylor had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Shields never took and passed the required PEB.

98.    Because Employee Shields never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

27

99.    Despite the fact that he was unbillable from at least February 25, 2020 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Shields' labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Shields was billable for the number of days worked that month.

100.    <u>Bradley Jones</u>:  Employee Bradley Jones ("Employee Jones") provided information technology support. The PEB Tracker shows that Employee Jones underwent and passed a PEB on June 11, 2019, but there is no WFR, clean sheet, or certification for this PEB. The PEB Tracker also states that Employee Jones' PEB was verified by "*ITI*," which refers to another employee of the Defendants. A PEB is required to be verified by a GTM.  In other words, there is no proof that Employee Jones ever underwent a PEB.

101.    Had Employee Jones properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Jones was inputted by the Defendants in an attempt to conceal the fact that Employee Jones never took and passed a PEB on June 11, 2019.

102.    Despite the fact that Employee Jones never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in July 2019, and each subsequent quarter, falsely certifying that

Employee Jones had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Jones never took and passed the required PEB.

103.    Because Employee Jones never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

104.    Despite the fact that he was unbillable from at least June 11, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Jones's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Jones was billable for the number of days worked that month.

105.    <u>Kristen Carter</u>:  The PEB Tracker shows that employee Kristen Carter ("Employee Carter") underwent and passed a PEB on October 27, 2019.  While a clean sheet and a certificate do exist, there is no WFR for Employee Carter's PEB.

106.    The certificate is signed by Employee Taylor, the Training Manager, and the clean sheet is signed by employee Johnny Gonzalez ("Employee Gonzalez"). The PEB Tracker also states Employee Carter's PEB was verified by "*ITI*."  The clean sheet, however, is not signed by a GTM as is required. In other words, there is no proof that Employee Carter ever underwent a PEB. (*See*, Exhibit 3).

107.   Had Employee Carter properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Carter was inputted by the Defendants in an attempt to conceal the fact that Employee Carter never took and passed a PEB on October 27, 2019.

108.   Despite the fact that Employee Carter never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in October 2019, and each subsequent quarter, falsely certifying that Employee Carter had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Carter never took and passed the required PEB.

109.   Because Employee Carter never took and passed the required PEB, she was unbillable under the Contract and the Defendants knew she was unbillable.

110.   Despite the fact that she was unbillable from at least October 27, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Carter's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Carter was billable for the number of days she worked that month.

111.   Specifically, over the six-month period following the falsified PEB on October 27, 2019, the Defendants submitted monthly invoices to the Government

for Employee Carter's labor. In total, the Defendants billed for 131 days during this time period (5 days in October, 25 days in November, 27 days in December, 25 days in January, 23 days in March 2020, and 26 days in April 2020).

112.   For example, Employee Carter worked every day in November 2019 except for Fridays and the Defendants subsequently billed for 25 days.

113.   In each instance of billing described above, the Defendants falsely certified that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

<u>TRAINING REQUIREMENTS</u>

114.   Section C.8.5.2.9 defines "████████████." Subsection (A) provides: "████████████████████████████████



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████"[4]

115.   Subsection (F)(1)(a) provides: "████████████████████

████████████████████████████████████

_____

[4] █████████████████████████████████████████
██████████████████████████████████████.

██████████████████████████████████████████████

███████."

116.   Subsection (F)(1)(b) provides: "*Deliverable* - ████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████,"

117.   Subsection (F)(1)(e) continues: "*Deliverable* – ███████████████

████████████████████████████████████████████

██████████████████████████████."

118.   Subsections (F)(2) through (F)(14) provide other training requirements that the Defendants are required to ensure their employees undergo. These requirements include, but are not limited to, operations management training, tactical operations center training, security equipment training, annual in-service training for Protective Services Personnel (which requires the Contractor to ensure that these employees complete a ████████████████████████ ████████), annual in-service training for Guard Service Personnel (which requires the Contractor to ensure that these employees receive ██████████████ ████████████████, weapons training and qualifications, and cultural awareness training.

