**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.,* **JUSTIN FAHN,** ) ) ) ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **CIVIL ACTION NO. 5:20-cv-128 (MTT)** |
| **GARDAWORLD FEDERAL SERVICES, LLC, and AEGIS DEFENSE SERVICES, LLC,** ) ) ) ) | |
| **Defendants.** ) | |

## ORDER

Defendants GardaWorld Federal Services LLC ("GardaWorld") and Aegis

Defense Services LLC ("Aegis") move to dismiss Relator Justin Fahn's amended

complaint.  Doc. 49.  The defendants argue that Fahn's claims are foreclosed by the

public disclosure bar and that he fails to adequately plead a claim for relief under the

False Claims Act.  *Id.*  For the following reasons, that motion (Doc. 49) is **DENIED**.

### I. BACKGROUND

Aegis, d/b/a GardaWorld, received contracts from the United States Department

of State to provide security in Afghanistan at various locations, including the United

States Embassy in Kabul.  Doc. 44 ¶ 1.  Relator Justin Fahn was hired by the

defendants in September 2016 to defend the embassy, and Fahn worked there until its

fall to the Taliban in August 2021.  *Id.* ¶ 2.  From 2018 until 2021, Fahn's duties as a

Unit Support Coordinator included ensuring that guards employed by GardaWorld were

sufficiently trained and passed certain physical fitness tests required by the government contract.  *Id.* ¶¶ 3; 18.  These testing and training requirements were necessary for employees to be considered qualified and billable.  *Id.* ¶ 24.  GardaWorld submitted monthly invoices that billed a daily rate for the days worked by each employee.  *Id.* ¶ 35.  Invoices were also submitted for each employee's training courses, as well as certificates of course completion to show that the employees had actually completed the designated courses.  *Id.* ¶ 36.  Each invoice certified that the employee in question complied with the terms of the contract, which including physical fitness testing and training requirements.  *Id.* ¶ 38.  Additionally, the contract required GardaWorld to maintain and, in some cases, submit additional documentation verifying that each employee was appropriately tested for physical fitness and properly trained.  *Id.* ¶¶ 45-47; 123.

Fahn alleges that he discovered during the course of his employment that GardaWorld billed the Government for at least eight employees who failed to take the required physical fitness tests and at least ninety-one employees who failed to successfully complete required training.  *Id.* ¶ 4.  More broadly, Fahn claims that "[s]ince at least March of 2019, the Defendants engaged in a systematic scheme to defraud the United States by falsely certifying that their employees had undergone and passed the mandatory physical fitness testing."  *Id.* ¶ 49.  The scheme Fahn identifies was allegedly carried out by "the highest-ranking employees of the Defendants in Afghanistan," and GardaWorld "benefitted from the scheme by receiving payment from the Government for the labor and services of unqualified employees, redirecting the time it would take to undergo testing to business-related matters, maintaining continuity of the management

personnel, and avoiding the disruption that would be caused by a failed [physical fitness test]."  *Id.* ¶¶ 50-51.

In his position, Fahn had access to GardaWorld's records and communications that detailed the employees' physical fitness testing and training courses.  *Id.* ¶ 24. Fahn claims the purported scheme can be seen through a series of irregularities in the documentation of specific employees' training and physical fitness testing.  *Id.* ¶¶ 56-113, 146-47.  For physical fitness testing requirements, there are typically both "clean sheets" and signed certifications verifying that the employee took and successfully passed the required testing.  *Id.* ¶ 58.  But for the employees who have allegedly falsified physical fitness testing records, the appropriate documentation of their testing is missing.  *Id.* ¶ 57.  Instead, the records for these employees merely show that they underwent and passed testing on certain dates, without identifying a verifying employee, as the record typically would.  *Id.*  As for training courses, Fahn claims various forms of irregular documentation indicate which employees have falsified training records.  *Id.* ¶¶ 127- 153.  For example, Fahn alleges that pre-filled attestations GardaWorld management instructed employees to sign were a cover-up for the fact that these employees never attended training; although GardaWorld management wrote in the email distributing the attestations that the relevant employees had simply forgotten to sign in while attending training, Fahn contends that this communication and the attestations were falsifying a training record.  *Id.* ¶¶ 127-131.  Other forms of irregular documentation described in Fahn's claims include the submission of standard invoices, reports, and certificates on behalf of employees who had not yet completed training.  *Id.* ¶¶ 137-140, 146-147.

Fahn discussed GardaWorld's alleged fraud with an upper-management employee, a Deputy Operations Manager, who told him that "someone needs to turn the training team guys in for falsifying documents" and "everyone knows they're doing it." *Id.* ¶ 54.  Regarding the falsified physical testing documentation, Fahn claims the same management employee told him that "someone needs to report [certain management employees for falsifying] these fake ass [physical fitness tests]."  *Id.* ¶ 55.

Fahn alerted the Government to the alleged fraud, then filed his original complaint under seal in March 2020.  Doc. 3.  The Government investigated the fraud for 17 months before declining to intervene on September 1, 2021, roughly two weeks after the fall of the Kabul embassy and the United States' withdrawal from Afghanistan. Doc. 15.  Fahn filed an amended complaint on February 3, 2022, and GardaWorld filed its motion to dismiss on February 17, 2022.  Docs. 45; 49.

