# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*: | | |
| JUSTIN FAHN, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civil Action |
| | : | File No. 5:20-CV-00128-MTT |
| | : | |
| v. | : | |
| | : | |
| GARDAWORLD FEDERAL | : | JURY TRIAL DEMANDED |
| SERVICES, LLC, and AEGIS DEFENSE | : | |
| SERVICES, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>SECOND AMENDED COMPLAINT</u>

Pursuant to Rules 15(a)(2), 15(d), and 16(b)(4) of the Federal Rules of Civil

Procedure, Plaintiff Justin Fahn ("Relator Fahn") hereby amends his First

Amended Complaint, Doc. 44, and brings this action on behalf of the United States

of America under the False Claims Act, 31 U.S.C. § 3729 *et seq*., to recover

damages and civil monetary penalties arising from Defendant GardaWorld Federal

Services, LLC ("GardaWorld") and Defendant Aegis Defense Services, LLC

("Aegis," and, collectively with GardaWorld, the "Defendants" ) falsely certifying

to the United States that their employees – who protected the United States

Embassy and other diplomatic facilities in Kabul, Afghanistan – satisfied the requisite physical fitness and training requirements.

## SUMMARY OF THE FALSE CLAIMS

1.      Since 2010, Defendant Aegis has received U.S. Department of State contracts under the Worldwide Protective Services Contract (known as WPS I and WPS II) to provide security in Afghanistan. Defendant Aegis, which is owned by Defendant GardaWorld, was subsequently awarded a contract ("the Contract") by the U.S. Department of State to provide security at the U.S. Embassy and other diplomatic facilities in Kabul, Afghanistan.  Upon information and belief, the Defendants provided these services under WPS I prior to 2018 and under WPS II beginning on January 1, 2018.

2.      The Defendants hired Relator Fahn, a 20-year veteran of the U.S. Army, in September 2016 and sent Relator Fahn to Afghanistan to defend the U.S. Embassy in Kabul. Relator Fahn defended the embassy until its fall to the Taliban in August 2021.

3.      As part of his job duties, Relator Fahn ensured that certain individuals employed by the Defendants met specific prerequisites required by the Contract. These prerequisites, which were clearly listed in the Contract, included passing physical fitness tests and the successful completion of training classes.

4.      During the course of his employment with the Defendants, Relator

Fahn discovered that at least eight (8) employees had failed to take the required physical fitness tests. Relator Fahn also discovered that at least ninety-one (91) employees had not successfully completed training classes – both initial training before they arrived in Afghanistan, as well as training while in Afghanistan.

5.      Documents recently produced by the Defendants have confirmed Fahn's observations that the Defendants failed to satisfy the Contract's physical fitness and training requirements, and demonstrate that this misconduct was widespread and systemic.  Recently obtained witness reports corroborate the allegations in Fahn's original Complaint and First Amended Complaint, and further demonstrate that the Defendants' failure to satisfy the Contract's physical fitness and training requirements was a brazen, systematic, top-down scheme.

6.      In this scheme, the Defendants made the deliberate decisions to (1) not provide the required training under the contract, (2) cover up the failure to train by systematically forging documentation and summaries of that documentation which they were required to generate and maintain under the Contract, (3) certify compliance with the Contract requirements while knowing those requirements had not been met, (4) lie to the Government about the training it had provided, dismissing missing training documents discovered by the Government as isolated paperwork issues, and (5) falsely stating to the Government that they would cure these alleged paperwork issues by retraining and/or obtaining attestations with

reckless disregard to whether the training occurred.

7.    Despite the Defendants' knowledge that these employees were unqualified to protect the U.S. Embassy and other diplomatic facilities or to be billed under the Contract, the Defendants billed the Government the full price for each and every one of their unqualified employees, as well as numerous related charges including travel, training, and more.

8.    The Contract also imposed minimum staffing requirements upon the Defendants, with the Government imposing financial "deductions" for staffing shortfalls.  The Defendants' scheme was motivated, in part, to avoid these deductions.

9.    To carry out their scheme, the Defendants falsified their own records as well as reports submitted to the Government. These records and reports falsely state that the unqualified employees completed and passed their physical fitness tests and required training classes and were therefore supposedly in compliance with the Contract specifications.

10.    The Defendants had an obligation to report to the Government those employees who were unqualified and therefore unbillable.  The Defendants did not do so.  In those instances where the Government identified missing training documentation for employees, the Defendants falsely characterized the missing documentation as paperwork errors, and falsely represented to the Government that

they would either retrain these employees or obtain attestations from them allegedly confirming that the employees had received this training but simply failed to sign in for it.  The Defendants then failed to retrain and/or obtain attestations. Even after this systemic cover-up, enormous gaps exist for large numbers of untrained, unqualified, and unbillable employees who still lack the required documentation.

11.     If the Government had known that the Defendants were billing the Government based on false statements and misrepresentations that their employees were compliant with the Contract specifications, it would not have paid the Defendants' claims for the cost of the employees and would have acted to terminate the Defendants' contract.

12.     Since at least January 2018 through August 2021, the Defendants defrauded the Government by billing for employees who were unqualified under the terms of the Contract.  The Defendants' fraud had significant consequences, as they received hundreds of millions of dollars for the provision of services which did not comply with Contract requirements.  Moreover, other contractors providing the Government services under WPS II were entitled under Attachment Two, Section 1.1(F) to give full faith and credit to the training provided by the Defendants.  Therefore, the falsification of training records not only meant that Defendants employed unqualified personnel, it meant that these unqualified

individuals could be hired by other companies providing protective services under WPS II.

13.    This scheme was systemic and widespread.  It was perpetrated at each of the four locations where Defendant operated:  the Embassy, Alvarado, Seitz, and Sullivan.

## THE COURT'S JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733 and 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

15.    This action is not subject to 31 U.S.C. § 3730(b)(5)'s first-to-file restriction because the false claims allegations in this complaint are not based on the facts underlying a pending FCA action. Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s public disclosure limitations because the allegations and transaction in this action have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or in the news media. Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator

qualifies as an "original source" pursuant to 31 U.S.C. § 3730(e)(4)(B).

16.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. At all times relevant to this action, up to and including the date of this filing, the Defendants can be found in and have transacted business in the Middle District of Georgia. Moreover, the Defendants have committed acts proscribed by § 3729 in the Middle District of Georgia.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) because the Defendants reside in the Middle District of Georgia in that they have contacts in the district that would be sufficient to subject them to personal jurisdiction if the district were a separate state. At all times relevant to this action, the Defendants have regularly conducted substantial business within the Middle District of Georgia, maintained employees in the district, and trained their employees in the district. Venue is also proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, have transacted business, and have committed False Claims Act violations in the Middle District of Georgia.

**THE PARTIES**

<u>DEFENDANT GARDWORLD AND DEFENDANT AEGIS</u>

18.     GardaWorld is a security firm formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102. GardaWorld may be served with process on its registered agent, C T Corporation System, located at 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

19.     GardaWorld is the cleared business of GardaWorld Security Corporation – a Canadian private security firm which is based in Montreal, Quebec, Canada and was founded in 1995. GardaWorld focuses on providing security and mission support services to the U.S. Government.

20.     Aegis is a private military and security company founded in 2002. In October 2015, Aegis was purchased by GardaWorld. Since the purchase, Aegis has transacted business as GardaWorld.

21.     Aegis is formed under the laws of Delaware with its principal address located at 1760 Old Meadow Road, Suite 400, McLean, Virginia, 22102. Aegis may be served with process on its registered agent, C T Corporation System, located at 289 S Culver Street, Lawrenceville, Georgia 30046.

22.     While the Defendants are headquartered in McLean, Virginia, their employees undergo initial training at a facility in Perry, Georgia before being deployed to Afghanistan. Initial training spans more than thirty days and consists

of classroom instruction as well as practical field application (which includes physical, tactical, and weapons training and testing). The Defendants also maintain an office at the training facility with dedicated employees to oversee the training of new hires. The training facility is located at 600 Perry Parkway, Perry, Georgia 31069 and is operated by Guardian Centers, LLC. As described more fully herein, it is at this facility in Perry, Georgia where the Defendants claim their employees received mandatory training classes when, in fact, the employees did not.

## RELATOR JUSTIN FAHN

23.     Relator Justin Fahn is a United States citizen and resident of the State of Florida who resides at 14 Mooney Road NE, Fort Walton Beach, Florida 32547.

24.     Relator Fahn has been employed by the Defendants since September 2016 to secure the U.S. embassy in Kabul, Afghanistan. From February 2018 to August 2021, Relator Fahn was a Unit Support Coordinator on the Emergency Response Team. In this role, Relator Fahn had both administrative and tactical duties. On the administrative side, Relator Fahn was responsible for making sure that approximately 50 of the Defendants' employees were current with training and physical testing requirements under the terms of the Contract.

25.     Prior to his employment with the Defendants, Relator Fahn was a soldier in the United States Army for 20 years. He attained the rank of Sergeant First Class and retired in June of 2016.

26.     Relator Fahn has direct and independent knowledge of the Defendants' fraudulent conduct as it relates to the physical fitness testing and training requirements of their employees. He acquired this first-hand knowledge of the Defendants' fraudulent conduct during his employment with the Defendants.

27.     Relator Fahn brings this action under the qui tam provision of the federal False Claims Act. He has complied with all statutory requirements placed on qui tam relators and qualifies as an original source.

28.     Prior to any public disclosure, Relator Fahn voluntarily disclosed to the Government the information on which the allegations and transactions set forth in his original Complaint, his First Amended Complaint, and his Second Amended Complaint are based.

29.     The information described in Paragraph 24, including a copy of the original Complaint, was voluntarily disclosed by Relator Fahn to the Government on March 18, 2020, and March 26, 2020, and a copy of the Second Amended Complaint was voluntarily disclosed by Relator Fahn to the Government on October 2, 2023.

