**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. JUSTIN FAHN,**<br><br>         **Plaintiffs,**<br><br>**vs.**<br><br>**GARDAWORLD FEDERAL SERVICES, LLC, and AEGIS DEFENSE SERVICES, LLC,**<br><br>         **Defendants.** | **CIVIL ACTION FILE NO. 5:20-CV-00128-MTT** |

## RELATOR'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants are a sophisticated government contractor that chose to falsely bill the United States. What happened in this case is straightforward: Defendants agreed to meet contractual training requirements for the safety and benefit of Americans in Afghanistan. Instead of keeping their word, Defendants executed a scheme to defraud. First-person accounts and Defendants' own documents reveal a scheme to deliberately falsify training documents and forge signatures to show refresher training occurred when it did not. According to Defendants' own internal records, the majority of Defendants' personnel in Afghanistan received a fraction of required, mission-critical training. The training documents in Defendants' files also betray another fraud: a cover up. Defendants did all this for a simple reason: to obtain payment from the Government for personnel that otherwise were "unbillable." The evidence is consistent and powerful, and the Court should deny Defendants' motion for summary judgment.

## ARGUMENT AND CITATION TO AUTHORITY

Defendants' six arguments are legally incorrect, ignore factual disputes, or both. The contract—Worldwide Protective Services II ("WPS II")—controlled the parties relationship. *See*

WPS II Contract (Exh. 1). Under WPS II, only the State Department Contracting Officer could modify the contract. *Id*. at GWFS00220413. As Defendants knew, neither Defendants nor other DoS personnel could change the contract's terms. *See* Contracting Officer[1] (Exh. 2) at 40:7-14, 52:7-13, 315:6-18; DoS Employee (Exh. 3) at 267:12-19, 268:1-20; GardaWorld 30(b)(6) (Exh. 4) at 78:9-12; *see also* Delegation of Authority Memorandum (Exh. 5) (preventing even an ACOR from modifying the contract). Defendants' own policies placed the burden on itself to understand and comply with the contract. *See* Code of Business Ethics at 15 (Exh. 6) ("[I]t is incumbent on those with the responsibility of performing them to understand and fulfill the Company's obligations in accordance with the contractual terms and conditions."). Defendants had an obligation to ensure "all modifications to or deviations from contract requirements are approved by the [Contracting Officer] in advance." Exh 1 at GWFS00220413.

WPS II imposed on Defendants detailed training requirements. Exh. 1 at GWFS00220604-695. Defendants had to comply with *all* of WSP II's training requirements—Defendants could not pick and choose which training their personnel wished to complete. Contracting Officer (Exh. 2) at 329:8-14, 379:10-19; DoS Employee (Exh. 3)  268:14-20; GardaWorld 30(b)(6) (Exh. 4) at 51:13-19. Defendants were required to perform "Annual Refresher Training," which included 40 hours of instruction each year. Exh. 1 at GWFS00220370 (requiring Guard and Protective Services personnel "receive and successfully complete a minimum of forty (40) hours of in-service refresher training annually."). WPS II required Defendants to have instructors approved by the DoS, teach approved curriculum, and abide by a set student-to-instructor ratio of 5 to 1. Contracting Officer (Exh. 2) at 328:17-329:7; DoS Employee (Exh. 3) at 278:2-12, 323:24-324:2; *see als*o Exh. 1 at GWFS00220612-624, 686; Email from Don Taylor, Dec. 31. 2019 (Exh. 7) (explaining ITI

---

[1] At the request of DoS, Relator has omitted the identities of DoS personnel in this filing.

instructor requirement). The curriculum included substantive topics such as compound defense, deadly force, pre-attack indicators, and tactical medicine. *See* Exhs. 8-11 (identifying curriculum and instructor type). The refresher training obligation began "once the Contractor's personnel commences work" in country. Exh. 1 at GWFS00220370; Email from Eric Lasich, Feb. 14, 2018 (Exh. 12) (discussing that refresher training began February 2018).[2] Under WPS II, any individual who did not receive all the required training was "unqualified," "unbillable," and the position was "unstaffed for purposes of deductions." *See* Exh. 1 at GWFS00220612, -632, -672, -686.

I.   **GardaWorld Federal Services LLC Is a Proper Defendant.**

The Court should deny Defendants' motion as to GardaWorld Federal Services LLC. First, Defendants rely on a declaration to draw a distinction between GardaWorld Federal Service LLC and "GardaWorld," *see* Defs. MSJ at 4—but the Declaration itself says "GardaWorld Federal Services LLC" *is* "GardaWorld". *See* Exh. 13 ¶ 2. Second, Defendants' corporate representative for both entities testified the two named defendants are "one in the same." GardaWorld 30(b)(6) (Exh. 4) at 16:19-20. Third, Defendants' initial disclosures defined the entities as one: "Defendants GardaWorld Federal Services, LLC and Aegis Defense Services LLC (collectively, "GardaWorld")". *See* Defendants' Initial Disclosures (Exh. 14). Fourth, Defendants' counsel repeatedly stated to deponents: "if I refer to Aegis as GardaWorld, we'll understand that GardaWorld is Aegis, Aegis is GardaWorld?" *See, e.g.,* Lopezzamora (Exh. 15) at 13:21-14:6. At a minimum, fact questions exist as to each named Defendant's responsibility.

II.  **Overwhelming Evidence Exists as to Defendants' Scheme and Scienter.**

Defendants engaged in a multi-year scheme, at multiple locations in Afghanistan,

---

[2] This is one example of over 5,000 documents Defendants elected to produce mere hours prior to the close of discovery on January 17, 2024—after all depositions were completed.

disregarding their clear legal duties to always provide DoS fully trained personnel. Defendants then consciously chose to cover up their refresher training failures by creating false documentation and casting aside Defendants' affirmative obligations to disclose compliance issues.