119.   ██████████████████████████████

██████████████████████████████████████

████████████████████████████████

To show that the Defendants are in compliance with the training requirements, the

Contract required: "████████████████████████

██████████████████████████████████████

██████████████████████████████

████████████████████." Subsections (F)(7)(c) and (F)(8)(c).

120.   The Contract further explains: "████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████"

Attachment Two, Section 1.3.

121.   With regard to records, the Contract states: "████████████

██████████████████████████████████

████████████████████████." Attachment Two, Section 2.

122.   With regard to sign-in sheets, the Contract requires the following:

"████████████████████████████████

██████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

████████." Attachment Two, Section 7.2.1(V).

123.   To bill the Government for training, the Defendants were required to submit documentation with all training invoices, including a copy of the Training Status Report showing course completion. G.8.2.2.2.

124.   Since at least February 6, 2018, the Defendants have engaged in a systematic scheme to defraud the U.S. Government by falsely certifying that their employees have undergone and completed required training classes.

125.   The scheme set forth below consisted of the Defendants providing the Government with reports falsely certifying that its employees had taken training classes, invoicing the Government for these unbillable employees, and attempting to conceal the fraud by having the employees falsely certify that they had taken the missed classes. These fraudulent acts were performed by corporate officers as well as employees acting within the scope of their employment and for the benefit of the Defendants.

126.   The Defendants benefitted from the scheme by receiving payments from the Government for labor costs of unqualified employees and the training costs for training that never occurred. Moreover, requiring these employees to take

the missed classes would have negatively impacted the Defendants' business. The Defendants would have had to expend time and money to ensure that the classes were taken. The Defendants would have also suffered disruptions in the deployment of employees to Afghanistan and difficulty in maintaining appropriate staffing levels.

<u>EXAMPLES OF FRAUD INVOLVING TRAINING CLASSES</u>

127.   On October 19, 2019, Michael J. Stevenson, a Deputy Operations Manager, sent an email to Relator Fahn and other employees, including Employee Jenkins, which explained that it was a "*message from corporate*" and that "*[w]e have been auditing our training files and in the files we discovered that your signature was missing from relevant training classes when you attended your Training Course.*" (Exhibit 4).

128.   The email attached pre-filled attestations for 12 different employees and asked these employees to sign the attestations to show that they did in fact take the training classes. (Exhibit 5).

129.   For instance, one of the attestations was for employee Joseph Hill ("Employee Hill"). The attestation form pre-checked a box affirming that Employee Hill participated in a training course entitled "*Use of Force/Force Continuum*" between February 6, 2018 and February 19, 2018.

130.    Had Employee Hill and the other employees actually taken the requisite courses, they would have signed the sign-in sheets at the time the courses were offered. But Employee Hill and the other employees did not take the courses or sign the sign-in sheets and were therefore unbillable.

131.    Despite knowing that these 12 employees were unbillable, the Defendants submitted Training Status Reports, training invoices, and certificates of course completion to the Government which falsely certified that these employees had received the required training. Because they did so, the Government paid for these training courses which never occurred.

132.    Despite knowing that these 12 employees were unbillable, the Defendants also submitted monthly labor invoices with muster sheets, certifying that the Defendants were billable. Because they did so, the Government paid for the labor of these unbillable employees.

134.    In an attempt to cover up the scheme, the Defendants attempted to have the employees sign the attestations after months of improperly billing the Government.

135.    On December 20, 2019, employee Bryan Bailey, an Integration and Training Instructor for the Defendants, sent an email to Relator with an attached list of employees "*that need training and need classes they were supposed to get*

*while they went through initial training. They simply failed to sign the sign in*

*sheet.... Nothing crazy just need to get this training done ASAP*." (Exhibit 6).

136.   The list included the names of 44 employees who were missing

required training classes. (Exhibit 7). Four of these employees had previously been

the subject of the October 19, 2019 email.

137.   Despite knowing that these 44 employees were unbillable, the

Defendants submitted Training Status Reports, training invoices, and certificates of

course completion to the Government which falsely certified that these employees

had received the required training. Because they did so, the Government paid for

these training courses that never occurred.