## II. STANDARD

The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011) (internal quotation marks and citations omitted).  But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Wiersum v. U.S. Bank, N.A.,* 785 F.3d 483, 485 (11th Cir. 2015) (internal quotation marks and citation omitted).  The complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts. *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018) (citations omitted).

The False Claims Act ("FCA") "is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014).  "As an enforcement mechanism, the FCA includes a qui tam provision under which private individuals, known as relators, can sue 'in the name of the [United States] Government' to recover money obtained in violation of § 3729." *United States ex rel. Bibby v. Mortg. Invs. Corp.,* 987 F.3d 1340, 1343 (11th Cir. 2021), *cert. denied sub nom. Mortg. Invs. Corp. v. United States ex rel. Bibby*, 141 S. Ct. 2632 (2021).  "In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan Uni.*, 780 F.3d 1039, 1051 (11th Cir. 2015).

Rule 9(b) requires that the relator "must state with particularity the circumstances constituting fraud" but may generally allege scienter.  *Id*.  To meet Rule 9(b)'s particularity requirements, a relator must plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them."  *U.S. ex rel. Clausen v. Lab'y Corp. of America, Inc.*, 290 F.3d 1301, 13010 (11th Cir. 2002).  (cleaned up).  "Liability under the False Claims Act arises from the submission of a fraudulent claim to the [G]overnment, not the disregard of government regulations or failure to maintain proper internal policies."  *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1012 (11th Cir. 2005) (citation omitted).  "Indeed, the 'central question' regarding whether a relator's allegations state a claim under [§ 3729(a)(1)] is, did the defendant present (or caused to be presented) to the [G]overnment a false or fraudulent claim for payment?"  *Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009)).

### III. DISCUSSION

As explained below, GardaWorld has not shown as a matter of law that Fahn's specific allegations of fraud are either barred by the public disclosure bar or insufficient to state a claim under the standards for FCA actions.

### A. GardaWorld and Aegis's Attached Exhibits Do Not Foreclose Fahn's Claims Under the Public Disclosure Bar

GardaWorld argues that the public disclosure bar forecloses Fahn's claims.  Doc. 49-1 at 18.  In support of this contention, GardaWorld attached to the motion to dismiss sixteen exhibits purported to establish public disclosure of Fahn's claims.  *See* Docs.

49-2 ("Index of Exhibits").  But most of these filings are not sufficiently connected to the allegations to justify their reference on a motion to dismiss.  And the few documents that can be considered at this stage fail to meet the standards for the public disclosure bar.

Although "a court generally may not look beyond the pleadings" in a motion to dismiss under Rule 12(b)(6), "a district court may consider an extrinsic document even on Rule 12(b)(6) review if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010)).  "In addition, a district court may consider judicially noticed documents."  *Id.* (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)).  Here, GardaWorld argues that its exhibits are "matters of which a court may take judicial notice" under Federal Rule of Evidence 201.  Doc. 49-1 at 8 n.1 (quoting *Quinette v. Reed*, 805 F. App'x 696, 700 (11th Cir. 2000)).  "[Rule] 201(b) provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Bryant*, 187 F.3d at 1278.

The public disclosure bar requires the dismissal of an FCA action "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed."  31 U.S.C. § 3730(e)(4)(A).  The application of the public disclosure bar is a three-part inquiry: (1) whether the relator's claims or allegations have been publicly disclosed; (2) whether the allegations are "substantially the same" as the allegations or transactions in the public disclosures; and (3) whether the relator is an original source of the information.  *Osheroff*, 776 F.3d at 812.  The FCA statute provides three sources of

public disclosures which may bar a relator's claims: (1) "[f]ederal criminal, civil, or administrative hearing[s] in which the Government or its agent is a party;" (2) "congressional, Government Accountability Office, or other Federal report[s], hearing[s], audit[s], or investigation[s];" and (3) "news media." 31 U.S.C. § 3730 (e)(4)(A)(i)-(iii). Such public disclosures sometimes fall under the exceptions that allow courts to reference materials beyond the pleadings on a motion to dismiss. *See Osheroff*, 776 F.3d at 805, 811 n.4.

GardaWorld's exhibits include: (1) the contract between the defendants and the Government (Doc. 49-3); (2) various governmental audits, reports, reviews, and memorandum published between 2005 and 2018 (Docs. 49-4; 49-5; 49-6; 49-7; 49-8; 49-9; 49-16); (3) congressional hearings from 2009 and 2015 (Docs. 49-13; 49-15); (4) an article about alleged embassy security risks from 2013 (Doc. 49-14); (5) task orders (Docs. 49-10; 49-11); (6) a comparison between the original complaint and the first amended complaint (Doc. 49-12); and (7) employee reviews posted on GlassDoor by purported employees of defendants (Docs. 49-17, 49-18). As an initial matter, the bulk of the filings were published before the dates at issue in this case. The relator alleges that fraud occurred between 2018-2021. Doc. 44 ¶ 7. The exhibits published between 2005 and 2018 concern security issues which occurred (or allegedly occurred) before Fahn began working for GardaWorld and before any of the alleged scheme to defraud the Government took place.[1] Docs. 49-4; 49-5; 49-6; 49-7; 49-8; 49-9; 49-13; 49-14; 49-15; 49-16. While these documents' trustworthiness is not subject to reasonable dispute, they do not concern the relevant timeframe for the relator's specific allegations.