30.     Relator Fahn's knowledge is independent of and materially adds to any publicly disclosed allegations or transactions. Relator Fahn's knowledge of the fraud set forth in this Amended Complaint is first-hand because Relator Fahn discovered the fraud during and in the scope of his employment with the

Defendants. One of Relator Fahn's job responsibilities was to ensure that the Defendants' employees were compliant with the Contract's physical fitness testing and training requirements in order to prevent the Government from being improperly billed. As a member of the Defendants' compliance system, Relator Fahn had access to the Defendants' records and communications showing that many employees were unqualified, that the Defendants knew the employees were unqualified, that the Defendants nonetheless inappropriately billed the Government despite these employees being unbillable, and that the Defendants took steps to conceal the fraud by altering their own records to evade Government audits.

31.    Relator Fahn's knowledge also materially adds to any publicly disclosed allegations or transactions. As with any large government contract, the government conducted routine audits of the Defendants' records and billing to ensure compliance with the Contract. The Government, however, was unaware that the specific transactions outlined in this Complaint were actually occurring. In fact, the 2018 OIG "Audit of the Bureau of Diplomatic Security's Invoice Review Process for Worldwide Protective Services Contracts" does not even mention physical fitness testing requirements. (Doc. 36-10). The 2018 OIG audit also found the Defendants' training and training records to be in compliance based on its audit, explaining:

"OIG… visited the training facility in Perry, Georgia… OIG verified that the

training information was recorded and documented… OIG reviewed training status reports and supporting documents, including… individual course training certificates, and attendance sheets. OIG also reviewed 28 recruit training records at… the Perry, GA… training facilities and verified that training results were documented."

32.     Relator Fahn has not simply provided limited detail to previously alleged schemes. He has provided numerous, specific, and detailed examples of fraud of which the Government was unaware. He has also set forth the framework of the schemes, the employees involved, the dates the fraud occurred, how the Defendants were able to evade the Government's audits, and how the Defendants attempted to conceal the fraud.

33.     Moreover, even if the Government had been aware of the instances of fraud set forth below, there had been no public disclosure of it. Indeed, the Defendants admit that "[t]he DS audit of GardaWorld's training records, which occurred in 2019, did not result in a public report…" Doc. 42, p. 17, n. 3.

34.     Relator has brought this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from the Defendants for the fraudulent conduct detailed herein. The FCA provides that any person who knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment or approval is liable for (a) three times the amount of

the damages sustained by the Government and (b) a civil penalty ranging from $11,665 to $27,018 for each such claim. See, 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9); 28 C.F.R. § 85, 85.5.

## FACTUAL ALLEGATIONS – THE CONTRACTUAL REQUIREMENTS AND EXAMPLES OF FRAUD

A. <u>General Contractual Provisions And Record Keeping</u>

35.    The Bureau of Diplomatic Security ("DS") is the U.S. Department of State's law enforcement arm. The primary role of DS is to provide a safe and secure environment for the United States to conduct its foreign policy. Specifically, DS develops and implements the security programs that protect personnel who work at U.S. diplomatic missions around the world.

36.    In September 2010, DS awarded the Worldwide Protective Services (WPS) contract – a multi-billion-dollar, indefinite-delivery/indefinite-quantity contract – to eight contractors, including Defendant Aegis. In February 2016, DS awarded a follow-on contract, referred to as "WPS II," which is similar in scope and nature to WPS and was awarded to seven contractors, including the Defendants.  Upon information and belief, WPS II governed the Defendants services beginning on January 1, 2018.

37.    These contracts require the contractor to plan, manage, and provide static guard security services, protective movement security services, emergency

response teams, and explosive detection security services.

38.     Following the award of these contracts, DS released a number of task orders. Task orders are individual contracts that DS puts into place to protect specific assets around the world.

39.     In 2011, DS awarded Task Order 10 under WPS I to Aegis. Task Order 10 called on Aegis to provide static security services for the U.S. embassy and other diplomatic facilities within Kabul, Afghanistan (including Camp Alvarado, Camp Eggers, Camp Sullivan, and Camp Seitz). The task order was for 1 year, with the base period of performance beginning June 15, 2012, and had four option years.

40.     Task Order 10 ended in December 2017, but it transitioned from the WPS I to WPS II. Under WPS II, it has been divided into two task orders: one for static security and one for movement security. These task orders – which includes Task Orders 6 and 7– were awarded to the Defendants.

41.     The Contract established separate "Contract Line Item Numbers" or "CLINs" for each billable claim.

42.     Each job description created under the Contract was assigned a unique CLIN comprising of an acronym and alphanumeric designation.  Employees working under the task orders were placed within one of these CLINs.  For example, the position "Protective Security Specialist" was assigned the CLIN

14

"PSS" and "X016."

43.     Certain CLINs were placed into one of three categories, category "P," which generally included PSS-associated CLINs, category "G," which generally included Guard-associated CLINs, and category "S" which generally included support-related CLINs.  See Attachment One, § 2.1.4 et seq. for a list of which CLINs fell within which category.

44.     The Contract required individuals employed to provide training to possess certain qualifications based upon biographical information (known as "BIO" approval).  C.8.5.2.9.  Only employees possessing this biographical - authorization and also filling the proper CLIN were authorized under the Contract to provide training.  Attachment One, § 2.7.2.3, Attachment Two, § 5.2.

45.     Section C.6.A.9 identifies as a "minimum" work "requirement":

"███████████████████████████████████████████

███████████████████████████████████"

46.     Section C.7.1 provides "General Resource Requirements" and states that the contractor "shall" ████████████████████████████

█████████████████████████████████████████████

█████████████████████" (A.3) and ████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████," (A.5).

47.    The Contract required the Defendants to implement a management structure that was capable of tracking and analyzing the cost, schedule, and performance under the Contract.  § C.9.1.  This performance involved, *inter alia*,



█████████████████████████████████████ §

C.7.1.

48.    It required the Defendants to adequately staff an office within the United States with personnel capable of recordkeeping.  § C.9.3.B.  It required the establishment of a personnel record keeping system in Afghanistan for filing employment related and required documents associated with each individual working under the Contract, with an identical file kept within the United States.  §

C.10.1.3.2.A.  Within this file, the Defendants were required to keep all Contract required documents such as "█████████████████████" and "██████████ ██████████ *Id.*

B. <u>The Duty to Disclose Noncompliance and Minimum Staffing Levels</u>

49.    The Contract required the Defendants to conduct "internal quality control" inspections of their performance under the Contract on at least a semiannual basis, provide a written report to the Government documenting performance, and identify any deficiencies.  § C.10.1.2.  For any deficiencies, the Defendants had to submit a "█████████████████████" which would correct the deficiency and "███████████████████████████████████████ ███████████████████████████████████████████████████████ ██████" § C.10.1.2.C.

50.    The Contract also provided that the Defendants "███████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████" § E.4.

51.    Given the critical role of WPS II security services, the Contract provided for certain minimum staffing levels of certain CLINs, divided into critical

and non-critical groups.  § H.26.1.  For critical positions, Defendants were required to ensure that 95% of the required staffing levels were met.  For non-critical positions, the minimum staffing level was 85% of contractual requirements.

52.    The Government reserved the right under the Contract to assess a "deduction" to the invoiced labor for that month equal to the percent that the labor category/CLIN is understaffed, with the deduction not to exceed 10% of the total labor value of the invoice.  § H.26.1.F.

53.    For example, the Contract might require the Defendants to provide five employees in the Shift Leader CLIN and designate that CLIN as critical.  If the Defendants provided four Shift Leaders in a given month, or 80% of the required number of Shift Leaders, the Government might deduct 15% of that CLIN's invoice value (95% minimum staffing level minus 80% actual staffing).

54.    Pursuant to Attachment Two § 1.3, the " ███████████████████ ████████████████████████████████ ████████████████████████████████████ ███████████████████████████ ████████████ " (All Caps in Original.)  Section H.26.C made clear that ████████ ██████████████████████████████████████ ███████████████████████

55.    The Defendants were entitled to request a "recoupment" of these

deductions based upon its overall performance. § H.26.4. The Contract imposed certain conditions upon the request for recoupment, including, *inter alia*, that Defendants meet certain staffing levels and have no directed corrective action plans. § H.26.4.

56. The Defendants therefore had immense economic incentive, and were under immense economic pressure, to ensure the Government perceived the Defendants' employees as compliant and billable under the Contract, and contributing toward the minimum staffing levels.

### C. Physical Fitness Testing Requirements

57. The Contract awarded to the Defendants contain a Statement of Work ("SOW"). Section C.10.4.3 of the SOW concerns "Physical Fitness Testing." The physical fitness test is known as Physical Efficiency Battery ("PEB").

58. Subsection A of C.10.4.3 states: "███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ████████████"[1] It goes onto state: "█████████████████████

---

[1] Attachment 1 sets forth various job positions and the requirements for each job position, including completing a "WPS Physical Readiness Test" at a certain performance level and "maintain[ing] that fitness level for the duration of his/her service on the task order." Appendix N, which is also attached to the contract, is labeled "DS Physical Readiness Testing Protocols and Standards" and contains the



59.    Subsection C states as follows: "███████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

█████████████████████████

█████████████████████████████." This

qualification schedule is referred to as "Weekly Field Report" or "WFR".

60.    Section F states as follows: ██████████████

██████████████████████████████

████████████████████████████

████████████████████.″[2]

61.    The Contract explains: "████████████████████

_____

components of the physical fitness tests that each employee must undergo. This includes the number of push-ups, sit-ups, and the timing of a 1.5-mile run based on age and gender.

[2] "COR" refers to Contracting Officer's Representative. "GTM" refers to Government Technical Monitor and is a Government employee.

[redacted]

[redacted]

[redacted].” *See*, Subsection G of SOW C.10.4.3.

62.     As described above, the Defendants were required under the Contract to maintain documents verifying that employees properly underwent and passed physical fitness testing.