Although Defendants cite no supporting legal authority, Defendants seek to draw an artificial and self-serving line between "management" and the rest of the company. That is not the law. In FCA cases, "knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment." *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) ("We rejected the contractor's claim that a corporation may not be charged with the knowledge of an employee who was not responsible for the operations of the corporation."). Although, supervisors were aware of the scheme, the FCA does not limit liability of a company to its managers. *See, e.g.*, *United States ex rel. Reeves v. Mercer Transportation Co., Inc.*, 253 F. Supp. 3d 1242, 1255 (M.D. Ga. 2017) ("There is no requirement, as Mercer suggests, that these employees must work in a managerial capacity.").

The evidence of Defendants' scheme to conceal their failure to provide mission critical refresher training is substantial. Witnesses have testified to the scope of the wrongdoing. Defendants' documents significantly corroborate the witnesses. Far from no genuine dispute, the evidence is compelling and demands a jury trial.

A. **Hundreds of Defendants' Employees Did Not Receive Required Refresher Training.**

Defendants' argument that the "unrefuted" evidence shows that Defendants gave all the required refresher training WPS II is simply not true. Motion at 13. Substantial evidence exists that not only were Defendants' employees not trained as required, but that the scope of these

training failures was stunning. The United States paid tens of millions of dollars for **hundreds** of Defendants' employees who did not receive the required refresher training and were "unbillable."

Relator obtained declarations from over a dozen of Defendants' former employees. *See* Exh. 16-34. These declarants—many of whom do not know each other and served at different times and locations—relay a remarkably similar account: they did not actually receive all the required refresher training, their teams did not actually receive all the required training, and Defendants fostered a pervasive practice of creating false documentation for training not actually received.[3] Defendants decided to depose each of these individuals. *See* Exh. 15, 35-53.

During their depositions, the breadth and scope of Defendants' fraud became even clearer. Defendants' own personnel reiterated they did not receive the required refresher training reflected in Defendants' internal records, which included signing in for classes that did not occur at all, classes where employees signed then left after a few minutes, "training" days were held when an individual actually packed for leave or travel, and sometimes even "training" when the team actually just **played video games**.[4]

---

[3] *See*, *e.g.*, Figueroa Decl. ¶16 ("As a dispatcher, I was in charge of creating the daily guard schedule for the day shift. I would staff the required guard positions and, in theory, those not on post were free to receive 40-hour training. However, we never sent those not on post to receive any training because of manpower issues."); Prohaska Decl. ¶ 17 ("[O]ne of the team members would go to the classroom and sign the sign-in sheets on behalf of the entire team. Neither the team nor the team member signing in would attend or receive the training. The mix of my ERT evolved over time, but everyone who was ever a part of my shift signed in this way."); Juanchi Decl. ¶ 18 ("I received in-person training from an ITI once or twice. The rest of the time, I signed a sign-in sheet along with my team even though there was no trainer present.").

[4] Figueroa (Exh. 35) at 214:10-215:19, 217:17-218:22, 218:19-219:13, 222:19-223:4, 244:10-245:7 (discussing false Excel spreadsheets); Juanchi (Exh. 36) at 192:4-24, 228:22-230:21, 232:6-232:12, 235:19-235:24, 248:1-249:7, 249:14-21, 285:19-286:9, 299:18-301:24, 50:21-51:1; Prohaska (Exh. 37) at 225:17-228:19, 230:13-232:10, 246:1-247:6, 249:7-250:14; Collins (Exh. 38) at 241:9-251:2, 257:1-4, 258:19-259:20 (indicating he did not receive training as depicted on Defendants' documents), 260:11-18 (confirming 17 hours of training did not actually happen), 267:5-269-18 (confirming 10 hours of training did not actually happen); Coufal (Exh. 39) at 148:11-1, 151:23-25; 160:23-163:13, 186:15-192:11; Denison (Exh. 40) at 244:7-22, 245:15-

While that alone raises fact questions, Defendants' records corroborate the systemic scheme to defraud the Government. WPS II understandably required Defendants to create a number of training records, including reports, class schedules, and sign-in sheets. Exh. 1 at GWFS00220632; GardaWorld "Standard Operating Procedures" for Integration and Training (Exh. 54 at GWFS00164664) and (Exh. 55 at GWFS00164386) (describing documentation as a "deliverable"). WPS II also required Defendants to maintain "complete employee training records," including sign-in sheets for classes attended. *See* Exh. 1 at GWFS00220614; *see also* Contracting Officer (Exh. 2) at 317:2-318:4.

In the words of DoS, "Sign-in Sheets are a contractual requirement explicitly spelled out as a deliverable…this requirement although seemingly innocuous is in place as one of the only tools to assist the [DoS] in providing some level of oversight while not present for each class." *See* Email from D. Hixon, Apr. 23, 2019 (Exh. 56); Contracting Officer (Exh. 2) at 317:2-318:4. Defendants were fully aware of the requirement to maintain training documents in an individuals' personnel file (if the training actually occurred). Email from B. Bailey, May 31, 2020 (Exh. 57) (discussing missing training records); Dooley Dep. (Exh. 58) at 109:2-5 (acknowledging sign in sheets identify who received training); Email from D. Harrison, May 8, 2019 (Exh. 59)