138.   Despite knowing that these 44 employees were unbillable, the

Defendants also submitted monthly invoices with muster sheets, certifying that the

Defendants were billable, for the labor of these employees. Because they did so,

the Government paid for the labor of these unbillable employees.

139.   For example, the attachment lists Jeffery Palmer ("Employee

Palmer"), a Unit Support Coordinator assigned to the embassy in Kabul, as not

having completed a class titled: "*Personnel recoveries (structures), Active Shooter*

*PE*." Employee Palmer had been an employee of the Defendants and working in

Afghanistan for more than five years prior to December 2019.

140.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Palmer each and every month.

141.    As another example, the attachment lists Luis Rivera ("Employee Rivera"), a Protective Security Specialist, as not having completed the following classes: "*Deadly Force, PPE, Explosive Counter, Intel Brief, Vehicle Search, Enemy TTP, WAE, SUT, IMT, Land Nav, Cultural Awareness*."  Employee Rivera had been an employee of the Defendants and working in Afghanistan for approximately two years before he resigned in November 2019.

142.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Rivera each and every month.

143.    As another example, the attachment lists Patrick Fisher, a Guard Site Supervisor at the embassy, as not having completed the following classes: "*Use of Force/Force Continuum*."  Employee Fisher has been an employee of the Defendants and working in Afghanistan for approximately five years.

144.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Fisher each and every month.

145.    On March 7, 2020, Lewis Dooley, an Integration and Training Officer for the Defendants, sent an email to Relator with an attachment showing a list of 39 of the Defendants' employees who had not undergone the requisite training. The email explains: "*This training is high priority and needs to be completed by*

*Tuesday 10 March.  This was another schoolhouse issue that needs correcting. These guys are unbillable but per OM they are standing post.  So the sooner we get these guys through training the better*." (Exhibits 8 and 9).

146.   Despite knowing that these 39 employees were unbillable, the Defendants submitted Training Status Reports, training invoices, and certificates of course completion to the Government which falsely certified that these employees had received the required training. Because they did so, the Government paid for these training courses which never occurred.

147.   Despite knowing that these 39 employees were unbillable, the Defendants also submitted monthly invoices with muster sheets, certifying that the Defendants were billable, for the labor of these employees. Because they did so, the Government paid for the labor of these unbillable employees.

148.   As an example, the attachment lists Christopher Bass as not having completed "*IMT*" which stands for Individual Movement Technique.

149.   As another example, the attachment lists Matthew Wilkey as not having completed "*IMT & RET*."  RET stands for Room Entry Technique and is required in order to complete the 40 hours of annual training.

150.   Despite being unbillable, the Defendants inappropriately billed the Government for Employee Bass and Employee Wilkey each and every month.

151.    The statements contained within the certifications and reports discussed above were false, the Defendants knew they were false, and the Defendants made the false statements for the purpose of getting paid by the Government.

152.    For each of the employees discussed above, the Defendants billed the Government for the time and services of the employees, despite knowing that each employee was unbillable.

153.    In each instance of billing, the Defendants were required to certify that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

<u>MATERIALITY</u>

154.    The Defendants' truthful certification that its employees had met the requisite physical fitness and training requirements was a condition of the Government's payment for labor, services, and training.

155.    The central aim of the Contract was for the Defendants to provide competent guards to protect Department of State personnel and assets. Compliance with the physical fitness and training requirements therefore went to the essence of the bargain.

156.    Had the Government known of the Defendants' noncompliance, it would not have paid the invoices in question.

157.    Even if the Government did know of the noncompliance, the fact that the Government paid the invoices in question does not render the Defendants' noncompliance immaterial as there were other reasons for payment. Indeed, the Defendants' employees were defending Department of State personnel and assets in the middle of a warzone. The Government could not simply stop paying altogether or the security of its personnel and assets would be jeopardized.

158.    The Government has also previously clawed back money from the Defendants upon learning of noncompliance or taken other corrective action.

159.    In 2019, for example, the Defendants deployed two guards to Afghanistan who had failed their PEBs at the training center in Perry, Georgia and were therefore unbillable. Upon learning that the Defendants had invoiced the Government for the guards' labor in Afghanistan, the Government required the Defendants to pay the money back.