---

[1] The audit published in 2018 also has no overlap with the dates in question, as the audit reviewed performance during 2017.

More substantively, although many of these exhibits touch on issues of under-trained and unqualified security personnel—and even specifically under-trained and unqualified GardaWorld employees—they do not address the allegations at issue here. Some of the cited materials relate to billing issues with a different private security contractor, which held a previous government contract.  Docs. 49-1 at 10-11; 49-6; 49-9.  Others relate to failures to properly train and test, or insufficiently trained and tested employees, but do not indicate that these failures were intentionally covered up with fraudulent record-keeping.  Docs. 49-1 at 13-14 49-9; 49-14.  Those exhibits that do address record-keeping issues concern failures to properly maintain files and records, but again, do not contend that such failures were part of a falsification scheme.  Docs. 49-1 at 13-14; 49-4; 49-5; 49-8; 49-15; 49-16.  As stated in the complaint, "the [G]overnment conducted routine audits of the Defendants' records and billing to ensure compliance with the Contract. The Government, however, was unaware that the specific transactions outlined [in the complaint] were actually occurring in 2018, 2019, and 2020."[2]  Doc. 44 ¶ 25.

---

[2] The complaint addresses the relevancy of the 2018 audit cited by GardaWorld for the purposes of the public disclosure bar:

> [T]he 2018 OIG "*Audit of the Bureau of Diplomatic Security's Invoice Review Process for Worldwide Protective Services Contracts*" [Doc. 49-5] does not even mention physical fitness testing requirements… The 2018 OIG audit also found the Defendants' training and training records to be in compliance based on its audit, explaining: "*OIG … visited the training facility in Perry, Georgia … OIG verified that the training information was recorded and documented … OIG reviewed training status reports and supporting documents, including … individual course training certificates, and attendance sheets.  OIG also reviewed 28 recruit training records at … the Perry, Ga … training facilities and verified that training results were documented.*"

Doc. 44 ¶ 25 (quoting Doc. 49-5).  Although this audit could properly be considered on a motion to dismiss because it is referenced in the complaint, its substance—as indicated in the preceding quote and discussed in the body of this section—still fails to meet the standard of the public disclosure bar.

GardaWorld characterizes Fahn's claims as "alleg[ations] that GardaWorld billed the Government for personnel working on the Afghanistan Task Orders who were not billable under the Contract because they did not complete all required [physical fitness testing] and training." Doc. 49-1 at 21. According to GardaWorld, Fahn "reaches this conclusion based on his personal perception that certain of GardaWorld's [physical fitness testing] and training records were either missing or deficient." *Id.* If this were the case, the attached exhibits might be more helpful to GardaWorld. But Fahn's allegations go beyond missing and deficient records—Fahn contends that the record-keeping issues are an indication of a larger scheme to defraud the Government. He claims that employees intentionally created and submitted fraudulent paperwork to make unqualified employees appear billable. Doc. 44 ¶¶ 49-53. Further, Fahn claims this fraud was so pervasive that it was well-known throughout the company and discussed by upper-level employees. *Id*. These allegations go beyond publicly disclosed record-keeping issues GardaWorld cites.

Only two of GardaWorld's submissions pertain to the fraud central to Fahn's claims. The GlassDoor employee reviews address substantially similar allegations, but these reviews from anonymous individuals claiming to be former GardaWorld employees are not a "source whose accuracy cannot be questioned." *Bryant*, 187 F.3d at 1278. The Court is not prepared to consider anonymous online postings as a trustworthy publication in the context of a 12(b)(6) motion. *See Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1274 (11th Cir. 2014) ("The document [at issue] could not be judicially noticed by the district court because the facts within it … could not be 'accurately and readily determined from sources whose accuracy cannot reasonably be

questioned.'") (quoting Fed. R. Evid. 201(b)); *Nassar v. Nassar*, 2017 WL 26859, at *5 (M.D. Fla. Jan. 3, 2017) ("In general, non-governmental websites are not proper subjects of judicial notice."); *Gaza v. LTD Fin. Servs., L.P.*, 2015 WL 5009741 (M.D. Fla. Aug. 24, 2015) ("Courts have long recognized that private, non-governmental websites are not the proper subject of judicial notice.")[3]

Finally, GardaWorld submits that Fahn "erroneously contends that the public disclosure bar applies only where the allegations of a complaint precisely match those in public disclosures." Doc. 54 at 8. But the question GardaWorld presents as the appropriate inquiry, "whether the information conveyed to the [G]overnment could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing," supports a finding that the public disclosure bar does not foreclose Fahn's claims. *Id.* at 8-9 (citing *Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). Nothing in the exhibits cited by GardaWorld (with the exception of the GlassDoor reviews) would have alerted the Government that apparently ordinary documentation irregularities were part of a larger fraud scheme perpetrated by GardaWorld employees. Even if the Government had become suspicious and conducted an audit to review GardaWorld's record-keeping based on the public information that GardaWorld cites, the investigation would likely reveal only the cursory documentation issues—not the fraud central to Fahn's claims.