63.     The verifying documents the Defendants generated and maintained included a certification and what is referred to as a "clean sheet." The certificate is signed by a witness and affirms that the employee passed the PEB. The clean sheet lists the employees' testing scores and is signed by a witness and a GTM. Every PEB must be witnessed and verified by a GTM.

64.     The Defendants maintained the WFRs, clean sheets, and certifications in an electronic database, and they were required to do so by the Contract. The Defendants also maintained a spreadsheet in the database which they refer to as a "PEB Tracker." The PEB Tracker shows each employee, their PEB testing date, the testing scores, and the individual who verified that the employee took and passed the test. The Contract required that the Government be allowed access to the database at any time to audit the Defendants' internal documents.

65.     Relator Fahn had access to this electronic database as he was responsible for making sure that the WFRs, clean sheets, and certifications for the

50 employees under his command were properly filled out and updated.

66.    Since at least March of 2019, the Defendants engaged in a systematic scheme to defraud the United States by falsely certifying that their employees had undergone and passed the mandatory physical fitness testing.

67.    This scheme was carried out by the highest-ranking employees of the Defendants in Afghanistan, including the Operations Manager, Deputy Operations Manager, and Training Manager. These employees had substantial authority, broad responsibility, and control over all of the Defendants' activities in Afghanistan. These high-ranking employees, and their subordinates discussed below, were at all times acting within the scope of their authority and with the purpose of benefiting the Defendants.

68.    The Defendants benefitted from the scheme by receiving payment from the Government for the labor and services of unqualified employees, redirecting the time it would take to undergo testing to business-related matters, maintaining continuity of the management personnel, and avoiding the disruption (and loss of revenue from unqualified and unbillable personnel) that would be caused by a failed PEB.

69.    The employees discussed below were not easily replaceable by the Defendants. If one of the employees failed the physical fitness testing requirements, they would be removed from their post causing disruption in the

Defendants' activities in Afghanistan. The Defendants would also have to expend significant time and money to replace the employee. The Defendants would also have fewer qualified individuals contributing toward their minimum staffing levels. These risks were removed by simply falsifying the PEB records.

70.    In 2019 and 2020, this fraudulent scheme was well-known to the Defendants' management personnel in Afghanistan, but the fraud was never reported the Government until Relator Fahn did so in March 2020.

71.    In June 2019, Relator Fahn, while working at the U.S. embassy, had a conversation with employee Nicholas Schneider ("Employee Schneider"), a Deputy Operations Manager. Employee Schneider told Relator Fahn that "someone needs to turn the training team guys in for falsifying documents" and that "everyone knows they're doing it."

72.    In early March 2020, Employee Schneider told Relator Fahn: "Somebody needs to report Don Taylor and Robert Smith for these fake ass PEBs."

<u>Examples Of Fraud Involving Physical Fitness Testing</u>

73.    <u>Robert Smith</u>: Employee Robert Smith ("Employee Smith") was the Operations Manager for the Defendants. He was the highest-ranking and highest-paid employee in Afghanistan. Employee Smith was ultimately in charge of all of the Defendants' activities in Afghanistan, including ensuring that the Defendants

properly billed the United States for the services of their employees.

74.    The PEB Tracker showed that Employee Smith underwent and passed a PEB on March 23, 2019, but there is no clean sheet or certification for this PEB. The PEB Tracker also states that Employee Smith's PEB was verified by "Unknown." Thus, there is no documentation or witness showing that Employee Smith took the PEB.

75.    Had Employee Smith properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Smith was inputted by the Defendants in an attempt to conceal the fact that Employee Smith never took and passed a PEB on March 23, 2019.

76.    Despite the fact that Employee Smith never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2019, and each subsequent quarter, falsely certifying that Employee Smith had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Smith never took and passed the required PEB.

77.    Because Employee Smith never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

78.    Despite the fact that he was unbillable from at least March 23, 2019

24

through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Smith's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Smith was billable for the number of days he worked that month.

79.    Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Smith's labor. In total, the Defendants billed for 123 days during this period: 9 days in March, 24 days in April, 3 days in May, 30 days in June, 31 days in July 2019, 14 days in August 2019, and 12 days in September 2019.

80.    For example, Employee Smith worked from April 1, 2019, through April 24, 2019, and the Defendants subsequently billed for 24 days for that month.

81.    At all times, Employee Smith was aware that he and the other employees set forth in this section had not taken and passed the required PEBs and were therefore unbillable. He nonetheless allowed for and directed the submission of invoices to the Government for their labor as well as the creation of false documents to conceal the fraud.

82.    Robert Jenkins: Employee Robert Jenkins ("Employee Jenkin") was the Deputy Operations Manager ("DOMSEC"). He was the second highest-ranking employee in Afghanistan behind Employee Smith. Employee Jenkins substituted as the Operations Manager when Employee Smith was on leave, thereby

temporarily becoming the highest-ranking employee.

83.    The PEB Tracker shows that Employee Jenkins underwent and passed a PEB on March 23, 2019. The tracker states that Employee Jenkins' PEB was verified by "ITI," which refers to another employee of the Defendants (an Integration and Training Instructor). The certification is signed by William Taylor, the Training Team Manager, two days later. (See, Exhibit 1). But there is no clean sheet associated with the PEB. The clean sheet is required to be signed by a GTM, verifying that the PEB was taken and passed. In other words, there is no proof that Employee Jenkins ever underwent and passed a PEB.

84.    Had Employee Jenkins properly taken and passed a PEB, there would have been a valid clean sheet affirming such. The information in the PEB Tracker and the certification were created by the Defendants in an attempt to conceal the fact that Employee Jenkins never took and passed a PEB on March 23, 2019.

85.    Despite the fact that Employee Jenkins never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in April 2019, and each subsequent quarter, falsely certifying that Employee Jenkins had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Jenkins never took and passed the required PEB.

86.    Because Employee Jenkins never took and passed the required PEB,

he was unbillable under the Contract and the Defendants knew he was unbillable.

87.    Despite the fact that he was unbillable from at least March 23, 2019, through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Jenkins' labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Jenkins was billable for the number of days worked that month.

88.    Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Jenkin's labor. In total, the Defendants' billed for 140 days during this period: 8 days in March, 27 days in April, 30 days in May, 26 days in June, 27 days in July 2019, 12 days in August 2019, and 10 days in September 2019.

89.    For example, Employee Jenkins worked from June 1, 2019, through June 30, 2019 except for Fridays, and the Defendants subsequently billed for 26 days for that month.

90.    At all times, Employee Jenkins was aware that he and the other employees set forth in this section had not taken and passed the required PEBs and were therefore unbillable. He nonetheless allowed for and directed the submission of invoices to the Government for their labor as well as the creation of false documents to conceal the fraud.

91.    <u>William "Don" Taylor</u>: Employee William Taylor ("Employee

27

Taylor") was the Training Manager and the head of the Defendants' training team in Afghanistan under Task Order 6. He was charged with the responsibility of making sure that the Defendants were in compliance with the training and testing requirements of the Contract. The training team was comprised of approximately 23 employees under Employee Taylor's command.

92.    The PEB Tracker shows that Employee Taylor underwent and passed a PEB on March 23, 2019, but there is no WFR or clean sheet. A clean sheet is required to be signed by a GTM, verifying that the PEB was taken and passed. In other words, there is no proof that Employee Taylor ever underwent and passed a PEB. Interestingly, there is a certification for this PEB, but it is signed by Employee Taylor (See, Exhibit 2). An employee cannot certify his own PEB. The PEB Tracker also states that Employee Taylor's PEB was verified by "ITI," which refers to another employee of the Defendants.

93.    Had Employee Taylor properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Taylor was inputted by the Defendants in an attempt to conceal the fact that Employee Taylor never took and passed a PEB on March 23, 2019.

94.    Despite the fact that Employee Taylor never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the

Government in April 2019, and each subsequent quarter, falsely certifying that Employee Taylor had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Taylor never took and passed the required PEB.

95.     Because Employee Taylor never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

96.     Despite the fact that he was unbillable from at least March 23, 2019, through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Taylor's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Taylor was billable for the number of days worked that month.

97.     Specifically, over the six-month period following the falsified PEB on March 23, 2019, the Defendants submitted monthly invoices to the Government for Employee Taylor's labor. In total, the Defendants billed for 127 days during this period: 9 days in March, 24 days in April, 6 days in May, 26 days in June, 26 days in July, 26 days in August, and 10 days in September.

98.     For example, Employee Taylor worked from April 1, 2019, through April 24, 2019, and the Defendants subsequently billed for 24 days.

99.     At all times, Employee Taylor was aware that he and the other employees set forth in this section had not taken and passed the required PEBs and

were therefore unbillable. He nonetheless allowed for and directed the submission of invoices to the Government for their labor as well as the creation of false documents to conceal the fraud.

100.    Brian Bailey and Lewis Dooley: Employee Brian Bailey ("Employee Bailey") and employee Lewis Dooley ("Employee Dooley") were members of the training team and held the title of Integration and Training Instructor.

101.    The PEB Tracker shows that Employee Bailey and Employee Dooley underwent and passed PEBs on June 19, 2019, and June 20, 2019, respectively. There is a clean sheet and a certification for each PEB, but there is no WFR.

102.    Importantly, the clean sheet and certification for Employee Bailey's PEB are signed by Employee Dooley, and the clean sheet and certification for Employee Dooley's PEB are signed by Employee Bailey.

103.    Employee Bailey and Employee Dooley never took their required PEBs. Rather, Employee Bailey and Employee Dooley forged the necessary paperwork to conceal the fact that they never took and passed the PEB.

104.    Despite the fact that Employee Bailey and Employee Dooley never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in July 2019, and each subsequent quarter, falsely certifying that Employee Bailey and Employee Dooley had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that

Employee Bailey and Employee Dooley never took and passed the required PEB. Because Employee Bailey and Employee Dooley never took and passed the required PEB, Employee Bailey and Employee Dooley were unbillable under the Contract and the Defendants knew they was unbillable.