---

247:5, 247:15-248:4, 260:8-261:14, 262:1-263:3; Dubasik (Exh. 41) at 228:4-12; Esters (Exh. 42) at 171:23-172:19, 186:6-186:16, 187:2-187:6; Giles (Exh. 43) at 116:11-117:3, 121:8-122:11, 125:3-125:19, 126:4-135:11; Harness (Exh. 44) at 157:1-24, 160:9-12, 162:22-163:14, 199:2-200:9, 202:24-205:16, 208:14-212:19, 215:1-217:10; Homan (Exh. 45) at 171:13-16, 173:7-15, 175:19-176:11, 184:14-23; Howell (Exh. 46). at 207:20-209:1, 173:18-179:6, 185:2-7; Jakubowski (Exh. 47) at 145:20-146:23, 155:13-24, 159:10-161:19; Kay (Exh. 48) at 167:7-168:18, 169:22-170:2, 174:16-177:3, 183:13-184:23, 209:25-211:19; Lopezzamora (Exh. 15) at 318:9-13; Niutei (Exh. 49) at 151:9-154:20, 156:15-158:15, 208:8-209:6, 215:23-217:1, 217:6-219:22, 220:6-222:13, 130:24-131:6; Oates (Exh. 50) at 378:5-387:25, 401:6-403:3, 407:9-408:25; Romano (Exh. 51) at 185:1-192:14, 216:19-217:8; Vinzant (Exh. 52) at 322:12:326:7, 322:5-323:11, 326:8-328:8, 355:6-336:1; Fahn (Exh. 53) 50:21-51:3, 91:16-21, 148:2-149:13, 150:5-8, 157:7-160:10, 164:15-167:13, 346:11-16, 355:16-21.

(acknowledging direction regarding importance of sign-in sheets); Email from K. Carter, May 26, 2020 (Exh. 60) (noting none of the personnel files contain training records, despite requirement). Communications between DoS and Defendants likewise made clear the requirement to maintain training documents. *See* Ltr. from DoS, July 12, 2019 (Exh. 61) ("The Contractor shall maintain complete employee training records, documenting the training each employee receives throughout the life of the contract. Copies of training records shall be retained in the individual's personnel record[]" and "posted on their web portal."); *see also* Ltr. from P. Hoyt, Jan. 30, 2020 (Exh. 62) (acknowledging record-keeping duties under WPS II).

Relator reviewed Defendants' sign-in sheets—i.e. a contract deliverable—to identify which individuals took which refresher class and whether Defendants' own records reflect compliance with the refresher training requirement. Wells (Exh. 63) at 100:16-102:14. Far from there being an absence of dispute, Defendants' own records show ***hundreds*** of individuals failed to meet the DoS requirements. *See* Summary of Sign-In Sheets (Exh. 64-1) (totaling "hours" of refresher training on sheets); *see also* Resp. Mot. To Strike Exhibits (ECF 123). Relator then performed a second review, identifying individuals and amounts billed to the United States. *See* Summary of Payments (Exh. 64-2). At trial, the jury will see tens of millions of dollars—itemized by individual—paid for personnel Defendants' own training records show as "unbillable."

**B.  Evidence Exists Proving a Scheme to Cover Up Defendants' Training Failures.**

Separate from the failure to complete required refresher training, substantial evidence of Defendants' cover up of training failures refutes any scienter defense. By way of illustration, Defendants' employees repeatedly testified signatures on training documents contained **false and**

7

**forged signatures**.[5] Defendants' own employees admitted to recognizing photocopied sign-in sheets for refresher training classes and that such a practice was not appropriate.[6] Defendants' own personnel described Defendants' refresher training records as false documentation:

```
        Q.   How would you characterize the practice
of signing sign-in sheets for 40-hour training that
did not actually occur?
        A.   That it was false documentation.
```

Harness (Exh. 34) at 206:19-22. [7] And, to be clear, the purpose of false documentation was to avoid DoS detection: one individual described a common practice of signing a few names and then another person would sign a couple more, "Because they wanted to make them look different. Not make the same person sign it with, let's say, a blue ink pen.  Then it will look kind of weird." Figueroa (Exh. 25) at 239:18-244:5; Juanchi (Exh. 26) at 244:23-245:17.[8] To be sure, multiple individuals testified to the importance of refresher training and dangers created by the lack of such

---

[5] Collins (Exh. 38) at  241:9-251:2, 257:10-14 (identifying signatures that were not genuine); Coufal (Exh. 39) at 154:25-155:23, 164:1-165:6, 166:18-22; Figueroa (Exh. 35) at 218:19-220:4, 223:7-225:7, 235:5-236:17, 247:1-247:24 ("I believe GardaWorld was trying to show, hey, we're trying to train them, but the training wasn't actually really happening."); Harness (Exh. 44) at 183:4-184:13; Oates (Exh. 50) at 382:1-19; Lopezzamora (Exh. 15). at 305:2-9; Kay (Exh. 48) at 171:3-172:14, 212:9-14; Juanchi (Exh. 36) at 50:17-50:20 ("Q: In your declaration you admit to forging signatures on GardaWorld's sign-in sheets, correct? A: Absolutely."), 227:2-229:22, 231:2-232:5, 257:15-259:6; Giles (Exh. 43). at 174:20-175:24; Esters (Exh. 42) at 176:7-176:12, 177:7-178:19, 181:9-184:13; Niutei (Exh. 49) at 212:16-214:22.
[6] Coufal (Exh. 39) at 146:20-147:18; Howell (Exh. 46) at 200:20-204:13, 212:10-11; Kay (Exh. 48) at 184:24-191:18; Romano (Exh. 51) at 208:22-213:20; Niutei (Exh. 49) at 205:14-206:2.
[7] *See also* Oates (Exh. 50) at 423:19-424:3 ("Q: Was -- was asking someone to sign a 40-hour sheet for a course they didn't take and then telling the government that they took that course, was that crossing the line? A: Absolutely."); Juanchi (Exh. 36) at 45:10-12 (Q Okay.  You knew that your actions violated federal law? A: Yes.").
[8] Romano (Exh. 51) at 196:1-197:7 ("We already knew that it's all about money.  That's why stuff was being forged in the first place, or training sign-in sheets, because the company wanted to be -- to look like everything was all -- everything was clear as day that we're doing the training, everybody is good because they can't -- because then you're unbillable."); Figueroa (Exh. 35) at 241:19-22; Harness (Exh. 44) at 206:8-18; Jakubowski (Exh. 47). at 161:22-162:16; Oates (Exh. 50) at 409:16-25; Kay (Exh. 48) at 191:15-18; Juanchi (Exh. 36) at 245:23-247:25, 51:2-6.