## COUNT I

### VIOLATION OF THE FALSE CLAIMS ACT: 31 U.S.C. § 3729(a)(1)(A)

160.    Relator re-alleges the allegations contained in Paragraphs 1 through 159 of this Complaint as if fully set forth herein.

161.    The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented, or caused to be presented, to the United States, a false or fraudulent claim for payment or approval.

162.    The Defendants submitted labor and training invoices for payment based upon the materially false representation that their employees had met the qualifications of the Contract, including the requirements that their employees had taken and passed physical fitness tests and training classes.

163.    Specifically, the Defendants submitted monthly labor invoices for Employee Smith, Employee Jenkins, Employee Taylor, Employee Bailey, Employee Dooley, Employee Shields, Employee Jones, and Employee Carter based on the materially false representation that these employees had taken and passed the required physical fitness tests.

164.    The Defendants also submitted training invoices and monthly labor invoices for the employees listed in Exhibit 5, Exhibit 7, and Exhibit 9 attached to this Amended Complaint based on the materially false representation that these employees had taken and passed the required training classes.

165.    The Defendants presented their claims for payment knowing that they were materially false.

166.    The United States, unaware of the falsity of the claims made by the Defendants, and in reliance of the accuracy of these claims, paid for the services of the Defendants' unqualified employees.

167.    Had the United States known that the Defendants were violating the federal laws cited herein and/or that the claims the Defendant caused to be submitted to the United States failed to meet the criteria under the Contract, it would not have paid those claims.

168.    The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

## COUNT II

### VIOLATION OF THE FALSE CLAIMS ACT:
### 31 U.S.C. § 3729(a)(1)(B)

169.    Relator re-alleges the allegations contained in Paragraphs 1 through 168 as if fully set forth herein.

170.    The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim submitted to the United States.

171.    The Defendants made and used false records indicating that their employees had completed and passed required physical fitness tests and training classes to induce the United States to approve and to pay the Defendants' false claims.

172.    Specifically, the Defendants made and used statements in muster sheets, Physical Fitness Qualification Status Reports, WFRs, clean sheets, certifications, and the PEB Tracker which falsely stated and certified that the employees described in Paragraph 163 had taken and passed the required physical fitness tests and that their labor costs were therefore billable.

173.    The Defendants also made and used statements in muster sheets, certificates of course completion, training status reports, and attestations which falsely stated that the employees described in Paragraph 164 had taken and passed the required training classes and that their labor costs and the costs of the training were therefore billable.

174.    These Defendants made, used, and submitted these false statements and records to the Government for the purpose of getting monthly labor invoices and training invoices paid or approved by the Government.

175.    The United States was misled by the actions of the Defendants, and, as a result, paid the Defendants' false claims.

176.    The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, respectfully requests a trial by jury on all issues and that this Court award the following damages and all further relief as this Court deems equitable and just to the following parties and against the Defendants:

To the United States:

(A)    Three times the amount of the actual damages which the United States has sustained as a result of the Defendant's conduct;

(B)    A civil penalty of not less than $11,665, and as much as $23,331, for each false or fraudulent claim, record, or statement the Defendants caused to be presented, made, or used to or with the United States.

(C)    Prejudgment interest; and

(D)    All costs incurred in bringing this action.

To Relators:

(A)    The maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law;

(B)    Reimbursement for reasonable expenses which Relators incurred in connection with this action; and

(C)    An award of reasonable attorneys' fees and costs.

This 3rd day of February, 2022.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson

Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310

Jess B. Johnson
Georgia Bar No.: 322066
jess@patejohnson.com

Page A. Pate
Georgia Bar No.: 565899
page@patejohnson.com

Attorneys for Plaintiff/Relator

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day electronically filed the foregoing First Amended Complaint with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter.

This 3rd day of February, 2022.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson
Jess B. Johnson
Georgia Bar No.: 322066
jess@patejohnson.com

Pate, Johnson & Church, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310

Page A. Pate
Georgia Bar No.: 565899
page@patejohnson.com

Attorneys for Plaintiff/Relator