---

[3] GardaWorld argues that Glassdoor reviews are "expressly geared towards disseminating information— 'insights into the employee experience'—to the public and providing a place for the public to 'research[]' companies.'" Doc. 54 at 7 (brackets in original) (citation omitted). While that may be true, these aspirations do not make anonymous reviews a trustworthy source with accuracy beyond reasonable questioning.

Accordingly, the exhibits substantively addressed above are not properly considered on a motion to dismiss.  GardaWorld's contract and the task orders that governed GardaWorld's work are both referenced in the relator's complaint and therefore may be considered for the purposes of this motion.  Docs. 49-3; 49-10; 49-11.  However, these documents do not support GardaWorld's public disclosure bar argument because nothing cited by GardaWorld establishes that Fahn's allegations have been publicly disclosed.

### B. Relator's Claims Are Sufficient to Survive the Motion to Dismiss

Fahn raises two claims under the FCA: (1) an implied false certification claim under 31 U.S.C. § 3729(a)(1)(A) alleging that GardaWorld "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval," and (2) a make-or-use claim under 31 U.S.C. § 3729 (a)(1)(B), alleging that GardaWorld "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim."  Doc. 44 ¶¶ 160-68, 169-76.  GardaWorld argues that Fahn has not stated a claim for relief under the FCA because he fails to allege that (1) GardaWorld made a false representation, (2) GardaWorld acted with scienter, and (3) the misrepresentation was material.  Doc. 49-1 at 25, 30, 31.  GardaWorld's arguments do show weaknesses in Fahn's claims.  But, for the following reasons, GardaWorld has not shown that Fahn's claims must be dismissed as a matter of law.

As an initial matter, "more toleran[ce]" is warranted "toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct."  *United States ex rel.*

*Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012).  Here, Fahn

deserves this additional "tolerance" because of his prior position and work experience

with GardaWorld.  A relator must have "some indicia of reliability … to support the

allegation of *an actual false claim* for payment being made to the Government."

*Clausen*, 290 F.3d at 1311.  This can be established by "showing that [the relator]

personally was in a position to know that actual false claims were submitted to the

[G]overnment and [that he] had a factual basis for his alleged personal knowledge."

*United States ex rel. Mastej v. Health Mgmts. Assocs., Inc.*, 591 F. App'x 693, 707 (11th

Cir. 2014); *see also United States v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349,

1352 (11th Cir. 2005); *Hill v. Morehouse Med. Assocs.*, 82 F. App'x 213 (11th Cir.

2003).[4]  The Eleventh Circuit has explained the value of "firsthand information" from

relators who have personal access to the practices used to perpetrate alleged fraud—

unlike relators "who [are] 'corporate outsider[s],'" relators who work where they allege

fraudulent schemes occur can be considered more "factually credible."  *Corsello*, 428

F.3d at 1013 (discussing *Hill*, 82 F. App'x 213 (11th Cir. 2003)).

---

[4] GardaWorld takes issue with Fahn's citation to these cases and argues the relators in *Mastej* and *Hill* were more closely connected to the fraud at issue.  In *Mastej*, the relator was "'in the very meetings' where the fraud was discussed and planned," and in *Hill*, the relator "'observed' first-hand specific people that committed the fraud."  Doc. 54 at 13 (citations omitted).  GardaWorld argues that Fahn cannot make similar claims, as he "merely surmises" that GardaWorld committed fraud and "bases his information [regarding training] on rumors from another employee."  *Id.*  But Fahn is not a "corporate outsider" to GardaWorld; he was an employee responsible for ensuring compliance with contractual requirements, such as testing and training.  *See Corsello*, 429 F.3d at 1013; Doc. 44 ¶ 3.  And the "rumors" that GardaWorld references are allegations that an employee in the "second highest ranking position" told him that specific employees were committing the alleged fraud.  Docs. 44 ¶¶ 54-55; 53-1 at 24.  While it is true that the relators in *Mastej* and *Hill* may have been closer to the fraud at issue, it is inaccurate to label Fahn's allegations mere "rumor" or "conjecture."  Doc. 54 at 13 (citing *Mastej*, 591 Fed. App'x at 1347).  Fahn's claims still warrant the tolerant standard afforded to relators with "some indicia of reliability."  *Clausen*, 290 F.3d at 1311.

*1. Fahn Has Adequately Pled False Representation*

GardaWorld argues that Fahn has failed to allege that GardaWorld made a false representation because Fahn fails to plead (a) falsity or (b) the making or use of false documents.  Doc. 49-1 at 25, 27.  But GardaWorld misstates the scope of Fahn's claims and fails to address the bulk of his arguments.  Fahn's complaint does allege a false representation sufficient to sustain his claims on motion to dismiss.

**Falsity:** The FCA does not define the term "false."  "Case law, however, has identified various types of false claims and statements."  *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021) (collecting cases).  Two common examples of falsity include claims that "misrepresen[t] the goods or services provided" or identify circumstances in which "a person or entity fails to comply with statutory, regulatory, or contractual requirements but certifies that it has complied with them."  *Id.* (citations omitted).