105.   Despite the fact that they were unbillable from at least June 20, 2019, through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Bailey's and Employee Dooley's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Bailey and Employee Dooley were billable for the number of days worked that month.

106.   Specifically, over the six-month period following the falsified PEB on June 19, 2019, the Defendants submitted monthly invoices to the Government for Employee Bailey's labor. In total, the Defendants billed for 139 days during that period: 11 days in June, 19 days in July, 4 days in August, 26 days in September, 27 days in October, 25 days in November, and 27 days in December.

107.   For example, Employee Bailey worked every day from July 1, 2019 through July 22, 2019 except for Fridays and the Defendants subsequently billed for 19 days.

108.   Over the six-month period following the falsified PEB on June 20, 2019, the Defendants submitted monthly invoices to the Government for Employee

Dooley's labor. In total, the Defendants' billed for days 138 days during that period: 9 days in June, 27 days in July, 26 days in August, 16 days in September, 8 days in October, 25 days in November, and 27 days in December.

109.    For example, Employee Dooley worked every day in July 2019 except for Fridays and the Defendants subsequently billed for 27 days.

110.    <u>Todd Shields</u>: Employee Todd Shields ("Employee Shields") was an Administrative and Logistics Security Specialist. One of Employee Shields' responsibilities was to prepare and maintain records so that billing was proper.

111.    The PEB Tracker shows that Employee Shields underwent and passed a PEB on February 25, 2020, but there is no clean sheet or certification for this PEB. The PEB Tracker also states that Employee Shields' PEB was verified by "Dooley," an employee of the Defendants. A PEB is required to be verified by a GTM. In other words, there is no proof that Employee Shields ever underwent and passed a PEB.

112.    Had Employee Shields properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Shields was inputted by the Defendants in an attempt to conceal the fact that Employee Shields never took and passed a PEB on February 25, 2020.

113.    Despite the fact that Employee Shields never took and passed a PEB,

the Defendants submitted a Physical Fitness Qualification Status Report to the

Government in April 2020, and each subsequent quarter, falsely certifying that

Employee Taylor had taken and passed the required PEB. In doing so, the

Defendants were able to conceal the fact that Employee Shields never took and

passed the required PEB.

114.   Because Employee Shields never took and passed the required PEB,

he was unbillable under the Contract and the Defendants knew he was unbillable.

115.   Despite the fact that he was unbillable from at least February 25,

2020, through August 15, 2021, the Defendants submitted monthly invoices to the

Government for Employee Shields' labor, which the Government paid. With each

invoice, the Defendants also submitted a muster sheet that falsely certified that

Employee Shields was billable for the number of days worked that month.

116.   <u>Bradley Jones</u>: Employee Bradley Jones ("Employee Jones") provided

information technology support. The PEB Tracker shows that Employee Jones

underwent and passed a PEB on June 11, 2019, but there is no WFR, clean sheet,

or certification for this PEB. The PEB Tracker also states that Employee Jones'

PEB was verified by "*ITI*," which refers to another employee of the Defendants. A

PEB is required to be verified by a GTM. In other words, there is no proof that

Employee Jones ever underwent a PEB.

117.   Had Employee Jones properly taken and passed a PEB, there would

have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Jones was inputted by the Defendants in an attempt to conceal the fact that Employee Jones never took and passed a PEB on June 11, 2019.

118.    Despite the fact that Employee Jones never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in July 2019, and each subsequent quarter, falsely certifying that Employee Jones had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Jones never took and passed the required PEB.

119.    Because Employee Jones never took and passed the required PEB, he was unbillable under the Contract and the Defendants knew he was unbillable.

120.    Despite the fact that he was unbillable from at least June 11, 2019 through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Jones's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Jones was billable for the number of days worked that month.

121.    Kristen Carter: The PEB Tracker shows that employee Kristen Carter ("Employee Carter") underwent and passed a PEB on October 27, 2019. While a clean sheet and a certificate do exist, there is no WFR for Employee Carter's PEB.

122.    The certificate is signed by Employee Taylor, the Training Manager, and the clean sheet is signed by employee Johnny Gonzalez ("Employee Gonzalez"). The PEB Tracker also states Employee Carter's PEB was verified by "ITI." The clean sheet, however, is not signed by a GTM as is required. In other words, there is no proof that Employee Carter ever underwent a PEB. (See, Exhibit 3).

123.    Had Employee Carter properly taken and passed a PEB, there would have been a valid clean sheet and certification affirming such. The information in the PEB Tracker for Employee Carter was inputted by the Defendants in an attempt to conceal the fact that Employee Carter never took and passed a PEB on October 27, 2019.

124.    Despite the fact that Employee Carter never took and passed a PEB, the Defendants submitted a Physical Fitness Qualification Status Report to the Government in October 2019, and each subsequent quarter, falsely certifying that Employee Carter had taken and passed the required PEB. In doing so, the Defendants were able to conceal the fact that Employee Carter never took and passed the required PEB.

125.    Because Employee Carter never took and passed the required PEB, she was unbillable under the Contract and the Defendants knew she was unbillable.

126.    Despite the fact that she was unbillable from at least October 27, 2019

through August 15, 2021, the Defendants submitted monthly invoices to the Government for Employee Carter's labor, which the Government paid. With each invoice, the Defendants also submitted a muster sheet that falsely certified that Employee Carter was billable for the number of days she worked that month.

127.    Specifically, over the six-month period following the falsified PEB on October 27, 2019, the Defendants submitted monthly invoices to the Government for Employee Carter's labor. In total, the Defendants billed for 131 days during this time period (5 days in October, 25 days in November, 27 days in December, 25 days in January, 23 days in March 2020, and 26 days in April 2020).

128.    For example, Employee Carter worked every day in November 2019 except for Fridays and the Defendants subsequently billed for 25 days.

129.    In each instance of billing described above, the Defendants falsely certified that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

130.    These are merely examples of Defendants' fraud.  The fraud is systemic, and the scope and breadth of the fraud runs broader than the examples listed for illustration purposes herein.

D. <u>Training Requirements</u>

131.    With respect to training, the Contract provided that the Defendants "shall maintain complete employee training records, documenting the training each

36

employee receives throughout the life of the contract.  Copies of training records

shall be retained in the individual's personnel record as required in SOW Section

C.10.1.3, posted on their web portal."  Attachment Two, § 2.

132.   The training records Defendants were required to keep included sign-

in sheets for each training class.  The Contract stated the Defendants' instructors

███████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    Attachment Two, § 7.2.1.V.

133.   Section C.8.5.2.9 required Defendants to provide certain training to

identified CLINs.  That Contract section defines "Training Services." Subsection

(A) provides: "███████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████[3]

---

[3] Attachment 2 of the Contract contains a comprehensive list of classes employees
are required to undergo and complete in order to be billable.

134.    Subsection (F)(1)(a) provides: "."

(Contractor-provided Candidate WPS II Basic Training).

135.    Subsection (F)(1)(b) provides: "

."

136.    Subsections (F)(2) through (F)(14) provide other training requirements that the Defendants are required to ensure their employees undergo. These requirements include, but are not limited to, operations management training, tactical operations center training, security equipment training, annual in-service training for Protective Services Personnel (which requires the Contractor to ensure that these employees complete a minimum of forty hours of in-service training), annual in-service training for Guard Service Personnel (which requires the Contractor to ensure that these employees receive forty hours of in-service refresher training), weapons training and qualifications, and cultural awareness

training (the forty hours of in-service refresher training is hereinafter referred to as "40-hour training").

137.    Attachment Two, § 10.9 provided that all personnel in "P" labor categories (which consisted of PSS-related CLINs) and "G" labor categories (which consisted of Guard-related CLINs) must successfully complete at least 40 hours of annual refresher training.  The refresher training is in addition to all required firearms training and requalifications contained in SOW – Attachments One, Two, and Three. The Government will consider personnel that fail to complete the annual refresher training as unqualified to perform under the assigned task order. Upon completion of annual refresher training, the Contractor "shall notify" the Government which individuals have completed the required training and shall update the individual's administrative files accordingly.

138.    The annual 40-hour in-service training, weapons training, and cultural awareness training all require the Defendants to submit a training class schedule to the COR and GTM by noon on the Friday of the previous week before the class. To show that the Defendants are in compliance with the training requirements, the Contract required: "███████████████████████████████████████ ███████████████████████████████████████," tracking the completion of such required training, in Microsoft Excel format, to DS/RSO COR and DS/OPO/WPS and GTM." Subsections (F)(7)(c) and (F)(8)(c).

139.   The precise number and composition of classes required for 40-hour annual in service refresher training varies from year to year.  Each year, the Defendants would submit a proposed list of classes and number of hours for each class.  For example, based upon documents produced by Defendants, in 2018 the - 40-hour training consisted of 14 classes per person with each class lasting between 1-5 hours.

140.   As described above, the Government considers any person assigned to a position who has not successfully completed the required training to be unqualified and the position unstaffed; the Defendants must maintain training records documenting the training each employee receives.  Attachment Two, §§ 1.3, 2.  Sign-in sheets are included in the training records the Defendants must obtain and maintain to demonstrate compliance with the Contract requirements. Attachment Two, § 7.2.1(V).

141.   Section C.9.5 "Deliverables" provides that "

███████████████

142.    Since at least February 6, 2018, the Defendants have engaged in a systematic scheme to defraud the U.S. Government by falsely certifying that their employees have undergone and completed required training classes, both in Perry Georgia and in Afghanistan.

143.    The scheme set forth below consisted of the Defendants providing the Government with reports falsely certifying that its employees had taken training classes, invoicing the Government for these unbillable employees, and attempting to conceal the fraud by having the employees falsely certify that they had taken the missed classes. These fraudulent acts were performed by high-ranking corporate employees as well as employees acting within the scope of their employment and for the benefit of the Defendants.