training. *See, e.g.*, Romano (Exh. 51) at 180:11-183:5, 192:16-195:24 ("But we would talk about it all the time. Like, 'Dude if they ever attack us here, we're so screwed because it's going to be just a gaggle. It's going to be a mess.  There's only going to be a few people that are going to be able to repel the attack.'").[9] Coufal (Exh. 39) at 138:24-142:11 ("Q: And why is that refresher training important? A: When you don't actively do something, it's perishable.").

Defendants' own documents corroborate this witness testimony. By way of illustration, attached are over ***100 examples*** of false documentation, including (1) copied/xeroxed sign-in sheets, (Exh. 65, 1-18); (2) forged signatures identified by individuals with personal knowledge, (Exh. 66, 1-55); (3) unrealistic training hours in a single day based on Defendants' duty schedule and witnesses' testimony, (Exh. 67, 1-10), *see also* Email from B. Bailey to GardaWorld Trainers, Nov. 9, 2020 (Exh. 68); (4) one-person training that did not happen, (Exh. 69, 1-2); and (5) classes twenty people or more despite a 1:5 instructor/student ratio, (Exh. 70, 1-13).

### C. Scienter Evidence Exists as to Supervisors, Training Staff, and Others.

Although the supervisor versus employee distinction is a red herring, there is substantial evidence regarding knowledge of supervisors and other key employees. Defendants' employees admitted to signing false documents, including refresher training, because the practice was pervasive throughout Defendants' corporate culture.[10] In the words of one witness, "[s]ign the

---

[9] *See also* Denison (Exh. 40) at 252:1-253:2, Figueroa (Exh. 35) at 210:10-212:21, Harness (Exh. 44) 189:22-193:2, 261:1-10; Homan (Exh. 45) 186:3-8; Jakubowski (Exh. 47) 124:16-127:24, 162:17-163:10; Prohaska (Exh. 37) 252:11-253:9, 259:19-262:3; Oates (Exh. 50) 340:25-341:12; Howell (Exh. 46) 193:22-196:6; Kay (Exh. 48) 158:17-162:11; Juanchi (Exh. 36) at 232:13-235:2; Dubasik (Exh. 41) at 203:204:18; Niutei (Exh. 49) at 169:12-21, 185:21-24, 188:21-189:18.

[10] Prohaska (Exh. 37) at 262:6-18 ("Q: And when it comes to training, what do you mean?  A: I'm telling you, it's just the culture.  I mean, you're signing stuff that you're not actually doing. I mean, it's like telling your wife you're at Walmart when you're really at the strip club."); Collins (Exh. 38) at 269:14-272:13; Jakubowski (Exh. 47) at 146:24-147:16; Howell (Exh. 46) at 207:2-19, 213:7-13; Juanchi (Exh. 36) at 53:13-55:13, 236:1-241:6, 243:1-244:22, 249:22-250:4, 281:17-

papers and shut up" and "pencil whipping"—at the directions of Defendants' supervisors. [11]

In one eloquently blunt assessment of Defendants' own refresher training records, one training instructor saw 16 hours of refresher training purportedly documented—despite there only being 12 hours on shift. *See* Exh. 68. In this trainer's view, this was "bullshit" and the trainer proceeded to warn his fellow trainers about what would happen when "ALL the stones get turned and they start digging." *Id.* (emphasis in original). Incredibly, even after putting these concerns in writing, the author of the email calling out 16-hour days as improper then ***gave 18 hours of instruction*** in a single day. *See* Sign-in Sheets dated May 10, 2021 (Exh. 71). The same is true of training staff recognizing problems with refresher training class sizes yet disregarding their own warnings in the interest of expediency. *Compare* Email from B. Bailey, Jun. 2, 2020 (Exh. 72) ("Having one instructor teaching 20 people for UD at one time is a BIG no go.") *with* Sign-in sheet dated Mar. 8, 2021 (Exh. 73) (ITI Bailey teaching more than 20 people at one time).

Evidence also exists Defendants' US-based personnel saw red flags as to training compliance. Near the start of WPS II, Defendants internally projected 59,000 hours of training needed, which required a dramatic increase in training staff (totaling 20+ instructors) because

---

285:18, 303:6-304:1; Romano (Exh. 51) at 186:12-187:18, 188:14-189:9; Giles (Exh. 43) at 144:23-148:23; Fahn (Exh. 53) at 28:13-14, 159:25-161:18, 162:9163:15, 164:3-165:15.