In arguing that Fahn has not properly alleged falsity, GardaWorld claims that Fahn's allegations are premised on a fundamental misunderstanding of contractual requirements.  Doc. 49-1 at 25-26.  To support this argument, GardaWorld contends that the documentation of physical fitness testing and training that Fahn identifies as being irregular or missing is not required by the contract.  Specifically, GardaWorld claims that "[Fahn] fails to identify a single contractual provision that requires clean sheets, certifications, or [management] signatures on clean sheets, despite alleging GardaWorld was 'required to do so by the Contract.'"  *Id.* at 25 (citation omitted).  According to GardaWorld, this contractual misunderstanding mandates the dismissal of Fahn's claims.  *Id.* at 26 (citing *U.S. ex rel. Watt v. VirtuOx, Inc.,* 2021 WL 3883944 at *7

(S.D. Fla. Aug. 31, 2021)) ("finding no falsity and dismissing FCA claims where relator 'fail[ed] to identify any statute, regulation, rule, standard, or even guideline that [defendant] has actually violated'").  But GardaWorld misstates Fahn's claims.

The core of Fahn's complaint is that the missing "clean sheets," certifications, and GTM signatures are indications of a larger scheme—these missing or irregular documentations correspond with GardaWorld's intentional efforts to cover up employees' lack of appropriate testing and training, which made these employees unbillable per the terms of the contract.  *See* Doc. 44 ¶¶ 24, 60, 125.  Fahn's support for his allegations goes beyond the irregular documentation and includes claims of personal knowledge, as well as statements from management employees that specifically address the alleged fraud at issue.  *Id.* ¶¶ 53-55.

Moreover, Fahn does identify two deliverables required by the contract that were affected by the alleged scheme: weekly field reports and quarterly physical fitness qualification status reports.  *Id.* ¶¶ 42-43, 47; 53-1 at 20.  According to Fahn's complaint, weekly field reports were missing for the eight employees identified as lacking appropriate physical fitness testing.  Doc. 44 ¶¶ 75-113.  GardaWorld submits that this contention is invalid because the contract provided an option to forgo weekly field reports through verbal notice.  Doc. 49-1 at 26.  GardaWorld argues that Fahn's contentions amount to a "conclu[sion] that falsity exists because some persons who completed [physical fitness testing] were not listed on a [weekly field report]."  *Id.*  But Fahn specifically argues that those documents are missing because the testing was never completed.[5]  Doc. 44 ¶¶ 56-113.  And Fahn's allegations are not limited to

---

[5] GardaWorld claims that Fahn improperly raises for the first time in his response to the motion to dismiss the argument that "there were no [weekly field reports] because the testing never took place."  Doc. 54 at

documentation errors that may be explained by contractual provisions—rather, the missing and irregular documents for physical fitness testing and training classes "are important because they help to show that the statements contained in the invoices, muster sheets, and quarterly status reports are in fact false."  Doc. 53-1 at 21.  The documents are illustrations of the larger scheme Fahn alleges.  Accordingly, Fahn's allegations are not "based on 'nothing more than his own interpretation' of the contract."  Doc. 49-1 at 26 (citation omitted).

As a prime example of allegations which extend beyond an interpretation of the contract, Fahn contends that he was told by GardaWorld management that other management employees were falsifying physical fitness training records.  Doc. 44 ¶¶ 54-55.  Fahn also claims that this information was common knowledge among employees, and because of his work experience, he was able to confirm that this fraud was being perpetrated by reviewing the documents and communications he cites.  Doc. 53-1 at 24.

The fraudulent scheme alleged by Fahn meets the standards for falsity, as Fahn claims—with the support of his personal knowledge and conversations with an upper-management employee—that GardaWorld actively falsified documentation to make it

---

12. Not so.  *See* Doc. 44 ¶ 58 ("The information in the PEB Tracker for Employee Smith was [input] by the Defendants in an attempt to conceal the fact that Employee Smith *never took and passed a PEB* on March 23, 2019."); *see also id.* ¶¶ 60, 64, 69, 73.  To the extent that GardaWorld means that Fahn contests for the first time GardaWorld's specific argument that there was not documentation for these employees because GardaWorld utilized the verbal notice provision in the contract, this argument does not attempt to "supplement the allegations of h[is] Amended Complaint."  Doc. 54 at 12 (citation omitted).  Fahn clearly claimed that the lack of documentation was a result of the employees not receiving physical fitness testing *throughout his complaint.*  Rebutting an alternative explanation for the missing documents in response to a motion to dismiss is not an attempt to amend or add to the complaint.  To the extent GardaWorld means that Fahn never raised such an argument regarding a missing weekly field report specifically, that is also untrue.  Doc. 44 ¶¶ 84 ("There is a clean sheet and a certification for each [physical fitness test], but no [weekly field report]" for certain employees), 86 (the same employees "never took their required [physical fitness test]").

appear as though employees were meeting contractual requirements in order to improperly bill the Government.  *See Yates*, 21 F.4th at 1299.