144.    The Defendants benefitted from the scheme by receiving payments from the Government for labor costs of unqualified employees and the training costs for training that never occurred. Moreover, requiring these employees to take the missed classes would have negatively impacted the Defendants' business. The Defendants would have had to expend time and money to ensure that the classes were taken. The Defendants would have also suffered disruptions in the deployment of employees to Afghanistan and difficulty in maintaining appropriate staffing levels.  All the Defendants' billing of the Government flowing from these

█

unqualified and unbillable employees would have been lost.

## EXAMPLES OF FRAUD INVOLVING TRAINING CLASSES

### (Perry Georgia)

145.   On October 19, 2019, Michael J. Stevenson, a Deputy Operations Manager, sent an email to Relator Fahn and other employees, including Employee Jenkins, which explained that it was a "*message from corporate*" and that "[w]e have been auditing our training files and in the files we discovered that your signature was missing from relevant training classes when you attended your Training Course." (Exhibit 4).

146.   The email attached pre-filled attestations for 12 different employees and asked these employees to sign the attestations to show that they did in fact take the training classes. (Exhibit 5).

147.   For instance, one of the attestations was for employee Joseph Hill ("Employee Hill"). The attestation form pre-checked a box affirming that Employee Hill participated in a training course entitled "Use of Force/Force Continuum" between February 6, 2018, and February 19, 2018.

148.   Had Employee Hill and the other employees actually taken the requisite courses, they would have signed the sign-in sheets at the time the courses were offered. But Employee Hill and the other employees did not take the courses or sign the sign-in sheets and were therefore unbillable.

149.    Despite knowing that these 12 employees were unbillable, the Defendants submitted Training Status Reports, training invoices, and certificates of course completion to the Government which falsely certified that these employees had received the required training. Because they did so, the Government paid for these training courses which never occurred.

150.    Despite knowing that these 12 employees were unbillable, the Defendants also submitted monthly labor invoices with muster sheets, certifying that the Defendants were billable. Because they did so, the Government paid for the labor of these unbillable employees.

151.    In an attempt to cover up the scheme, the Defendants attempted to have the employees sign the attestations after months of improperly billing the Government.

152.    On December 20, 2019, employee Bryan Bailey, an Integration and Training Instructor for the Defendants, sent an email to Relator with an attached list of employees "that need training and need classes they were supposed to get while they went through initial training. They simply failed to sign the sign in sheet.... Nothing crazy just need to get this training done ASAP." (Exhibit 6).

153.    The list included the names of 44 employees who were missing required training classes. (Exhibit 7). Four of these employees had previously been the subject of the October 19, 2019, email.

154.    One of those individuals, Ramiro Durazo, informed Defendants that he had not taken the class in question and would therefore not sign the attestation. Upon information and belief, Defendants never informed the Government that Durazo was unbillable and instead kept him employed and deployed in Afghanistan through the fall of Afghanistan in August 2021.

155.    In more than 100 instances, Defendants did not obtain attestations from individuals who Defendants' internal records indicated did not receive proper training in Perry Georgia prior to deployment.  For these individuals, the Defendants nevertheless, aware that neither training records nor attestations existed to show these individuals were billable under the Contract, continued to employ, deploy, and submit claims to the Government.

156.    Despite knowing that these employees were unbillable, the Defendants also submitted monthly invoices with muster sheets, certifying that the Defendants were billable, for the labor of these employees. Because they did so, the Government paid for the labor of these unbillable employees.

157.    For example, the attachment lists Jeffery Palmer ("Employee Palmer"), a Unit Support Coordinator assigned to the embassy in Kabul, as not having completed a class titled: "Personnel recoveries (structures), Active Shooter PE." Employee Palmer had been an employee of the Defendants and working in Afghanistan for more than five years prior to December 2019.

158.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Palmer each and every month.

159.    As another example, the attachment lists Luis Rivera ("Employee Rivera"), a Protective Security Specialist, as not having completed the following classes: "Deadly Force, PPE, Explosive Counter, Intel Brief, Vehicle Search, Enemy TTP, WAE, SUT, IMT, Land Nav, Cultural Awareness." Employee Rivera had been an employee of the Defendants and working in Afghanistan for approximately two years before he resigned in November 2019.

160.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Rivera each and every month.

161.    As another example, the attachment lists Patrick Fisher, a Guard Site Supervisor at the embassy, as not having completed the following classes: "Use of Force/Force Continuum." Employee Fisher has been an employee of the Defendants and working in Afghanistan for approximately five years.

162.    Despite being unbillable, the Defendants inappropriately billed the Government for Employee Fisher each and every month.

163.    On March 7, 2020, Lewis Dooley, an Integration and Training Officer for the Defendants, sent an email to Relator with an attachment showing a list of 39 of the Defendants' employees who had not undergone the requisite training. The email explains: "This training is high priority and needs to be completed by

Tuesday 10 March. This was another schoolhouse issue that needs correcting.

These guys are unbillable but per OM they are standing post. So the sooner we get

these guys through training the better." (Exhibits 8 and 9).

164.    Despite knowing that these 39 employees were unbillable, the

Defendants submitted Training Status Reports, training invoices, and certificates of

course completion to the Government which falsely certified that these employees

had received the required training. Because they did so, the Government paid for

these training courses which never occurred.

165.    Despite knowing that these 39 employees were unbillable, the

Defendants also submitted monthly invoices with muster sheets, certifying that the

Defendants were billable, for the labor of these employees. Because they did so,

the Government paid for the labor of these unbillable employees.

166.    As an example, the attachment lists Christopher Bass as not having

completed "IMT" which stands for Individual Movement Technique.

167.    As another example, the attachment lists Matthew Wilkey as not

having completed "IMT & RET." RET stands for Room Entry Technique and is

required in order to complete the 40 hours of annual training.

168.    Despite being unbillable, the Defendants inappropriately billed the

Government for Employee Bass and Employee Wilkey each and every month.

169.    The Defendants were also aware that 83 individuals had received

training in Perry Georgia prior to deployment by a non-BIO approved instructor in violation of the Contract. Defendants were aware that employees who received training from a non-BIO approved instructor were unbillable under the Contract and the Government would refuse to pay claims for these employees.

170.    Therefore, Defendants falsely reported to the Government that these individuals had been, or would be, retrained with a BIO approved instructor knowing that such training was needed to submit a claim for these employees. However, Defendants' records show that these individuals never received this mandatory retraining. In fact, several of these employees were never informed that they were in need of retraining. Others were told they needed retraining, but the training was never provided.

171.    In fact, upon information and belief, 29 of these individuals needed retraining in "ORU/URD" a course which could not be delivered in Afghanistan. Aware that properly training these employees would require rotating them out of Afghanistan (which would mean Defendants could not present claims to the Government and would exacerbate the Defendants' staffing shortages), Defendant simply chose to not retrain them.

(Training in Afghanistan)

172.    In another instance, the Defendants self-reported to the Government that certain individuals had been trained in Perry Georgia by a non-BIO approved

47

instructor.

173.    In response to this disclosure, the Government informed Defendants that these individuals were not billable until they were properly retrained. The Defendants reported to the Government before the next billing period that the affected individuals had been retrained. However, the Defendants had not retrained these individuals.

174.    For example, one person whom the Defendants represented had been retrained, Daniel Lorona, was never even told by the Defendants that he needed to be retrained. Another, Billy Gilbert, spent a total of fifteen minutes going over a PowerPoint presentation, and then identified the points of entry into the room he was in, before signing a piece of paper saying he had been retrained. Another, Justin Coufal, was told he needed to be retrained in Stress Brief and ORU/URD because he had been trained by a non-BIO approved instructor in those classes in Perry, Georgia prior to deployment. While Coufal received retraining in Stress Brief, he was told that the instructor would need to figure out a way to provide the retraining in ORU/URD, and the instructor never followed up and provided this retraining.

175.    Upon information and belief, 29 GardaWorld employees did not receive ORU/URD training in Perry, Georgia from a BIO approved instructor. When GardaWorld told the Government that the employees who had received

training from a non-BIO approved instructor would be retrained, it was aware that it was not possible to provide retaining for ORU/URD in Afghanistan. Yet it continued to submit claims for these individuals to the Government and did not disclose that they remained unqualified and unbillable.

176.    Falsely certifying that employees had been properly retrained in Afghanistan by a BIO approved instructor was not the only false certification of required training in Afghanistan by the Defendants.

177.    The Defendants falsely certified compliance with the 40-hour training required for both the "P" and "G" group employees—hundreds of employees in all. As described above, the PSS-affiliated CLINs in the "P" group and the Guard-affiliated CLINs in the "G" group were required to undergo 40-hour training in order to be billable under the Contract.

178.    Also as described above, the Defendants were required to obtain sign-in sheets documenting completion of 40--hour training, maintain those records, and provide the Government with periodic reports on this annual refresher training progress. This training did not take place, and the Defendants falsified these records in many different ways to make it appear to the Government as though the training did take place.