[11] Collins (Exh. 38) at 273:20-22, 275:1-12; Juanchi (Exh. 36) 49:20-50:8 ("As I said in my statement, us preparing these documents, forging these signatures and whatever else, was a process that was set in place that predated my position in the SOC. So as far as us knowing -- us that work in the SOC knowing that it's a federal crime and that working for GardaWorld, now we have to retain a lawyer because it's -- we're breaking federal law, that's not something we thought of when we did this. That's not something that we thought we'd be subjected to. Because it was a standard practice to do the forging of the signatures or whatever the case may be."), 51:7-51:14 ("Q: Okay. And it never occurred to you, in light of those admissions, that it might be more prudent for you to have your own lawyer review that statement before you signed it? A: No. I didn't think that at all because I was under the assumption that I was protected by my supervisors at GardaWorld because I was being told by them to do so."), 53:11-55:13; Figueroa (Exh. 35) at 106:12-116:23 (ITI's and other supervisors knew guards were not getting training), 152:3-24, 236:18-238:1; Romano (Exh. 51) at 200:5-203:6 (alerting a supervisor about scheme and no action taken).

staffing levels made it "absolutely not feasible in current state" to comply with WPS II. *See* Email from R. Smith, Feb. 11, 2019 (Exh. 74). Did Defendants hire 20+ ITI's? The answer is "no"—as conceded by Defendants. *See* SOF ¶ 54. ("The Training Team also included 3 or 4 ITIs who were primarily responsible for conducting, facilitating, or overseeing all training on the WPS II Contract in Afghanistan."). Defendants chose not to give the required refresher training—just as the witnesses testified to in their various declarations and depositions and Defendants' documents reveal. That Defendants would bill for "unbillable" personnel not fully trained as required was known to senior leadership no later than early 2019.

By way of further example, Defendants' internal emails reflect a fear that an upcoming DoS audit of its training records could reveal problems if discovered. Email from S. Edwards, Jan. 4, 2018 (Exh. 75). Yet another instance involved the Senior Vice President of Contracts predicting what would happen if the DoS would "dig deeper and find the extent of our administrative type issues." *See* Email from D. Watson, Apr. 30, 2019 (Exh. 76). In a moment of candor, Defendants' own Director of Training notes to his supervisor he "foresaw an upcoming crisis of non-compliance," relayed his concerns, but (in his words) GardaWorld simply "refused to take any action." Email from D. Harrison, Jul. 18, 2019 (Exh. 77). The Director of Contracts himself realized he was being fed false information by his own training team, which was not disclosed to the State Department. Email from P. Hoyt, Jul. 16, 2020 (Exh. 78); *see also* Contracting Officer (Exh. 2) at 363:8-13. And, to top it off, Defendants' Vice President and others ***joked about committing fraud*** on the United States. Email from David Watson, Aug. 1, 2019 (Exh. 79).

During a 2019 OIG audit into training issues, DoS described finding "systemic" training issues in Defendants' training facility in Perry, Georgia. *See* Email from DoS, Apr. 26, 2019 (Exh. 80). The issues identified in 2019 mirror many of the issues identified in discovery that occurred

in Afghanistan until 2021: missing sign-in sheets, sign-in sheets with data/signature problems, alteration of records, and "mismatched signatures." *See id.*; *see also* DoS Employee (Exh. 3) at 194:20-196:14. Defendants told DoS they conducted a "full review", yet this deep dive "did not identify any issues with training records beyond the issues identified by [DoS] as part of its training records audit." *See* Ltr. from M. Twigg, Jun. 7, 2019 (Exh. 81). Behind closed doors, however, Defendants simply found a "fall guy." *See* Email from W. Swinton, Jun 16, 2019 (Ex. 82). As we now know, DoS had not even found the tip of the iceberg because Defendants hid from DoS what was really going on. *See*, *supra*, Sections II.A-B.

In sum, evidence relating to Defendants' scienter exists both in their internal communications and through witness testimony. Far from agreeing with Defendants' factual descriptions as "technical deficiencies," "recordkeeping," and a "misunderstanding," a jury could very well agree with Defendants' own employees who testified Defendants knew what they were doing (violating the law) and why they were doing it (to deceive DoS).

III.    **Defendants' Non-Compliance with WPS II Training Requirements Was Material.**

The Eleventh Circuit has described the *Escobar* analysis as "holistic," analyzing (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021). At the motion-to-dismiss stage, the Court found there were sufficient allegations as to materiality. (ECF 56). Discovery has only confirmed the Court's analysis was correct.

First, the Court cited that WPS II "expressly states that employees must meet physical fitness testing and training requirements in order to be considered qualified and capable of working

under the task order." (ECF 56 at 22). This weighs in favor of materiality and Defendants concede this point.

Second, the Court's analysis as to the "essence of the bargain" element remains correct. Defendants did not depose a 30(b)(6) DoS representative to obtain the official position of the United States, so the Court's analysis remains applicable. As to personal opinions, multiple DoS witnesses confirmed the words of WPS II meant what it said: Defendants should not have billed for any personnel who did not receive all the required training, nor would the United States have paid claims had there been a timely truthful disclosure of training status.[12]

No amount of money can guarantee "effective security" in war.[13] Knowing they could not contract for guaranteed "security," the "essence" of the bargain according to DoS testimony was the government paid for fully trained personnel, not just warm bodies. *See* DoS GTM Dep. (Exh. 83) at 272:4-13; Contracting Officer (Exh. 2) at 339:4-18; DoS Employee (Exh. 3) at 276:6-25. Testimony in this case is consistent with DoS's contemporaneous communications to Defendants during performance of the contract. *See*, *e.g.*, Email from M. Twigg, Jan. 4, 2018 (Exh. 84) (forwarding DoS view that "A portion of our audit is examining how the government confirms that it is paying for services that meet contractual requirements, in this case, ensuring that the government is paying for properly qualified and training personnel."). DoS's stated emphasis on

---

[12] *See* CO (Exh. 2) at 327:5-328:7, 330:2-10, 331:10-18, 331:19-332:18, 339:4-18; Redacted (Exh. 3) at 275:10-276:25 280:17-281:14, 282:8-282:21; GardaWorld 30(b)(6) Dep. (Exh. 4) at 61:25-62:18 (acknowledging understanding of the meaning "billable" and "unbillable"), 168:12-169:11 (acknowledging "unbillable" status if an individual fails to complete annual training, absent a waiver); *see also* Exh. 1 at 307, 327, 367; GardaWorld "Standard Operating Procedures" for Integration and Training (Ex. 54, 55) (acknowledging significance of annual training and documentation as "deliverable"), Email from Todd Shields, Mar. 24, 2020 (Ex. 93) (acknowledging training compliance as condition for payment).