**Making or Using of False Documents:** GardaWorld argues that Fahn's make-or-use claim in Count II of the amended complaint "fails to plead with particularity that GardaWorld created or used a 'false record or statement.'"  Doc. 49-1 at 27 (citing 31 U.S.C. § 3729(a)(1)(B)).  This argument also relies on the premise that Fahn "simply assumes" that the physical fitness tests and training classes were not taken because of the documentation issues previously addressed.  Doc. 49-1 at 27.  According to GardaWorld, Fahn "pleads no facts with particularity to support his allegations of the making or using of false documents."  *Id.* at 29.  But Fahn pleads several facts with particularity that support his contention that GardaWorld made or used false documents, including conversations with an upper-management employee who said that specific GardaWorld management employees were falsifying documents and detailed allegations of specific employees whose physical fitness testing and training were allegedly falsified.  Doc. 43 ¶¶ 54-55, 56-123, 127-153.

GardaWorld also argues that "even if [Fahn] was correct that a few underlying documents were missing or did not follow standard procedure, such allegations of poor record keeping do not amount to an FCA violation."  Doc. 49-1 at 29 (citations omitted). But again, the documentation claims are alleged to be indications of a larger scheme, buttressed by Fahn's personal knowledge and discussions with GardaWorld management.  The claims are not allegations of poor record-keeping.  And Fahn's allegations of falsified documents and improper billing sufficiently plead that GardaWorld made or used a false record or statement.

Accordingly, Fahn has adequately pled a false representation.

### 2.   *Fahn Has Adequately Pled Scienter*

"With regard to scienter, a relator must show that the defendant acted 'knowingly,' which the FCA defines as either 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard.'"   *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (citation omittited).   Although relators "must state with particularity the circumstances constituting fraud," they may generally allege scienter. *Urquilla-Diaz,* 780 F.3d at 1051; *Matheny*, 671 F.3d at 1224 (11th Cir. 2012). GardaWorld contends that Fahn cannot plausibly allege that GardaWorld acted with scienter.   To this end, GardaWorld points towards the emails Fahn cites in his complaint as evidence that GardaWorld was making every attempt to comport with the contract. Doc. 49-1 at 30.

First, the "knowingly" requirement for scienter can be established by alleging that a defendant "willfully and knowingly devised a scheme to create false records" and that the defendant certified that it was in compliance with its contract despite being aware of the scheme.   *Matheny*, 671 F.3d at 1224 (emphasis removed).   According to this standard, the scheme Fahn describes in his amended complaint adequately alleges that GardaWorld acted knowingly in perpetrating the alleged fraud.   *See* Doc. 44 ¶¶ 49, 151-152, 161, 165, 168, 170, 176.   The complaint claims that the employees falsifying documents were among the highest-ranking employees of GardaWorld and that other employees, including a member of upper-management, were aware of the scheme.   *Id*. ¶¶ 49-55, 125.

GardaWorld argues that *Matheny* reaches its limit here because of the Supreme Court's holding in *Iqbal* that "factual pleadings merely consistent with the plaintiff's legal conclusions are insufficient to establish those conclusions when those pleadings are also consistent with an 'obvious alternative explanation.'"  Doc. 54 at 16 (quoting *Iqbal*, 556 U.S. at 680-82).  The "obvious alternative explanation" offered by the motion to dismiss is that GardaWorld was doing its best to abide by the requirements of the contract according to the emails that Fahn cites.  *Id.* at 17.  The emails will be addressed in detail below, but as an initial matter, Fahn's allegations are sufficient to withstand the screening measures imposed by both *Iqbal* and *Twombly,* which also addresses "obvious alternative explanations*."*

In both cases, it was the implausible, conclusory nature of the complaint's claims that removed the presumption of truth and allowed for dismissal.  *See Twombly,* 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."); *Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.")  While determining whether a complaint stated a plausible claim for relief under the FCA, the Eleventh Circuit explained that *Twombly* suggests "that courts considering motions to dismiss adopt a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).  Although this approach provides that "courts

may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer," this inference is inappropriate here.  *Id.*  Fahn has stated a facially plausible claim for relief under the FCA with well-plead factual allegations.  It may be that there are alternative explanations that can overcome Fahn's claims on the merits, but Fahn has sufficiently pled his claims to survive the motion to dismiss.

Second, the emails that are addressed in the complaint do not, as GardaWorld argues, weigh against a finding that Fahn properly pled scienter.  There are three emails at issue, which provide in relevant part:

> We have been auditing our training files and in the files we discovered that your signature was missing from relevant training classes when you attended your Training Course.  We are asking if you can fill out the form and return it to us.

Doc. 45-4 (sent with pre-filled attestations).

> Attached is a list of personnel that need training and need classes they were supposed to get while they went through initial training.  They simply failed to sign the sign in sheet.  For everyone's SA this is just corporate being proactive after they did a check and found these names.  Nothing crazy just need to get this training done ASAP.  We will knock these guys out as quick as we can and they need to come to training.

Doc. 45-6.

> Attached is a list of guys we need for training.  This training is high priority and needs to be completed by Tuesday 10 March.  This was another schoolhouse issue that needs correcting.  These guys are unbillable but per OM they are standing post.  So the sooner we get these guys through training the better.