179.    According to a significant number of employees across all camps and the embassy for the entire period of WPS II, the Defendants deliberately did not

provide the required 40-hour training for their employees, and they undertook a systemic effort to conceal this practice by forging sign in sheets and falsifying other required recordkeeping under the Contract.  For example:

    a. <u>Alexander Lopezzamora</u>, who worked as a PSS, has testified that "I did not receive a single in-person training class from an ITI" and "never saw an ITI give an in-person training class."  Instead, shift leaders would obtain sign-in sheets and bring them to the react rooms where multiple five-man teams would assemble and "pass around sign-in sheets for 40-hour training for everyone to sign at once."  He "never saw anyone take an in-person 40-hour training class" and does "not think that any GardaWorld employees received anywhere near 40 hours of this training" because "these practices were systemic, and no one seemed to care about it."

    b. <u>James Warden</u>, a medic, has testified that he too "never once took an in-person 40-hour training class.  I never saw anyone else take an in-person training class. I never interacted with the trainers.  I do not recall ever signing a sign-in sheet for 40-hour training. Sign-in sheets were constantly being passed around for people to sign, and I routinely signed sign-in sheets for no apparent reason. So, it is possible I signed a 40-hour sign-in sheet without knowing it. But I

never received 40-hour training with GardaWorld." He also testified

that "[b]ecause I never saw anyone taking a 40-hour training class, I

do not think that anyone working at the Embassy or Alvarado

received anywhere near 40-hours of annual refresher training, if they

received any such training at all."

c.  Nicholas Romano, who was a Shift Leader and stationed at all four

GardaWorld locations in Afghanistan, said, "I went entire 105-day

stints without receiving any training though I was signing in on sign-

in sheets. Sometimes trainers would track me down to collect

signatures for training I did not receive. I saw them do this for other

GardaWorld employees as well."  Romano also observed that

"[s]ometimes when that happened the instructor was present and

collected sign-in sheets when we were done. Other times, the

instructor left the sign-in sheet unattended for us to sign in his

absence.  Many times one person from a team would be sent to sign in

for everyone on the team. I did this many times for others on my team

and others on my team did this many times for me. This happened in

the presence of trainers. I learned to sign-in without training because

that was how everyone employed by GardaWorld did it. This practice

was systemic."

d. <u>Brandon Jakubowski</u>, a PSS and Shift Leader at each of the four GardaWorld locations in Afghanistan, has said, "Based on my experience as an employee of the company and interacting with other employees of the company, it was common knowledge in GardaWorld that employees were not expected to actually receive 40-hour training, but instead to just sign in the sign in sheets and leave." "At Sullivan, the 40-hour training sign-in sheets were left near the chow hall. Sometimes there would be a training printout to go with it, but no one read the printout. Everyone just signed in and moved on without receiving any training. No trainers were ever present. At the other camps, it was more common for Detail Leaders or Shift Leaders to track down employees to obtain signatures as needed. We never really did anything with the trainers. It was SLs or DLs that obtained signatures. Often, if the sign-in sheet was brought to someone on the team, that person would just sign in everyone in the team so the person with the sign-in sheet would not have to track down everyone. I signed in others and others signed me in routinely. I saw other teams doing this. From my observation, all teams did this. These practices were systemic, and training was viewed as an inconvenience to be avoided."

e. <u>Anthony Niutei</u>, a PSS stationed at Sullivan, the Embassy, and
Alvarado, has testified that "about 90-99% of the time lots of PSS
would either sign 40-hour sign-in sheets and leave without receiving
any retaining or sit in the class room for about 5-10 minutes before the
instructor would tell us we could go. About 75% of the time we
simply signed 40-hour sign-in sheets and left with no training. We
would show up and there would be a stack of sign-in sheets on the
table and we would pass them around and everyone would sign in at
once before leaving. I routinely signed in for 40-hour training I did
not receive." If someone who needed training was not present,
"someone would go looking for them to bring them to the classroom
so they could sign in on the 40-hour training sign-in sheet before
returning to whatever they were doing." This practice was "pervasive
throughout the company." Niutei "never received anywhere close to
40 hours of training and never saw or heard of anyone else receiving
anything close to 40 hours of training."

f. <u>Patrick Vinzant</u>, a PSS stationed at Alvarado and the Embassy, agrees
that at "Alvarado, the 40-hour training sign-in sheet was located near
one of the bio machines. If I went by the sign-in sheets, I would sign
in and then leave without receiving any training. If I did not go by the

sheets, one of my team members would sign me in. We routinely met

at the truck where one of the team members would go and sign in any

other team members that had not signed in for the 40-hour training.

This was the general practice among PSS at Alvarado.  At the

Embassy, I don't recall signing any 40-hour training sign-in sheets.

However, we constantly had sign-in sheets brought to us for signing

and I routinely signed them without looking to see what I was signing.

So, it is possible I signed 40-hour sign-in sheets without realizing it.

The Shift Leaders would come to the react room and bring sign-in

sheets for the teams assembled there to sign. The Shift Leaders

brought sheets for all the teams present to sign. Some rooms held

multiple teams and one room held four teams. One or more Shift

Leaders would bring sheets for all teams present to sign at once.

Everyone would pass around the sign-in sheets and sign them without

receiving any training and go back to playing video games."

g.  <u>Thomas Giles</u>, a medic stationed at Alvarado and Sullivan, has

testified that "I only took one or two in-person 40-hour training class.

Ted Hockfelders was the ITI. Other than that, I did not take any 40-

hour training classes and do not recall seeing anyone else take them.

Instead, various sign-in sheets, including sign-in sheets for 40-hour

training, would be left by the bio reader along with the daily work sign-in sheet. So when GardaWorld employees reported for work, there was a stack of sign-in sheets. Everyone would sift through them and sign where their name was printed, but without receiving any training. I did this and saw all everyone else on base who needed to sign sign-in sheets do it as well. Other times I would go to the clinic early and by the time I was done some shift leaders would tell me they had already signed me in. I heard Ronald Crow, Eddie Mullins, Willie Smith, Brian Whitehead, Joel Lashley, and Marti Martinez tell others they had signed them in for 40-hour training. All shift leaders would either tell people to go sign in or sign in the other people on their team."

h.  <u>Ronald Crow</u> corroborates this testimony. He was a Shift Leader at all four GardaWorld locations and agrees "GardaWorld did not provide the 40-hour annual refresher training. Instead, about half of the time we would receive sign-in sheets for signing without any training being given. We would report for training and then sign in and leave while the instructor watched us do it. Many times, if I was on post when training was scheduled, the trainer would come to my truck and obtain a signature from me. The sign-in sheet would identify

55

the class supposedly taken and the number of hours it supposedly lasted. But my team and I signed in without taking the classes. This happened at the Embassy, Sullivan, Seitz, and Alvarado."

i. One Shift Leader, <u>Marcus Harness</u>, "was promoted to Shift Leader. From that leadership position I saw how widespread the false signing of sign-in sheets was. Everyone who needed 40-hour training did it. I never received anywhere near 40 hours of in-person training and no one else stationed at the embassy did either." Instead, "in the [security operations center] SOC, we would sign-in for 40-hour training and any other training, but without receiving the training. I would show up with other men on the ERT dayshift who needed to sign 40-hour training sign-in sheets. This could be up to 25 ERT at once showing up to sign in. There would usually also be 5-10 guards waiting in line to sign their 40-hour training sign-in sheets. The trainers were not present when we reported to the SOC for signing the sign-in sheets."

j. <u>Chris Prohaska</u>, a PSS, Shift Leader, and Detail Leader oversaw multiple shifts of PSS. He is aware that "we did not receive the 40-hour annual refresher training. Sign-in sheets, sometimes more than one, were left out unattended for people to sign in. When that

happened, no instructor was present to give any training or to supervise the sign in sheets. Those in need of training would just go to the unattended sign in sheets, sign their names, and then leave without receiving any training."  "Neither the team nor the team member signing in would attend or receive the training. The mix of my ERT evolved over time, but everyone who was ever a part of my shift signed in this way.  This practice was not limited to my shift of five men. I was employed with the company for years, and based on my personal experience and observation, this practice was systemic within GardaWorld during the entire time I was employed there. While detail leader, the evening shift would consist of 9-11 teams of around 45-55 men. Every person in the detail in need of training would sign in, or have someone else sign them in, without receiving the training."

k. <u>Joel Lashley</u>, a Shift Leader, recalled "time sign-in sheets were left out for people to sign in. When that happened, the instructor was present but would watch as those in need of training would just go to the sign in sheets, sign their names, and then leave without receiving any training."  In fact, one time, "at Alvarado, an instructor arrived and went around the camp telling everyone that the instructors were

behind on training. This instructor went around the base and presented each employee with multiple sign-in sheets to sign at once for those classes needed to keep the employees compliant with the 40-hour training requirements. No one received training during this instructor's visit, he only came to obtain sign in sheets and then left." Like the other Shift Leaders, Lashely "signed others in for 40-hour training they did not receive, and others signed me in for training I did not receive. When I signed others in, trainers were present and observed me signing others in. I signed my whole team in for 40-hour training it did not receive on multiple occasions and saw others signing their team in for training that was not given as well. The trainers were present and observed this as it was happening."

180.    This practice of systemically falsifying training records was the same for Guards.

a.  <u>Scott Kay</u>, who was a Guard before becoming a PSS, has testified that "[w]hile a Guard, I only attended one or two in-person training sessions for 40-hour training. Typically, the sign in sheet for training would be with the duty roster or nearby so that around the time we sign in for our shift we could also sign-in as needed for 40-hour training. We would not receive this training. I saw many others

signing-in for 40-hour training they did not receive and I did it myself."

b.  In fact, a Guard Dispatcher, <u>Dakota Juanchi</u>, saw "Deputy Operations Manager Nicholas Schneider or trainers Lewis Dooley or Bryan Bailey would come by the SOC and drop off sign-in sheets for those who needed it. Those of us in the SOC would pass around the sign-in sheets and sign in the entire day shift. Sometimes we would sign in night shift guards as well. When doing this, we would each sign in a couple of names before passing the sheet to someone else in the room so that they could sign in other names. This practice was intended to ensure that not all signatures looked alike because we knew the Government might inspect the sign-in sheets. Victor Figueroa, Antonio Gray, and Darryl Bryant were in the SOC with me and signing in the day shift guards on the 40-hour training sign-in sheets. No training was given in connection with our forging these signatures."  "This practice was in effect before I became a dispatcher. I simply began participating in a pre-existing practice of systemic forgery upon becoming a dispatcher. This practice was so pervasive and widespread that I am confident that I forged the name of every guard who was stationed at the embassy on a 40-hour training sign-in

sheet at least once."