[13] Address From George Washington to the United States Senate and House of Representatives, Jan. 8, 1790 available at https://founders.archives.gov/documents/Washington/05-04-02-0361 ("To be prepared for war is one of the most effectual means of preserving peace.").

the importance of training, common sense, Defendants' efforts to conceal their scheme, and the parties' testimony support materiality. *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (citing common sense and a defendant's cover up as bases for materiality finding).

Finally, the third factor likewise supports a materiality conclusion. (ECF 56 at 24) ("[T]he question is whether an alleged fraudulent scheme involving intentionally falsified documents would have influenced the Government's payment decisions."). DoS personnel confirmed the United States does not do business with people who commit fraud. Contracting Officer (Exh. 2) at 378:21-383:3 (acknowledging the United States does not do business with people who commit fraud and suggesting possible recourse if a truthful disclosure had been made "we would halt invoices relating to the issue and sort it out before they could invoice"); DoS Employee (Exh. 3) at 285:6-13 (discussing fraud could lead to contract termination), 313:12-17 (discussing referral to OIG had he learned of some previously unknown facts). To be sure, Defendants had a monthly obligation to affirmatively disclose non-compliance with any terms of WPS II, including non-compliance with training requirements. *See* Exh. 1 at GWFS00220401, GWFS00220442 (warning contractors of sanctions for violations of laws, policies, or instructions to include termination from WPS II, civil, and criminal sanctions). Yet, notwithstanding this duty, DoS never learned about Defendants' non-compliance until it was shown examples of the fraud in discovery. *See, e.g.*, Contracting Officer (Exh. 2) at 343:4-354:21, 363:7-364:13, 354:14-364:22, 370:4-370:22, 373:16-19, 376:21-377:10; DoS Employee (Exh. 3) at 287:13-291:13, 296:9-22, 299:10-14, 300:8-18, 306:3-10, 307:14-308:2, 308:11-19, 311:8-11, 312:24-313:21, 315:9-17, 320:17-321:5; DoS GTM Dep. (Exh. 83) 275:14-280:16. DoS' lack of knowledge does not change the materiality analysis. *Cf. Bibby*, 987 F.3d at 1348.

When the Government learned of isolated instances of non-compliance with training requirements, the DoS took steps to enforce the training requirements and emphasize the importance of training to Defendants. *United States ex rel. Permenter v. eClinicalWorks, LLC*, 2022 WL 17478238, at *11 (M.D. Ga. Dec. 6, 2022) (Treadwell, C.J.) (noting materiality "does not require the government to have taken 'the strongest possible action,' only that some enforcement action is taken." (quoting *Bibby*, 987 F.3d at 1352)). In the words of Deficiency Notice sent by the State Department to Defendants regarding training non-compliance,

> As the prime contractor responsible for the personal protection and safety of U.S. Chief of Mission (COM) personnel and facilities in Kabul, Afghanistan, the US Department of State ***cannot over emphasize the importance of Aegis maintaining contractual compliance with training program management***. Given the critical role WPSII security and support services play in the performance of the Department's mission in Kabul, Afghanistan, it is crucial all training-related performance is conducted in accordance with the WPSII IDIQ contract terms and conditions as well as all associated documents issued thereunder.

Deficiency Notice-Failure to Comply with Contract Terms and Conditions to Aegis Defense Service LLC, April 10, 2020 (Exh. 85) (emphasis added); Ltr. from DoS, Jan. 10, 2020 (Exh. 86). There is also evidence the Government directed Defendants to make sure non-compliant personnel either did not deploy, were brought into compliance, or immediately left the country; and, what's more, DoS made sure Defendants did not bill the United States for non-compliant personnel. *See* Email from DoS, Mar. 6, 2020 (Exh. 87) (requiring retraining or immediate departure); Email from DoS, Mar. 10, 2020 (Exh. 88) (reminding GardaWorld managers not to bill for specific unbillable personnel due to failure to complete required training). Contrary to Defendants' representation, there is also evidence from the Government's contracting officer that her personal recollection was the Government took steps to recover payments made for non-compliant personnel. Contracting Officer (Exh. 2)  at 380:1-383:3. The fact DoS authorized a time-limited waiver during COVID-

19—and then reinstated the refresher training—reinforces the material nature of refresher training. *See* Ltr. from DoS, Oct. 28, 2020 (Exh. 89) (requiring full compliance by January 31, 2021).

Even if the Government had learned of the conduct during the performance of the contract, this case falls squarely in the category of cases where courts have found the continued payment factor to weigh less. *United States v. Pub. Warehousing Co. K.S.C.*, 2017 WL 1021745, at *6 (N.D. Ga. Mar. 16, 2017) ("The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense."); *Bibby*, 987 F.3d at 1352 (citing continued payment but noting that evidence is not unrebutted.).

In short, the evidence of materiality is more than enough for a jury to weigh.