Doc. 45-8.  While GardaWorld argues that these emails suggest that GardaWorld was doing its utmost to remain in compliance with the contractual requirement, Fahn claims

that these emails were another attempt to obfuscate the lack of proper testing and training.  Docs. 53-1 at 30; 54 at 16.  Fahn's most compelling argument is that Doc. 45-8 indicates that "the training never occurred: '*[they] need classes they were supposed to get while they went through initial training*.'"  Doc. 53-1 at 30 (citing Doc. 45-8).  But at this stage in the case, it is not possible to determine whether these emails constitute misrepresentations or genuine attempts to ensure that testing and training complied with the contract.  However, the unknown reality of these emails does not detract from the scienter that Fahn properly pleads in his allegations that GardaWorld knowingly falsified documents to improperly bill the Government.  *See* Doc. 43 ¶¶ 49, 151-152, 161, 165, 168, 170, 176.

### 3.  Fahn Has Adequately Pled Materiality

FCA claims can only be supported by material misrepresentations.  *Universal Health Servs., Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016).  The FCA "defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *Id*. (quoting 31 U.S.C. § 3729(b)(4)).  The materiality requirement is "rigorous" and "demanding."  *Id*.  "And while several factors can be relevant to the analysis, 'materiality cannot rest on a single fact or occurrence as always determinative.'"  *Bibby,* 987 F.3d  at 1347 (citing *Escobar,* 579 U.S. at 191) (internal citation omitted).  Although "no single factor is dispositive, some factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the [G]overnment's payment, (2) whether the misrepresentations went to the essence of the bargain with the [G]overnment, and (3) to the extent the

[G]overnment had actual knowledge of the misrepresentations, the effect on the [G]overnment's behavior." *Id.*

As to the first factor addressed in *Bibby*, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" of materiality. *Id.* (citing *Escobar*, 579 U.S. at 194). Here, GardaWorld's contract expressly states that employees must meet physical fitness testing and training requirements in order to be considered qualified and capable of working under the task order. Doc. 49-3 at 65-66, 86. This factor weighs in favor of materiality.

Second, GardaWorld's contract contains language which implies the qualifications of employees and their ability to work under the task order go "to the essence of the bargain with the [G]overnment." *Bibby*, 987 F.3d at 1347-48 (looking to a Veterans' Affairs pamphlet's summary of the program at issue to determine the "essence of the bargain"). The "Overview" portion of the contract provides:

> The U.S. Department of State (DOS), Bureau of Diplomatic Security (DS), is charged with ensuring that global security to the DOS and foreign affairs agencies is adequate and appropriate for protection of personnel, classified information, and national security-related activities… The objective of this Worldwide Protective Services (WPS) contract is to secure best-in-class and on-time delivery of those Contractor-provided services and resources DS/OPO/WPS deems necessary to meet DS' global security and protective responsibilities.

Doc. 49-3 at 3. As in *Bibby,* this document establishes a core goal of the contract with the Government—to provide "adequate" and "appropriate" security and "best-in-class" delivery of contractor-provided services. This indicates that the qualifications of employees would indeed go "to the essence of the bargain with the [G]overnment." *Bibby*, 987 F.3d at 1347. Thus, the second factor also weighs in favor of materiality.

Third, the Government's actual knowledge of the misrepresentations and its corresponding behavior in this case is unclear.  "*Escobar* discusses three ways the [G]overnment might behave upon learning of noncompliance and [instructs] how that behavior factors into the materiality analysis." *Bibby*, 987 F.3d at 1348.  As explained in *Escobar*:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Escobar*, 579 U.S. at 194-95.  But here, the timeline of events complicates the matter of the Government's payment.  Because GardaWorld was no longer providing services when the Government ended its investigation and declined to intervene, it cannot be said that the Government "pa[id] a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.* at 195.  And despite GardaWorld's contentions, as discussed above, the Court does not find that there has been a showing that the Government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated." *Id.*  As Fahn argues in his response to the motion to dismiss, "[a]t this stage, it is still unknown what actions [the Government] took in response to Relator Fahn's complaint."  Doc. 53-1 at 34.  In light of these circumstances, this factor is not dispositive of materiality.  *See Bibby,* 987 F.3d at 1350 ("the significance of continued payment may vary depending on the circumstances").

GardaWorld cites an additional factor it contends weighs against materiality: a remedial process under the contract.  Doc. 49-1 at 34.  GardaWorld claims that a "'carefully crafted remedial process' under the Contract negates any finding of materiality."  Doc. 49-1 at 34 (citing *U.S. ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1221 (10th Cir. 2008)).  But the case GardaWorld cites deals with allegations that a health center "submitted false claims to the [G]overnment because it was not in *total* compliance with [Medicare] laws and regulations"—not allegations of a deliberately fraudulent scheme. [6]  *Conner*, 543 F.3d at 1221 (emphasis added).  In short, *Connor* addressed whether standard compliance issues with Medicare laws and regulations rose to the level of an FCA violation.  There, the inclusion of remediation as a contractual solution for compliance problems was highly relevant to materiality.  *See id.* (Because "the [G]overnment has established a detailed administrative mechanism for managing Medicare participation, we are compelled to conclude that although the [G]overnment considers substantial compliance a condition of ongoing Medicare *participation,* it does not require perfect compliance as an absolute condition to receiving Medicare *payments* for services rendered.").