c.  Another Guard dispatcher, <u>Victor Figueroa</u>, has corroborated this

testimony.  He too saw "[a]lmost daily, Deputy Operations Manager

Nicholas Schneider or trainers Lewis Dooley or Bryan Bailey would

come by the SOC and drop off sign-in sheets for those who has not

already signed in. Those of us in the SOC would pass around the sign-

in sheets and sign in the entire day shift. When doing this, we would

each sign in a couple of names before passing the sheet to someone

else in the room so that they could sign in other names. This practice

was intended to ensure that not all signatures looked alike because we

knew the Government might inspect the sign-in sheets. Darryl Bryant,

the Guards Force Commander was in the SOC with me when this

happened many times."  "This practice was in effect before I became

a dispatcher. I simply began participating in a pre-existing practice of

systemic forgery upon becoming a dispatcher. It was also the practice

of the night shift at the embassy. When I would talk with the night

shift supervisors, they too would complain about the inadequate guard

force and the inability to devote time or manpower to training. They

told me in these conversations that they too were forging signatures

on sign -in sheets and helping guards sign in for training that was not

given. This practice was pervasive and widespread. Guards who were transferred to the embassy told me that this same practice of signing in on 40-hour sign-in sheets without receiving any training existed at those camps as well." The Defendants went to extraordinary lengths to ensure that documentation was falsified to make it appear to the Government as though the training took place, even though the training did not take place.

d. For example, <u>Juanchi</u> and <u>Figueroa</u> were taught to centralize the Defendants' fraud. They were in charge of creating daily guard schedules. In theory, dispatch was supposed to send those not on post to attend the 40-hour training. Instead, the dispatchers never sent these employees to receive any training, so that those employees were instead available to provide relief to the employees who were on post. The employees not sent to receive training were instructed to keep a low profile so it would not be obvious to the Government that they were not receiving the required training. And, as both men have described, they signed the training sign-in sheets in a way to conceal the systemic practice of forging the names of entire Guard shifts.

181. The above are only some select examples included for illustration purposes, but they are just the tip of the systemic, broad, and widespread fraud

iceberg.  The consistency and ubiquity of this type of reporting is astounding, and reflects that the Defendants' deliberate efforts to defraud the Government spanned the entire Contract and all of their operations and locations.

182.   This fraud was top down.  While the above is only a sampling of the declarations obtained by the Relator, the witnesses commonly observed trainers participating in the fraud by obtaining sign-in sheets they knew to be forged and/or which falsely stated that training had taken place.  Senior leadership in Afghanistan ensured, through trainers, Detail Leaders and Shift Leaders, that any missing signatures would be obtained.

183.   The trainers were aware.  As the above witnesses noted, the trainers were often present when the sign-in sheets were falsely signed and/or forged.  In fact, <u>Charles Denison</u>, a PSS and Shift Leader, saw "trainers started stopping by the react room and getting us to sign sign-in sheets with no training whatsoever. My entire shift would sign-in without receiving any training. One time, an ITI came by and saw us playing PUBG on our phones.  PUBG is a first-person shooter battle royale video game that pits players against each other. He joked that the game qualified as SUT/RET training and had us all sign sign-in sheets for those classes without any training."  Denison also "know[s] many other shifts would have one person sign in the entire shift. I saw this happen and also heard shift leaders tell people on their shifts not to worry about signing in because someone on

the shift had taken care of the entire team." He knows the "practices of providing sign-in sheets without providing any training were common at both Sullivan and the Embassy. It was a systemic, company-wide practice. I never received anywhere close to 40 hours of training and never saw or heard of anyone else receiving anything close to 40 hours of training." Another witness reports "David Cascadden and Nicholas Simone each on separate occasions asked me to report to their office for the purpose of signing sign-in sheets for training I did not receive."

184.    Multiple witnesses have made clear this practice of systemic forgery was pre-existing when they were first deployed and they simply continued the practice. This forgery and falsification practice was in place for the day shift and the night shift, for both the Guards-related CLINs and the PSS-related CLINs.

185.    This systemic falsification was so widespread, leadership and trainers had trouble keeping up with the progress of the forged signatures. Therefore, they tasked Juanchi with covering their tracks, which frustrated him as it required him to do extra work. Trainers Dooley and Bailey gave Juanchi access to the training SharePoint and instructed him to update the in-service training status report—a "deliverable" under the Contract that was intended to keep the Government apprised of 40-hour training status Juanchi has testified that with the trainer's access, he updated the status reports so that the report matched the status of the training based on the forged sign in sheets. However, none of this training had

actually taken place.  The reports, which as described above were deliverables under the Contract, were "completely fabricated by me based upon the forged sign-in sheets."  Figueroa confirmed that he "watched him access the training SharePoint folder and update the in-service training status report so that the report matched the status of training based upon forged sign-in sheets. However, none of the training that Juanchi was updating in the report had taken place. The report was completely fabricated by him based upon the forged sign-in sheets."

186.    Some people were deployed without previous military experience. Many employees with military experience believed the lack of 40-hour training for those people who did not have such experience made things more dangerous at the embassy and camps because they did not have adequate experience before deployment or even training thereafter.

187.    Former employees of the Defendants who went on to work for Triple Canopy, SOC, or other companies had completely different experiences at these other companies.  For those companies, 40-hour training was mandatory, important, given by trainers, and taken by employees.  Documents were not forged. The Government was not intentionally lied to and deceived to hide fraud.  In other words, those experiences were the opposite of their experiences with Defendant.

188.    The Defendants' practice of not giving the Contractually required 40-hour training was so pervasive that the Guards and PSS employed by the

Defendants did not receive anywhere near forty hours of 40-hour training and witnessed others not receiving this training. However, each PSS and Guard was aware these training requirements were mandated by the Contract and that they were signing or forging 40-hour sign in sheets in order to fool the Government into believing the training did take place and the employees were not "unbillable."

189. The statements contained within the certifications and reports in connection with all the training discussed above were false, the Defendants knew they were false, and the Defendants made the false statements for the purpose of getting paid by the Government. The employees who were instructed to and did participate in the fraud believed the purpose of the system forgery was to fool the Government into thinking they were compliant with contract even though they were not, so that they employees would not be "unbillable" and have to be sent home.

190. Another way the Defendants perpetuated this fraud was by submitting claims for employees its internal records indicated had not received the required 40-hour training. For example, according to records recently produced by the Defendants, Brent Cooper was employed at least as early as 2018 and remained employed through 2021. He should therefore have more than fifty sign-in sheets showing he received 40-hour training. Yet the documents produced by Defendants using the search terms provided by the Defendants to locate 40-hour training sign-

in sheets reveal that Cooper did not sign a single sign-in sheet in 2018, signed only

one in 2019, three sheets in 2020, but somehow managed to sign 13 sign-in sheets

over a five-day span in February 2020.

191.   Another example is David Caligiuri, who, according to records

recently produced by the Defendants was deployed at least as early as 2018 and

remained in Afghanistan through 2021. Caligiuri should have more than fifty sign-

in sheets showing he received 40-hour training.  However, the documents produced

by the Defendants using the search terms provided by the Defendants to locate his

training records reveal that Caligiuri did not sign a single sign-in sheet in 2018 or

2019, and signed only two sign-in sheets in 2020 and four in 2021.

192.   A third example is Zachery Morris who, according to Defendants'

records, was deployed from 2018 through 2021.  Morris should also have more

than fifty sign-in sheets showing he received 40-hour training.  However, the

documents produced by the Defendants using the search terms provided by the

Defendants to locate his training records reveal that Morris signed a single sign-in

sheet on March 13, 2021.

193.   A fourth example is Mateo Salado who, according to Defendants'

records, was deployed from 2018 through 2021.  Salado should also have more

than fifty sign-in sheets showing he received 40-hour training.  However, the

documents produced by the Defendants using the search terms provided by the

Defendants to locate his training records reveal that Morris signed a single sign-in sheet in June 2021.

194.   A fifth example is Glenn Sears, who, according to Defendants' records, was deployed from 2018 through 2021.  Sears should also have more than fifty sign-in sheets showing he received 40-hour training.  However, the documents produced by the Defendants using the search terms provided by the Defendants to locate his training records reveal that Sears seven sign in sheets in December 2018, one in 2019, and five in 2020.

195.   For each of the employees discussed above, the Defendants billed the Government for the time and services of the employees, despite knowing that each employee was unbillable.

E. <u>Claims to the Government</u>

196.   The Contract provided that full payment for each invoice was



."  § G.9.A.

197.   Payment of invoices the Defendants submitted to the Government was contingent upon the Defendants fulfilling their training obligations under the Contract.

198.   In each instance of billing, the Defendants were required to certify

that the terms of the contract had been met and that the Defendants had not made any false statements in connection with the billing.

199.    The Contract permitted the Defendants to bill for the labor of its employees at the labor rates negotiated in the task order.  § B.4.2.2.  These labor rates changed from year to year.

200.    To receive payment from the Government for the labor of its employees, the Defendants were required to submit monthly invoices for each employee. Each employee was billed at a daily rate for the days worked. With each invoice, the Defendants were also required to submit muster sheets, which contained the names of the employees and the days the employees worked. The muster sheets were used to verify the number of days that would be applied to the daily labor rate.

201.    The Contract also permitted the Defendants to submit claims or payment on certain costs.  For example, the Defendants could seek payment for transportation, lodging, meals, incidental expenses, and passport/visa costs (collectively "Travel Costs").  § B.8.

202.    The Contract also permitted the Defendants to seek reimbursement for Post Hardship Differential Pay ("Hardship Pay") and Danger Pay, which the Contract recognized as a form of incentive compensation.  § B.9.

203.    Upon information and belief, Hardship Pay was 35% of the daily

labor rate while Danger Pay was an additional 35% of the daily labor rate. In other words, Defendant submitted claims to the Government for 170% of the daily labor rate for each CLIN at issue in this lawsuit.

204.   The Contract permitted the Defendants to submit claims for training costs associated with each employee.

205.   The Contract assigned separate CLINs for the Travel Costs, Training, Hardship Pay, and Danger Pay.  § B.16.

206.   For each submitted invoice, the Defendants certified that each employee met the terms of the Contract, including the physical fitness testing requirements and training requirements.

207.   Each time the Defendants submitted an invoice to the Government payment, the Defendants were falsely certifying that it had complied with the training and PEB requirements.

208.   In reality, none, or virtually none, of the employees deployed by the Defendants under the WPS II contract were eligible for payment at the daily labor rate, reimbursement of the Travel Costs, payment of Training costs, payment of Hardship Pay, and/or payment of Danger Pay.

<u>MATERIALITY</u>

209.   The Defendants' truthful certification that its employees had met the requisite physical fitness and training requirements was a condition of the

Government's payment for labor, services, and training.

210.   The central aim of the Contract was for the Defendants to provide properly trained personnel to protect Department of State personnel and assets. Compliance with the physical fitness and training requirements therefore went to the essence of the bargain.

211.   Had the Government known of the Defendants' noncompliance, it would not have paid the invoices in question.

212.   Even if the Government did know of the noncompliance, or of some bits of the noncompliance, the fact that the Government paid the invoices in question does not render the Defendants' noncompliance immaterial as there were other reasons for payment. Indeed, the Defendants' employees were defending Department of State personnel and assets in the middle of a warzone. The Government could not simply stop paying altogether or the security of its personnel and assets would be jeopardized.

213.   The Government has also previously clawed back money from the Defendants upon learning of noncompliance or taken other corrective action.

214.   In 2019, for example, the Defendants deployed two guards to Afghanistan who had failed their PEBs at the training center in Perry, Georgia and were therefore unbillable. Upon learning that the Defendants had invoiced the Government for the guards' labor in Afghanistan, the Government required the

Defendants to pay the money back.

215.    On April 10, 2020, the Government issued a deficiency notice in connection with the Defendants' notification that several employees had been trained by a non-BIO approved instructor.  In that letter, the Government made clear that ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████." 

216.    The Government also wrote the Defendants on March 10, 2020, and stated that employees who were not properly trained "███████████████████

███████████████████████████████████" and that the Defendants were prohibited from submitting claims for payment for employees who were not trained in compliance with the Contract.

217.   Record keeping was also of vital importance to the Government's efforts to ensure compliance with the training records.  On January 10, 2020, the Government wrote a letter of concern in which it notified the Defendants that in an October 2019 review Government officers found that certifications for medical personnel were missing and the Defendants were not in compliance with the above

mentioned contractual record keeping requirements.

218.    In this letter, the Government reiterated that the Defendants were

"████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████

219.    The Government also made clear that "████████████████████

██████████████████████████████████████████

███████████████████████████████████████████."

220.    Moreover, the Defendants lied to the Government to cover its tracks.
As set out above, sign in sheets were systematically forged to hide the fact that
employees were not trained and were therefore "unbillable."  Where the
Government became aware of any missing signatures, the Defendants lied to the
Government.  Upon information and belief, and as an example, on or around June
7, 2019, Defendants wrote the U.S. Department of State, Defendant to falsely
characterized these as "███████████████████████████████

█████████████████████."  The Defendants claimed:



██████████████████████████████████

221.    In making these false representations to the Government, the Defendants intentionally misled the Government into believing there were merely paperwork issues.  In fact, the Defendants deliberately failed to provide required training in a systemic manner, and covered up the failure with systemic forgeries of training documents.  Had it known the truth, the Government would have declared the Defendants' employees "unbillable" and would have considered these failures and frauds to be material.   The Government considers employees who are not properly trained under the contract to be "contractually unqualified and unbillable."  The Government communicated this to the Defendants.  That is why the Defendants perpetrated this widespread fraud – the financial costs to the Defendants are in the hundreds of millions of dollars.

### COUNT I

VIOLATION OF THE FALSE CLAIMS ACT:
31 U.S.C. § 3729(a)(1)(A)

222.    Relator re-alleges the allegations contained in Paragraphs 1 through 221 of this Complaint as if fully set forth herein.

223.    The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented, or caused to be presented, to the United States, a false or fraudulent claim for payment or approval.

224.   The Defendants submitted a wide variety of invoices for payment, including for the categories identified above, based upon the materially false representation that their employees had met the qualifications of the Contract, including the requirements that their employees had taken and passed physical fitness tests and training classes.

225.   For example, the Defendants submitted monthly labor invoices for all employees within each labor CLIN, including Employee Smith, Employee Jenkins, Employee Taylor, Employee Bailey, Employee Dooley, Employee Shields, Employee Jones, and Employee Carter based on the materially false representation that these employees had taken and passed the required physical fitness tests.

226.   The Defendants also submitted invoices for all claims permitted under the Contract for its employees, including but not limited to training and monthly labor invoices, for each of its employees whom had not been trained in compliance with the Contract requirements, including but not limited to the employees listed in Exhibit 5, Exhibit 7, and Exhibit 9 attached to this Amended Complaint, based on the materially false representation that each employee for whom payment was sought in the invoices submitted to the Government had taken and passed the required training classes and/or been retrained and/or provided an attestation.

74

227.   The Defendants submitted contractually required documentation, including but not limited to muster sheets, labor invoices, training invoices, and invoices for Travel costs, Training, Hardship Pay, and Danger pay knowing that no, or virtually no, employees deployed in Afghanistan and subject to these requirements  were in compliance with the Contract's training requirements and therefore were "unbillable."  Each and every such invoice submitted by Defendants from 2018 through and including 2021 was false.

228.   The Defendants' misconduct included the employees identified above for illustration purposes, but was widespread, systemic, and not limited to those employees as set out in their testimony and in the relevant documents. The Defendants also included employees who were not billable under the Contract based upon the records the Contract required the Defendants to generate and maintain.

229.   The Defendants presented their claims for payment knowing that they were materially false.

230.   The United States, unaware of the falsity of the claims made by the Defendants, and in reliance of the accuracy of these claims, paid for the services of the Defendants' unqualified employees.

231.   Had the United States known that the Defendants were violating the federal laws cited herein and/or that the claims the Defendant caused to be

submitted to the United States failed to meet the criteria under the Contract, it would not have paid those claims.

232.    The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

## COUNT II

## VIOLATION OF THE FALSE CLAIMS ACT:
## 31 U.S.C. § 3729(a)(1)(B)

233.    Relator re-alleges the allegations contained in Paragraphs 1 through 221 as if fully set forth herein.

234.    The Defendants, by and through their officers, agents, and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim submitted to the United States.

235.    The Defendants made and used false records indicating that their employees had completed and passed required physical fitness tests and training classes to induce the United States to approve and to pay the Defendants' false claims.

236.    For example, the Defendants made and used statements in muster sheets, sign-in sheets, Projected In-service Training Class Schedules, Quarterly In-

service Training Status Reports, Corrective Action Plans, correspondence with the Government, responses to letters of concern and/or deficiency notices, Physical Fitness Qualification Status Reports, WFRs, clean sheets, certifications, and the PEB Tracker which falsely stated and certified that the employees for whom payment was sought had taken and passed the required physical fitness tests and that their labor costs were therefore billable.

237.    The Defendants also made and used statements in muster sheets, sign-in sheets, Projected In-service Training Class Schedules, Quarterly In-service Training Status Reports, Corrective Action Plans, correspondence with the Government, responses to letters of concern and/or deficiency notices, Physical Fitness Qualification Status Reports, WFRs, clean sheets, certifications, and the PEB Tracker which falsely stated and certified that the employees for whom claims had been submitted had taken and passed the required training classes and/or signed an attestation stating that such training had been obtained, and/or been retrained and that the claims submitted, including their labor costs and the costs of the training, were therefore billable.

238.    The Defendants' misconduct included the employees identified above for illustration purposes, but was widespread, systemic, and not limited to those employees as set out in their testimony and in the relevant documents.

239.    These Defendants made, used, and submitted these false statements

and records to the Government for the purpose of getting invoices for allowable claims, including but not limited to monthly labor invoices and training invoices, paid or approved by the Government.

240.   The United States was misled by the actions of the Defendants, and, as a result, paid the Defendants' false claims.

241.   The Defendants have knowingly violated 31 U.S.C. § 3729, et seq., and have thereby damaged the United States by their actions in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States, respectfully requests a trial by jury on all issues and that this Court award the following damages and all further relief as this Court deems equitable and just to the following parties and against the Defendants:

To the United States:

(A)    Three times the amount of the actual damages which the United States has sustained as a result of the Defendant's conduct;

(B)    A civil penalty of not less than $11,665, and as much as $23,331, for each false or fraudulent claim, record, or statement the Defendants caused to be presented, made, or used to or with the United States.

(C)    Prejudgment interest; and

(D)    All costs incurred in bringing this action.

78

To Relators:

(A)    The maximum amount allowed pursuant to 31 U.S.C. § 3730(d)

and/or any other applicable provision of law;

(B)    Reimbursement for reasonable expenses which Relators incurred in

connection with this action; and

(C)    An award of reasonable attorneys' fees and costs.

This __ day of October, 2023.

**Bayuk Pratt, LLC**

*/s/ Bradley W. Pratt*
Bradley W. Pratt
Georgia State Bar No.: 586672
Frank T. Bayuk
Georgia State Bar No.: 142596
4401 Northside Parkway, Suite 390
Atlanta, GA 30327
Phone: 404-500-2669
Fax: 404-255-2019
bradley@bayukpratt.com
frank@bayukpratt.com

**ELLIS PAINTER RATTERREE & ADAMS**

*/s/ Jason S. Pedigo*
Jason S. Pedigo
Georgia Bar No. 140989
Attorneys for Relator
P.O. Box 9946
Savannah, GA 31412
T: (912)233-9700
pedigo@epra-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October ____, 2023, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system, which will automatically send notification of such filing to all counsel of record.

*/s/ Bradley W. Pratt*
BRADLEY W. PRATT