## IV. Evidence Exists as to False Claims, Representations, and Records.

Relator has identified ample evidence reflecting a systemic, knowing failure to provide required refresher training and a concerted effort to cover up said failures. *See*, *supra*, Section II (identifying sworn testimony, contemporaneous communication, falsified documents, missing documents, and other evidence). Against this backdrop of falsity, Defendants cite a case collecting inapposite health care cases involving "a reasonable difference of opinion among physicians reviewing medical documentation." *See* (ECF 122 at 14); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) (relying on the "proper exercise of a physician's clinical judgment"); *United States v. Cross Garden Care Ctr., LLC*, 2019 WL 6493972, at *5 n.5 (M.D. Fla. Dec. 3, 2019) (noting limit of *AseraCare* to hospice).

Those principles bear no resemblance to the facts here because there is no "exercise of clinical judgment" in this case. Defendants specifically agreed as part of WPS II to provide 40 hours each year of refresher training by approved instructors for approved curriculum. Exh. 1 at

GWFS00220370. Either Defendants' personnel received 40 hours of refresher training from an approved instructor for an approved class or they did not. If their employees did not meet the clear WPS II standard, Defendants could not deploy or receive payment for that individual. *See* Exh. 1 at GWFS00220612, -632, -672, -686. These are objective standards not comparable to the principles set forth in *AseraCare*. *See*, *e.g.*, *Livingston v. Digirad Corp.*, 2022 WL 4110897, at *10 (N.D. Ala. Sept. 8, 2022) (distinguishing *AseraCare* and reasoning "[e]ither the billing physicians exercised general supervision over the nuclear stress tests or they didn't."); *Gov't Emps. Ins. Co. v. Mas*, 2020 WL 7042645, at *5 (S.D. Fla. Dec. 1, 2020).

As to Defendants' first two points—arguments specifically as to the 290 individuals from the 2019/2020 audits and the 40-hour annual refresher training, there are disputed material facts Defendants simply ignore. As to the 290 individuals, there is evidence Defendants' employees did not receive complete pre-deployment training.[14] Indeed, Defendants' emails even show not everyone received this training.  *See* Email from N. Schneider, Mar. 9, 2020 (Exh. 95).  As to the 40-hour annual refresher training, the massive gaps in Defendant's records corroborate the witness testimony they did not receive the refresher training as required. *See* Summary of Personnel Refresher Training Records (Exh. 64-1); *see also supra*, Section II.

Defendants' argument that Relators cannot point to specific false claims likewise ignores evidence unearthed during discovery. It is undisputed Defendants' submitted claims to the Government for individuals subject to the training requirements and condition-of-payment

---

[14] *See*, *e.g.*, Kay (Exh. 29) 194:14-195:6 (discussing Perry training he did not receive), 215:24 – 216:18, Collins (Exh. 28) 52:3-54:10 (identifying forged signature), 227:12-228:3; Coufal (Exh. 20) ¶ 4; Coufal (Exh. 39) 130:21-131:15; Figueroa 199:8 – 202:2; Lopezzamora (Exh. 30) ¶ 7.

language in WPS II. *See* Invoices (Exh. 90); [15] *see also* Defendants' Statement of Facts ¶ 282-83 and Defs' Exhs. 222, 223 (acknowledging certification language). As part of the claims, including for payment of labor, Defendants made certifications as a condition entitling them to payment by the United States. *See id.* ("I certify that all payments requested are for the appropriate purposes and in accordance with the agreements set forth in the contract."). To state the obvious, payments made for "unbillable" personnel who lacked the required refresher training are not "in accordance with agreements set forth in the contract." *See* Exh. 1 at GWFS00220612, -632, -672, -686 (requiring full training in accordance with WPS II terms to bill). That certification would be (and was) false. Moreover, Defendants produced evidence of payments made by the United States tied to each of those demonstrably false claims and certifications. *See* Payments (Exh. 91). Comparing Defendants' training records (or lack thereof) with Defendants' claims permits a jury to link specific violations, specific non-billable employees, and payments made for those false claims (with false certifications). *See* Exh. 64-2.

## V.    <u>There Are Fact Questions as to Damages and the Measure of Damages is for the Jury</u>.

As to the damages theory, the starting point should be the terms of WPS II: any individual who did not receive the required training was "unqualified," "unbillable," and the position was "unstaffed for purposes of deductions"—there is no partial credit under the contract. *See* Exh. 1 at GWFS00220612, -632, -672, -686. Without testimony from a 30(b)(6) representative of the United States or a formal modification (neither of which Defendants possess), the terms of WPS II remain controlling. Defendants cite the DoS' Contracting Officer's personal opinions—but omit her testimony where she acknowledges that precise measure of damages depends on the facts and the

---

[15] Relator attached illustrative examples of certifications at Exh. 90 – all of which are identical. Relator redacted reference to specific bank accounts. Relator will hand deliver a drive to the Court with the complete set of invoices if the Court so directs.

value received by the Government could very well be nothing in "egregious" circumstances. *See* Contracting Officer (Exh. 2) at 211:17-212:15, 378:21-380:14 (stating Defendants "were expected to adhere to the terms and conditions of the contract, whatever they may be"), 387:7-389:20. A jury could very well conclude this case was "egregious" when shown the evidence. The Contracting Officer's personal opinion is consistent with WPS II and Relator's position: the starting point is the contract, and the jury should then decide based on all the evidence.

Contrary to Defendants' attempts to improperly affix the label "worthless services," Courts have routinely acknowledged Relator's theory of damages—even in cases Defendants' cite acknowledge Relator's approach. *See* MSJ at 16 (citing *United States ex. rel. Campie v. Gilead Scis., Inc.*, No. C-11-0941 EMC, 2015 WL 106255, at *14 (N.D. Cal. Jan. 7, 2015)); *but see Campie* 2015 WL 106255, at *14, n. 7 ("The limitations of the "worthless services" doctrine do not prevent an FCA claim for the sale of non-conforming goods to the government where, for example, there is a knowing breach of a material specification established by contract with the payor agency." (citation omitted); *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303–04 (6th Cir. 1998) ("However, [False Claims Act] actions have also been sustained under theories of supplying **substandard** products or **services**."). Indeed, the Old Fifth Circuit has endorsed this theory of damages, leaving to a jury the determination between the value for conforming services and the value for non-conforming services. *See United States v. Aerodex*, 469 F.2d 1003 (5th Cir. 1972).

These damages issues are quintessential jury questions not appropriate for summary judgment. *See U.S. ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 894 (S.D. Ohio 1999); *Faulk v. United States*, 198 F.2d 169, 173 (5th Cir. 1952) (citing flexibility in measuring damages).

**VI.    <u>The FCA is Constitutional as Applied Here</u>.**

The Court should reject Defendants' constitutional challenge to the FCA based on dissenting and concurring opinions in *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023). Defendants concede the Supreme Court has upheld the *qui tam* provision. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 (2000). As courts have noted post-*Polansky*, "[e]very circuit to consider the issue has concluded that the FCA does not violate Article II." *See*, *e.g.*, *United States ex rel. Wallace v. Exactech, Inc.*, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023) (citing cases); *United States ex rel. Miller v. ManPow, LLC*, 2023 WL 8290402, at *3 (C.D. Cal. Aug. 30, 2023) ("Statutes authorizing qui tam suits are older than the Republic"). The Court should reject Defendants' constitutionality argument.

<u>CONCLUSION</u>

After undersigned counsel showed a witness his own photocopied signature, the witness aptly summarized the state of the evidentiary record for trial:

```
Q.    And does it look like to you that --
A.    It looks like GardaWorld is in some deep shit.
```

Kay (Exh. 48) at 189:3-8. It is not just Defendants' former employees who recognize the gravity of the fraud scheme revealed in discovery. Indeed, Defendants' themselves have represented to the Court the conduct of its own employees could be ***criminal*** in nature. *See* Email from S. Lerner, Nov. 14, 2023 (identifying to the Court five felonies Defendants' personnel may have committed).

The testimony of multiple witnesses, who served at different times, in different locations, and in different positions—then corroborated by Defendants' own records—paint a compelling factual narrative for a jury to evaluate. For the foregoing reasons, the Court should deny Defendants' motion for summary judgment and afford the American people a chance to see what hundreds and hundreds of millions of dollars of taxpayer money bought in Afghanistan.

This 7th day of February, 2024.

**CLARK, SMITH & SIZEMORE, LLC**
**BY:**

/s/ *John Christopher Clark*_____

150 College Street                        John Christopher Clark
Macon, Georgia 31201                       Georgia Bar No. 127353
Telephone: (478) 254-5040                  Richard L. Sizemore
Facsimile: (478) 254-5041                  Georgia Bar No. 649449
chris@clarksmithsizemore.com               ***Attorneys for Relator***
rick@clarksmithsizemore.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

**UNITED STATES OF AMERICA, ex rel.**
**JUSTIN FAHN,**

                **Plaintiffs,**

**vs.**

**GARDAWORLD FEDERAL SERVICES, LLC,**
**and AEGIS DEFENSE SERVICES, LLC,**

                **Defendants.**

**CIVIL ACTION FILE NO.**
**5:20-CV-00128-MTT**

**<u>CERTIFICATE OF SERVICE</u>**

       This certifies that I have this day served a copy of the within and foregoing RELATOR'S

RESPONSE TO DEFENDANTS GARDAWORD FEDERAL SERVICES, LLC, AND AEGIS

DEFENSE SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT upon all counsel of

record by statutory electronic mail, as follows:

Mr. Bradley W. Pratt
Mr. Frank T. Bayuk
Bayuk Pratt, LLC
4401 Northside Parkway, Suite 390
Atlanta, Georgia  30327
*Attorneys for Relator*

Mr. Charles W. Byrd
Mr. J. Thomas Clarkson
Griffin Durham Tanner &
Clarkson, LLC
5400 Riverside Drive, Suite 205
Macon, Georgia  31210
*Attorneys for Relator*

Mr. Jason C. Pedigo
Ellis Painter
P. O. Box 9946
Savannah, Georgia  31412
*Attorney for Relator*

Ms. Tara Lee
Mr. Benedict S. Bernstein
Mr. Scott Lerner
Ms. Helin Akcam
Ms. Melissa Taylormoore
Mr. Charles D'Oria
White & Case LLP
701 13th Street, NW
Washington, DC  20005
*Attorneys for Defendants GardaWorld*
*Federal Services LLC and AEGIS Defense*
*Services, LLC*

22

Mr. Bowen R. Shoemaker
Mr. Todd P. Swanson
Mr. W. Taylor McNeill
United States Attorney's Office
P. O. Box 1702
Macon, Georgia  31202
*Attorneys for United States
of America, ex rel.*

Ms. Susan L. Grace
White & Case, LLP
1221 Avenue of the Americas
New York, New York  10020
*Attorney for Defendants
GardaWorld Federal Services LLC and
AEGIC Defense Services, LLC*

This 7th day of February, 2024.

**CLARK, SMITH & SIZEMORE, LLC
BY:**

/s/ *John Christopher Clark*
John Christopher Clark
Georgia Bar No. 127353
Richard L. Sizemore
Georgia Bar No. 649449
***Attorneys for Relator***

150 College Street
Macon, Georgia 31201
Telephone: (478) 254-5040
Facsimile: (478) 254-5041
chris@clarksmithsizemore.com
rick@clarksmithsizemore.com

23