Unlike in *Conner*, Fahn's alleged fraud is not the type of contractual issue that can be clarified by a "detailed administrative mechanism."  *Id.*  Neither substantial nor perfect compliance is at issue here—rather, the question is whether an alleged fraudulent scheme involving intentionally falsified documents would have influenced the Government's payment decisions.  The existence of a remediation plan does not help to

---

[6] Notably, this cited case is both out of circuit and published before *Escobar*, which significantly clarified findings of materiality under the FCA.  579 U.S. at 176.

answer this materiality inquiry, and accordingly, this factor does not weigh against materiality.

Thus, the balance of the addressed factors supports the finding that Fahn has pled materiality sufficient to survive dismissal.  But GardaWorld raises additional arguments against materiality.  GardaWorld contends that Fahn has not "plausibly allege[d] that any of GardaWorld's challenged conduct was material to the Government's payment decisions."  Doc. 49-1 at 32.  To this end, GardaWorld argues that Fahn "fails to identify any certifications that GardaWorld submitted to [the Government]" and "fails to identify a single contract provision that makes payment contingent on truthful certifications."  *Id.*  This is not accurate.

First, Fahn alleges in his complaint that GardaWorld submitted invoices and certificates of course completion for training courses taken by each employee.  Doc. 44 ¶¶ 36, 38.  Further, Fahn claims that GardaWorld submitted invoices and falsified certificates of completion for some employees who were unqualified according to contractual provisions.  *Id.* ¶¶ 56-113, 125-153.  The complaint also alleges that each invoice submitted for unqualified employees certified that the employee was billable and met the terms of the contract, including physical fitness testing and training requirements.  *Id.* ¶ 38.  This allegation is supported by the terms of the contract, which state that employees who have not completed the required training were not permitted to work under the task order and that employees who fail to meet physical fitness testing standards are considered unqualified.  Doc. 49-3 at 65-66, 86.

Second, materiality can be found regardless of whether a contractual provision specifically required certifications to be truthful—and the contention that certifications do

not have an expectation of truthfulness without an express contractual provision

stretches the limits of reasonable argument.  Certain aspects of contractual agreements

can be inferred even if they are not express conditions.  As quoted in Fahn's response

to the motion to dismiss:

> A defendant can have "actual knowledge" that a condition is material without
> the Government expressly calling it a condition of payment.  If the
> Government failed to specify that guns it orders must actually shoot, but the
> defendant knows that the Government routinely rescinds contracts if the
> guns do not shoot, the defendant has "actual knowledge."   Likewise,
> because a reasonable person would realize the imperative of a functioning
> firearm, a defendant's failure to appreciate the materiality of that condition
> would amount to "deliberate ignorance" or "reckless disregard" of the "truth
> or falsity of the information" even if the Government did not spell this out.

Doc. 53-1 at 32 (quoting *Escobar*, 579 U.S. at 191).  Accordingly, the lack of an express

provision requiring truthful certifications as a condition for payment does not overcome

the factors that weigh in the favor of materiality.

GardaWorld also argues that Fahn's claims are not material to the contract

because of a contractual provision that allows certain percentages of GardaWorld's

workforce to be unqualified at any given time.  Doc. 49-1 at 33.  This provision allowed

GardaWorld to be considered to meet contractual requirements as long as 85-95% of

employees met the appropriate qualifications.  *Id*.  GardaWorld contends that because

the numbers of employees implicated in Fahn's claims at any given time fell within the

acceptable ranges, that Fahn's claims would not have been material to the

Government's decision to pay the contract.  However, GardaWorld's argument again

overlooks the primary aspect of Fahn's allegations—that GardaWorld falsified

documents to cover up the fact that employees were unqualified.  A contractual

provision allowing a certain percentage of employees to be openly unqualified does not

allow for falsification of records with impunity so long as the number of falsely qualified employees still falls within that certain percentage range.

Accordingly, the majority of the considered factors weigh in favor of materiality, and none of the additional arguments offered by GardaWorld overcome this finding.

### C. Although Fahn's Claims Survive the Motion to Dismiss, His Allegations Are Thin

Despite finding that Fahn's claims survive the motion to dismiss, the Court acknowledges that the claims appear weak in several areas.  First, the sheer scope of the GardaWorld workforce in comparison with the small number of employees identified by the complaint casts doubt on whether Fahn's claims can ultimately prevail.  *See* Doc. 49-1 at 7 ("In fulfilling its contract, GardaWorld delivered ***hundreds-of-thousands of hours of training*** and administered ***tens-of-thousands of fitness evaluations***.  Yet Relator's allegations turn on … ***91 GardaWorld employees who allegedly failed to sign in for collectively a few-hundred hours of training*** and … ***8 semi-annual fitness tests***.") (emphasis in original).  Second, Fahn's allegations related to his conversations with other employees about the alleged fraud are crucial but, necessarily at this point, untested.  How they will fare remains to be seen.  Finally, the allegations of allegedly falsified documents, the most developed areas of the complaint, can only hold so much weight.  Most of these documents are not contractually required and prove precious little on their own.  Although the Court finds that the claims in the amended complaint are sufficient to withstand the standards for FCA pleadings on a motion to dismiss, the shape and state of this case may be significantly altered by discovery as simple as a quickly scheduled deposition of Fahn.

**IV. DISCUSSION**

For the reasons discussed above, GardaWorld's motion to dismiss (Doc. 49) is

**DENIED.**

**SO ORDERED**, this 8th day of July, 2022.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT