**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>***ex rel.* JUSTIN FAHN,** | ) )<br>)<br>) | |
| **Plaintiffs,** | )<br>) | |
| **v.** | )<br>) | **CIVIL ACTION NO. 5:20-cv-128 (MTT)** |
| **GARDAWORLD FEDERAL SERVICES**<br>**LLC and AEGIS DEFENSE SERVICES**<br>**LLC,** | )<br>)<br>)<br>) | |
| **Defendants.** | )<br>)<br>) | |

## <u>ORDER</u>

Defendants GardaWorld Federal Services LLC and Aegis Defense Services LLC

(collectively referred to as "GardaWorld") move for summary judgment on relator Justin

Fahn's claims under the False Claims Act ("FCA"). Docs. 122; 147. For the reasons

discussed below, GardaWorld's motion for summary judgment (Docs 122; 147) is

**GRANTED in part and DENIED in part.** Fahn's FCA claim based on GardaWorld's

failure to comply with the Worldwide Protective Services II Contract's ("WPS II") pre-

deployment training requirements is **DISMISSED**, but Fahn's annual refresher training

claim shall proceed to trial.

# I. BACKGROUND[1]

GardaWorld contracted with the United States Department of State ("DoS") to provide security in Afghanistan at various locations from October 2017 until August 2021 (i.e., the WPS II contract).  Docs. 147-2 ¶¶ 6-13; 149 ¶¶ 6-13; 152-1 ¶¶ 6-13. Relator Justin Fahn worked for GardaWorld as a unit support coordinator defending the Embassy in Kabul from February 2018 until its fall to the Taliban in August 2021.  Docs. 147-11 at 32:7-10, 32:18-20, 44:24-45:2; 147-2 ¶ 5; 149 ¶ 5; 152-1 ¶ 5.  Fahn claims that during his employment GardaWorld falsified compliance with various contractual "training requirements," specifically "initial training before [GardaWorld employees] arrived in Afghanistan," (pre-deployment training or PDT), and "training while in Afghanistan," (annual refresher training or ART).[2]  Doc. 44 ¶¶ 4, 160-68.

Generally, the WPS II contract divided GardaWorld's "security force" into three separate labor categories: "G" category labor, which included guards; "P" category labor, which included the emergency response team; and "S" category labor, which included, among others, the Explosive Detection Canine personnel.  Docs. 147-2 ¶ 35; 149 ¶ 35; 152-1 ¶ 35.  Each labor category was comprised of three nationalities: U.S. nationals; Afghans; and Nepalese.  Docs. 147-2 ¶ 33; 149 ¶ 33; 152-1 ¶ 33.  Fahn's PDT claim is limited to training provided to U.S. nationals in Perry, Georgia.  Doc. 93 at

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court notes that the 500-page plus statement of facts (Doc. 152-1) could have easily been reduced had the parties adhered to Local Rule 56.  The parties repeatedly purport to "dispute" various facts when in actuality the parties argue the legal conclusions that should be drawn from the facts.  *See, e.g.*, Docs. 147-2 ¶ 138; 149 ¶ 138; 152-1 ¶ 138.  As outlined in Local Rule 56, the Court will not consider "statements in the form of issues or legal conclusions."

[2] Fahn also alleged that GardaWorld failed to comply with physical fitness testing requirements.  Doc. 44 ¶¶ 40, 45-47.  Fahn expressly abandoned this claim.  Docs. 125; 153 at 54:25-55:1.

30:23-31:1.  Fahn's ART claim is limited to U.S. nationals working in the P and G labor categories.  Docs. 93 at 30:23-31:1; 124-9 ¶¶ 2, 5.  U.S. nationals comprised about 30% of GardaWorld's security force in Afghanistan.  Docs. 147-2 ¶ 33; 149 ¶ 33; 152-1 ¶ 33.

**A. Pre-Deployment Training**

Before deploying to Afghanistan, GardaWorld's security force was required to complete PDT in Perry, Georgia.  Docs. 147-2 ¶ 57; 149 ¶ 57; 152-1 ¶ 57.

**Amount of training**.  The PDT training curriculum and the amount of training required varied depending on the employee's labor category and prior employment status.  Docs. 147-2 ¶ 57; 149 ¶ 57; 152-1 ¶ 57.  For example, U.S. nationals in the P labor category who were new hires to GardaWorld were required to complete more than 300 hours of "PSS Basic Training" at GardaWorld's Perry training center.  Docs. 147-2 ¶ 61; 149 ¶ 61; 152-1 ¶ 61.  Incumbent employees were only required to complete "an abbreviated transition training."  Docs. 147-2 ¶ 57; 149 ¶ 57; 152-1 ¶ 57.

**Course instructors**.  Regardless of the specific course curriculum, the contract required all PDT courses to be taught by "bio-approved" instructors.  Docs. 147-2 ¶ 79; 149 ¶ 79; 152-1 ¶ 79.  Instructors became "bio-approved" by submitting a "WPS Bio Application" to DoS describing the instructor's education, training, certifications, and relevant experience.  Docs. 147-2 ¶ 78; 149 ¶ 78; 152-1 ¶ 78.  Additionally, bio-approved instructors could only teach the specific courses associated with their pre-approved instructor category.  Docs. 147-2 ¶ 77; 149 ¶ 77; 152-1 ¶ 77.

**Student-instructor ratios**.  The contract "also contained an instructor to student ratio."  Docs. 147-2 ¶ 80; 149 ¶ 80; 152-1 ¶ 80.  "[A]ll … practical exercises and live fire weapons training," other than vehicle dynamics and technical driving classes, required an instructor to student ratio of 1:5.  Doc. 147-12 at 319.  However, DoS could issue

waivers "so that GardaWorld did not need to comply with the ratio requirement."  Docs. 147-2 ¶ 80; 149 ¶ 80; 152-1 ¶ 80.

**Monitoring compliance**.  Generally, GardaWorld tracked attendance for PDT courses through course sign-in sheets.  Docs. 147-2 ¶ 74; 149 ¶ 74; 152-1 ¶ 74.  If a student-candidate failed to sign a course sign-in sheet, GardaWorld contends it would "take steps to investigate whether these individuals had, in fact, completed the course. This investigation typically involved reviewing other training records and documents (like the training status reports, timesheets, travel itineraries, and weapons qualification photos) from which" GardaWorld argues it "could reasonably determine whether the individual had completed the course in question.  GardaWorld would then create a missing record attestation describing the steps GardaWorld took to investigate the discrepancy."  Docs. 147-2 ¶ 76; 149 ¶ 76; 152-1 ¶ 76.

If an employee failed to "successfully complete[] the required training for that position," that individual was "considered unqualified for that position, and therefore [] unbillable."  Doc. 147-12 at 308, 328, 368 ("The Government will consider any Contractor personnel assigned to a position who have not successfully completed the required training for that position to be UNQUALIFIED, and the position will be considered UNSTAFFED for the purposes of assessing deductions, in accordance with Section H.26.").

## B.  DoS Audits of Perry Training Center

In April 2019, a DoS employee identified serious issues with GardaWorld's PDT records.  Doc. 147-185.  Specifically, "DoS notified GardaWorld of ten areas of concern, which fell into the following categories: (1) missing sign-in sheets or sign-in sheets with missing signatures; (2) instructors lacking bio-approval for the courses they taught or

otherwise lacking authorization to teach a specific course; (3) mismatched signatures for instructors and other irregularities on sign-in sheets; and (4) student-to-instructor ratios not being met." Docs. 147-2 ¶ 213; 149 ¶ 213; 152-1 ¶ 213. For example, DoS identified instances where a training coordinator "used 'white out' and inserted his name in several places on sign-in sheets." Doc. 129-25 at 9. Understandably concerned, DoS took possession of the falsified sign-in sheets. *Id*. Furthermore, DoS issued a "letter of concern" notifying GardaWorld that it was "in violation of the terms and conditions" of the contract. Doc. 147-192. The letter instructed GardaWorld to provide a "corrective action plan addressing the contract violations," which "shall include a specific timeline with milestones addressing [GardaWorld's] plan to become compliant with all terms and conditions of the" contract. Doc. 147-192 at 4.

In response, GardaWorld conducted a review of its Perry training records. Docs. 129-25; 150 at 192:9-194:23. The internal audit revealed "275 employees missing from training attendance rosters, 182 of which [were] actively deployed, on rotation, or pending deployment as a new hire." Doc. 147-196 at 3. GardaWorld's corrective action plan proposed "(1) obtaining attestation forms signed by employees who took and instructors who taught the required courses but for whom valid sign-in sheets were missing and (2) providing training at the Perry training center, in Afghanistan, or by Skype for employees who originally received training from a non-bio-approved instructor." Docs. 147-2 ¶ 221; 149 ¶ 221; 152-1 ¶ 221. DoS did not object to this plan. Docs. 147-2 ¶ 221; 149 ¶ 221; 152-1 ¶ 221. GardaWorld obtained attestations or retrained many of the 182 individuals who were actively deployed and missing from the training attendance rosters. Docs. 147-2 ¶¶ 222, 224; 149 ¶¶ 222, 224; 152-1 ¶¶ 222,

224.  However, GardaWorld could not obtain attestations or retrain all affected personnel.  Docs. 147-2 ¶¶ 223, 225; 149 ¶¶ 223, 225; 152-1 ¶¶ 223, 225.

In March 2020, GardaWorld discovered that 39 employees, 20 of whom were already deployed to Afghanistan, had been trained by non-bio-approved instructors during their PDT in Perry.  Doc. 147-203.  GardaWorld disclosed the issue to DoS and in response DoS instructed GardaWorld to "ensure none of these personnel who are NOT currently at post deploy prior to being trained" and "ensure the personnel at Post currently, are or can be trained immediately or depart post immediate to receive the training."  Doc. 147-205 at 2-3.  Additionally, DoS instructed GardaWorld that the affected personnel "were non-billable from the time of their … initial [boots on the ground] date until" the date of their retraining.  Doc. 147-204 at 4.  In the following months, GardaWorld began retraining the identified individuals.  Docs. 147-2 ¶ 230; 149 ¶ 230; 152-1 ¶ 230.  On July 16, 2020, GardaWorld reported to DoS that 25 out of the 39 employees had been retrained, 13 employees had left the company, and one employee continued to be non-responsive to inquiries.  Docs. 147-2 ¶ 230; 147-213 at 7-8; 149 ¶ 230; 152-1 ¶ 230.  On August 20, 2020, DoS confirmed that GardaWorld's response and supporting documentation were acceptable to close the matter.  Docs. 147-2 ¶ 231; 147-214; 149 ¶ 231; 152-1 ¶ 231.

## C. Annual Refresher Training

In addition to pre-deployment training, GardaWorld employees were required to complete ART to "reinforce the materials taught during pre-deployment training."  Docs. 147-2 ¶ 110; 149 ¶ 110; 152-1 ¶ 110; *see also* Doc. 147-12 at 65-66.

**Amount of training**.  The contract requires that employees subject to the ART requirement must "complete at least 40 hours of annual refresher training."  Doc. 147-12

at 382.  GardaWorld contends that ART "courses were not taught to a specific time requirement," but rather "were taught to an approved DoS standard."  Doc. 147-2 ¶¶ 126-28.  Thus, DoS, through informal technical guidance, permitted GardaWorld to provide fewer than 40 hours of ART.  *Id*.  Fahn disputes that GardaWorld could deviate from the 40-hour requirement.  Doc. 149 ¶¶ 126-28.  Specifically, Fahn contends that only the Contracting Officer had the authority to modify the terms of the contract.  *See* Doc. 147-12 at 109.  Because the contract stated that GardaWorld had to "complete at least 40 hours of annual refresher training," the informal technical guidance provided by DoS employees could not alter the terms of the contract.  Doc. 149 ¶¶ 120-24.  In any event, Fahn claims that GardaWorld fell woefully short of providing anything close to 40 hours of ART.  *See, e.g.*, Doc. 146-14 at 223-24.

**Deadline for completing training**.  The contract requires that "[t]he mandatory annual in-service training requirement begins once the Contractor's personnel commences work on the [task order], through the end of the three hundred [and] sixty five (365) calendar days following, and then begins again on the first day following while the individual is still working on the [task order]."  Doc. 147-12 at 66-67.  For example, if an individual started work on February 1, 2019, the individual had until February 1, 2020 to complete ART.

GardaWorld contends that it received informal technical guidance from DoS altering the ART completion deadline.  Doc. 147-2 ¶¶ 120-24; *see also* Doc. 147-47 at 50:6-18, 161:7-21, 371:6-12.  Rather than "tying the start of one's annual refresher training period to that person's first workday," DoS instructed GardaWorld to "use the 'contract year' as the period of performance for annual refresher training."  Doc. 147-2 ¶ 120.  The contract year typically began and ended in September.  *Id*. ¶ 13.  Because

employees often arrived "mid-way through the 'contract year,'" DoS instructed that employees "needed to complete [their] refresher training by the end of the *following* 'contract year.'"  *Id*. ¶¶ 121-22.  For example, an employee arriving in Afghanistan on February 1, 2019, "had until September 28, 2020—the end of the following contract year—to complete his or her annual refresher training."  *Id*. ¶¶ 122.

Again, Fahn disputes that this modification of the contract terms occurred.  Doc. 149 ¶¶ 120-24.  Because only the Contracting Officer had the authority to modify the terms of the contract and because the contract stated that GardaWorld had 365 days to complete ART, Fahn contends that DoS's informal technical guidance could not alter the terms of the contract.  Doc. 149 ¶¶ 120-24.

**Student-instructor ratios**.  The contract states all "practical exercises and live fire weapons training," other than vehicle dynamics and technical driving classes, required an instructor to student ratio of 1:5.  Doc. 147-12 at 319.  Fahn contends the plain language of the contract required GardaWorld to adhere to the 1:5 ratio for ART, as well as PDT.  Doc. 149 ¶ 125.  GardaWorld contends that DoS provided informal technical guidance that the ratio requirement did not apply to ART.  Doc. 147-2 ¶ 125.

**Monitoring compliance**.  Integration and Training Instructors ("ITIs") were primarily responsible for "coordinating and conducting" ART.  Docs. 147-2 ¶ 132; 149 ¶ 132; 152-1 ¶ 132.  "ITIs maintained records for annual refresher training, including schedules, contemporaneous notes, sign-in sheets, photographs, trackers, and SharePoint folders."  Docs. 147-2 ¶ 138; 149 ¶ 138; 152-1 ¶ 138.  Furthermore, "ITIs were responsible for creating sign-in sheets for the annual refresher training courses they instructed or observed."  Docs. 147-2 ¶ 139; 149 ¶ 139; 152-1 ¶ 139.  Based on sign-in sheets, ITIs "would populate the annual refresher training tracker and training

status report"—documents DoS used to monitor compliance with the ART requirement. Docs. 147-2 ¶ 142; 149 ¶ 142; 152-1 ¶ 142; *see also* Docs. 147-101; 127-34 at 10, 13-14; 127-35 at 12-13, 17-18.

GardaWorld was required to "[e]nsure" that personnel "who fail[ed] to complete the mandatory annual in-service training within the required time frame [were] not assigned to work under the [task order] until they … completed and [were] certified as having completed such training."  Doc. 147-12 at 66-67.  DoS considered personnel who "fail[ed] to complete the annual refresher training as unqualified to perform under the assigned task order."  *Id*. at 382.  Personnel who were "unqualified" to perform work under the task order were considered unbillable.[3]  Docs. 147-2 ¶ 270; 149 ¶ 270; 152-1 ¶ 270 ("If there was an issue with any of the [training qualifications] the employee in question was listed as not billable for the day of work on the monthly muster."); *see also* Doc. 147-12 at 308 ("The Government will consider any Contractor personnel assigned to a position who have not successfully completed the required training for that position to be UNQUALIFIED, and the position will be considered UNSTAFFED for the purposes of assessing deductions, in accordance with Section H.26.").

## C. Allegations of Fraud

Fahn contends that GardaWorld engaged in a "scheme to deliberately falsify training documents and forge signatures to show … training occurred when it did not." Doc. 125 at 1.

---

[3] At the March 20, 2024 hearing on GardaWorld's motion for summary judgment, GardaWorld disputed that failure to comply with the ART requirements rendered an employee unbillable.  Doc. 153 at 30:22-31:16.  This argument is contrary to their statement of undisputed material facts.  Docs. 147-2 ¶ 270; 149 ¶ 270; 152-1 ¶ 270.

*1. Allegations and evidence related to ART*

Fahn secured the testimony of numerous former GardaWorld employees, "many of whom do not know each other and served at different times and locations," who all testify that "they did not actually receive all the required refresher training … and [that GardaWorld] fostered a pervasive practice of creating false documentation for training not actually received." *Id*. at 5.

For example, Dakota Juanchi worked as a dispatcher at the Embassy in Kabul, which required him to create the daily guard schedule for the day shift—including scheduling ART.  Docs. 147-8 at 59:22-60:19; 126-13 ¶ 4.  He testified to the culture of falsifying sign-in sheets, that multiple sign-in sheets with his name were falsified, and that he did not actually attend the ART training courses associated with those sign-in sheets.  Docs. 147-8 at 49:17-51:6, 59:22-60:19, 258:12-16; 126-13 ¶ 5.  He also testified that as a dispatcher he was responsible for inputting training hours into GardaWorld's online record-keeping system and he knew that the hours reflected in this report were inaccurate.  Docs. 147-8 at 49:17-51:6, 59:22-60:19; 126-13 ¶ 8.  Finally, Juanchi testified that he falsified these sign-in sheets to make it appear as though GardaWorld was complying with the ART requirements in the contract.  Doc. 147-8 at 247:6-248:5 ("Q: Was it your understanding the reason it needed to be sent to the admin signed was for billable purposes?  A: Yes.").  Other former employees testified similarly.  *See, e.g.*, Doc. 149 ¶¶ 115-16.

In further support of his allegations of fraud, Fahn submitted summaries of GardaWorld's ART documentation.  *See* Docs. 146-8; 146-9; 146-10; 146-11; 146-12; 146-13; 146-14.  Specifically, Fahn's summary witness compiled GardaWorld's ART sign-in sheets and then compared the hours reported in the sign-in sheets with the

hours reported in the annual training tracker.  Doc. 124-9 ¶¶ 3-4, 16.  These summaries demonstrated that:

> [GardaWorld] provided 40 hours or more of 40-hour training to their employees 123 times, while providing 20 or fewer hours of such training to their employees 1,630 times.
>
> …
>
> Comparing the sign-in sheets to the annual tracker training reports shows 495 out of 822 times an employee's training reflected in the report was greater than the training reflected in 40-hour training sign-in sheets.
>
> …
>
> Approximately 400 such people received no 40-hour training at all according to [GardaWorld's] sign-in sheets.

*Id*.  Thus, Fahn argues that GardaWorld's "own internal records" demonstrate that hundreds of employees did not receive 40 hours or more of ART.  Doc. 125 at 1.

### 2. Allegations and evidence related to PDT

Fahn's response brief only mentions PDT once.  Doc. 125 at 18.  In support of his PDT claim, Fahn cites the testimony of five individuals—Scott Kay, Marvin Collins, Justin Coufal, Victor Figueroa, and Alexandro Lopezzamora.  *Id*. at 18 n.14.  Fahn contends that these individuals are examples of employees who did not take all the required PDT courses and, thus, GardaWorld falsified compliance with PDT requirements.  *Id*.  Unlike his ART claim, Fahn does not provide a summary of GardaWorld's PDT records to prove the extent of this alleged falsification.

## E. Procedural History

Fahn alerted the Government to the alleged fraud and then filed his original complaint under seal in March 2020.  Doc. 3.  The Government declined to intervene on September 1, 2021.  Doc. 15.   On January 24, 2024, GardaWorld moved for summary judgment on all of Fahn's claims.  Docs. 118; 122; 147.

**II. STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011)

(citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

The FCA "creates a cause of action in favor of the United States against any person who '(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *U.S. ex rel. 84Partners v. Nuflo, Inc.*, 79 F.4th 1353, 1359 (11th Cir. 2023) (quoting 31 U.S.C. § 3729(a)(1)(A)).  "As an enforcement mechanism, the FCA includes a qui tam provision under which private individuals, known as relators, can sue 'in the name of the [United States] Government' to recover money obtained in violation of § 3729." *United States ex rel. Bibby v. Mortg. Invs. Corp.,* 987 F.3d 1340, 1343 (11th Cir. 2021), *cert. denied*, 141 S. Ct. 2632 (2021).

Fahn claims that GardaWorld is liable under the FCA under the implied false certification theory of liability.[4]  "Under this theory, a defendant may be found liable for

---

[4] Fahn's complaint alleges two FCA claims: an implied false certification claim under § 3729 (a)(1)(A) and a make-or-use claim under § 3729 (a)(1)(B).  *See* Docs. 45 ¶¶ 160-68, 169-76; 56 at 12.  GardaWorld focuses on Fahn's implied false certification claim in its motion for summary judgment.  Doc. 147 at 7 ("This case is an implied false certification case.").   Fahn does not dispute GardaWorld's characterization of his complaint as an implied certification claim.  *See* Doc. 125.  Furthermore, Fahn does not identify an express false statement by GardaWorld that would be more appropriately analyzed under the make-or-

falsely certifying its compliance with applicable laws and regulations." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1103 (11th Cir. 2020).  "To prevail, a relator must prove '(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'" *Id*. (quoting *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015)).

The Supreme Court "clarified the contours" of this theory in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016).  *Ruckh*, 963 F.3d at 1103.  The Court held "that the implied certification theory can be a basis for liability" where "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Escobar*, 579 U.S. at 190.

GardaWorld contends that summary judgment on Fahn's PDT and ART claims is appropriate because Fahn "cannot establish scienter, materiality, falsity, or damages."  Doc. 147 at 7.[5]  Doc. 147 at 9-23.

## A. Annual Refresher Training

### 1. Scienter

To establish scienter, a relator must demonstrate "either actual knowledge, deliberate ignorance, or recklessness."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023).  The "scienter element refers to [the defendant's] knowledge

---

use framework.  *Id*. at 18.  Accordingly, the Court analyzes Fahn's claims under the implied false certification theory.

[5] GardaWorld also argues that the FCA is unconstitutional as applied.  Doc. 147 at 23.  This one-paragraph argument citing dissenting and concurring Supreme Court opinions is meritless.

and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id*. at 749. Thus, at a minimum, Fahn must present evidence that GardaWorld was subjectively "conscious of a substantial and unjustifiable risk that [its] claims [were] false, but submit the claims anyway." *Id*. at 751.

Fahn presents evidence that GardaWorld employees "did not receive the required refresher training reflected in [its] internal records, which included signing in for classes that did not occur at all, classes where employees signed then left after a few minutes, 'training' days were held when an individual actually packed for leave or travel, and sometimes even 'training' when the team actually just played video games." Doc. 125 at 5-6 (collecting deposition citations). GardaWorld contends the cited testimony is insufficient to demonstrate scienter because these individuals were all low-level employees, and no evidence suggests that GardaWorld's "management" and "high ranking officials" were aware of the fraudulent scheme. Doc. 147 at 10-13. But Fahn was not required to obtain the testimony of management employees. If the employee was acting for the benefit of the corporation and within the scope of his employment, the employee's knowledge may be imputed to the employer. *Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983); *United States ex rel. Reeves v. Mercer Transportation Co., Inc.*, 253 F. Supp. 3d 1242, 1255 (M.D. Ga. 2017) ("There is no requirement, as [the defendant] suggests, that these employees must work in a managerial capacity."). Here, GardaWorld employees were acting within the scope of their employment when they forged signatures on sign-in sheets, and they were acting for the benefit of GardaWorld because they knew the sign-in sheets were important for contract compliance and billing. *See, e.g.*, Doc. 147-8 at 247:6-248:5 ("Q: Was it your

understanding the reason it needed to be sent to the admin signed was for billable purposes?  A: Yes.").

Contrary to GardaWorld's strange assertion, *Grand Union* has not been overruled by *Schutte* or the 1986 FCA amendments.  Doc. 152 at 9.  *Schutte* held that subjective, rather than objective, knowledge is the standard under the FCA's scienter requirement.  598 U.S. at 750.  Thus, *Schutte* did nothing to undermine the application of traditional vicarious liability principles to FCA cases.  Furthermore, to the extent the 1986 amendments had any effect on corporate liability, the amendments lowered the bar for establishing scienter by clarifying that "no proof of specific intent to defraud" is required.  *See United States v. Hill*, 676 F. Supp. 1158, 1179 (N.D. Fla. 1987) (noting that the 1986 amendments did not alter the rule of corporate liability stated in *Grand Union*).  Finally, GardaWorld's contention that Fahn is attempting to "collectivize the knowledge" of the 19 employees who testified to the fraudulent scheme is inaccurate. Doc. 152 at 9 (citing *United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257 (D.C. Cir. 2010)).  Juanchi's testimony, described above, is an illustrative example of a single GardaWorld employee who knew about the false sign-in sheets and the implications of the false sign-in sheets.  Docs. 147-8 at 49:17-51:6, 59:22-60:19, 247:6-248:5, 258:12-16; 126-13 ¶¶ 4-5, 8.  Thus, while the Government in *SAIC* relied on a "collective knowledge" theory to establish scienter, Fahn is not attempting to "pool" the knowledge of various employees.  626 F.3d at 1273, 1276.  Rather, he identified multiple employees who all testify they knew about GardaWorld's fraudulent sign-in sheet scheme and the implications of that scheme for contract compliance and billing.

In any event, Fahn presents evidence that ITIs—the individuals primarily responsible for administering ART—and management personnel were aware of the

fraudulent scheme.  Doc. 125 at 10-13.  For example, ITI Bryan Bailey sent on

November 9, 2020 an email to the other training instructors stating:

> We have 16 hrs being taught worth of classes in one day!?!?!  How does
> that physically happen?
>
>> 1. We are all on 12 hr shifts
>> 2. Everyone knows we don't get guys for their entire shift even with
>> dedicated training days and we had the man power
>> 3. Instructor to student ratio
>
> This has to stop!  **We are going to get screwed on this and have
> another ordeal like Perry and ALL that training is going to be thrown
> out.  We've all been doing this long enough and know that when one
> stone is over turned and then something is seen not right or up to
> par then ALL the stones get turned and they start digging.**  Now, we
> aren't in the best of graces with DoS as it is.  Why do we keep shooting
> ourselves in the foot?  I get it, trying to make it happen.  I get it not all
> classes take the prescribed time they're stated to have.  And yes, most of
> these guys have had these same classes over and over for the past 2-5
> years.
>
> The issue remains the same.  If they could retain the information we
> wouldn't have a job. And we all don't even remember it all and we teach it
> on a regular basis.  **This absurd amount of hours in one day is
> bullshit**.  That's exactly what it is.  And it needs to stop.  We report these
> numbers to DC.  **If someone catches it and then says "hey that
> doesn't add up" what do you think is next to happen.  A phone call to
> the GTMs or RSO and they go through our records**. They have access
> and don't even have to tel [sic] us they are. Just happened to K9.
>
> We need to be smart about this.  And honestly if we get everyone done in
> less than a year after months of complaining about how we need more
> ITis how do you think that's going to go?  Or when we get it "done" in less
> than 12 months and then ask for something.  We're gonna [sic] get more
> piled on and not in our favor.  You can be upset at me and honestly I don't
> care.  Because at the end of the day this affects us all!

Doc. 128-88 (emphasis added).  Fahn presents evidence that the fraudulent scheme

continued even after this warning email.  *See* Docs. 146-15; 147-8 at 82:1-3, 49:17-

51:6, 225:13-226:9, 227:2-19.

Additionally, Fahn presents evidence that Rob Smith, the Operations Manager from 2017 until March 2021, was aware that GardaWorld did not have enough instructors to provide 40 hours of ART to the security force.  Docs. 129-18 at 2-3; 147-36 ¶ 4.  In a February 11, 2019 email, Smith stated, "[w]ith the current quantity of personnel" it "is absolutely not feasible" to provide the required ART, and GardaWorld would need to hire "20+ ITI's or resource instructors to constantly hammer through this requirement yearly."  Doc. 129-18 at 2.  It is undisputed that the training team only included "3 or 4 ITIs who were primarily responsible for conducting, facilitating, or overseeing all training on the WPS II Contract in Afghanistan."  Docs. 147-2 ¶ 54; 149 ¶ 54; 152-1 ¶ 54.  This clearly falls short of the "20+" instructors needed to administer 40 hours of ART.  In other words, GardaWorld didn't have enough instructors to do the required training.

Finally, Nicholas Romano, who worked as a shift leader during his deployment with GardaWorld, testified that he spoke to Nicholas Schneider, the Deputy Operations Manager for Security—the individual responsible for managing "all aspects of planning, scheduling, organizing, and assessing performance" of the Embassy's guard force— about GardaWorld's failure to provide ART.  Docs. 127-13 ¶¶ 3, 13; 147-2 ¶ 25; 147-27 at 200:6-22; 149 ¶ 25; 152-1 ¶ 25.  Specifically, Romano told Schneider "that the training was rarely taking place for anyone and when it did it was primarily 5-10 minutes of training not done as it should be."  Doc. 127-13 ¶ 13.  Schneider responded that "he was aware of these facts."[6]  *Id*.  Thus, Fahn presents evidence that GardaWorld's

---

[6] GardaWorld contends that Romano's testimony is about training problems that occurred during Task Order 10 of the WPS I contract and not Tasks Orders 6 and 7 of the WPS II contract.  Doc. 152-1 ¶ 143 (citing Schneider's declaration).  But the WPS I contract did not contain a 40-hour ART requirement.  Docs. 147-2 ¶ 111; 149 ¶ 111; 152-1 ¶ 111.  And Romano testified that he discussed the "40-hour" ART requirement with Schneider.  Doc. 127-13 ¶¶ 12-13.  Thus, Schneider's possibly conflicting testimony

employees at various levels were subjectively "conscious of a substantial and unjustifiable risk that [GardaWorld's] claims [were] false, but submit the claims anyway." *Schutte*, 598 U.S. at 751.

    *2. Materiality*

    The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  "And while several factors can be relevant to the analysis, 'materiality cannot rest on a single fact or occurrence as always determinative.'"  *Bibby*, 987 F.3d at 1343 (quoting *Escobar,* 579 U.S. at 191).  Accordingly, the Eleventh Circuit has "described the test as 'holistic.'"  *Bibby*, 987 F.3d at 1343 (quoting *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016)).  "[S]ome factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior."  *Bibby*, 987 F.3d at 1347.

      a. Condition of payment

    "'[T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive' to the materiality analysis." *Bibby*, 987 F.3d at 1347 (quoting *Escobar,* 579 U.S. at 194).  The contract states GardaWorld was required to "[e]nsure" that personnel "who fail[ed] to complete the mandatory annual in-service training within the required time frame [were] not assigned

_____

merely creates a fact dispute regarding his knowledge of compliance or lack of compliance with the ART requirements.

to work under the [task order] until they … completed and [were] certified as having completed such training."  Doc. 147-12 at 66-67.  DoS considered personnel who "fail[ed] to complete the annual refresher training as unqualified to perform under the assigned task order."  *Id*. at 382.  Personnel who were "unqualified" to perform work under the task order were considered unbillable.  Docs. 147-2 ¶ 270; 149 ¶ 270; 152-1 ¶ 270 ("If there was an issue with any of the [training qualifications] the employee in question was listed as not billable for the day of work on the monthly muster."); *see also* Docs. 147-12 at 308 ("The Government will consider any Contractor personnel assigned to a position who have not successfully completed the required training for that position to be UNQUALIFIED, and the position will be considered UNSTAFFED for the purposes of assessing deductions, in accordance with Section H.26."); 137-29 at 18:18-25 (Testimony of ITI Lewis Dooley, "Billable was somebody that we could bill the government for that they were up to standard on all their weapons quals, PEBs, 40-hour training, everything they needed to be.").

Clearly, there is evidence that DoS considered fully trained and qualified personnel an express condition of payment and this factor weighs in favor of materiality.

### b. Essence of the bargain

Courts also consider the extent to which the contract requirement that was violated is central to, or goes "to the very essence of, the bargain."  *Bibby*, 987 F.3d at 1347 (quoting *Escobar,* 579 U.S. at 193 n.5).  Fahn presents evidence from which a reasonable factfinder could find that ART requirements were essential to the bargain.  For example, DoS employee Margret Manchini testified:

> Q: In terms of the contract and what the United States was purchasing, no offense to present company included, but the United States was not buying, say, a bunch of lawyers to go act as guard forces, right?

A: No.
Q: They wanted trained personnel consistent with the WPS requirements, qualified, right?
A: Yes.
Q: That was the bargain.  It wasn't to hire DOJ or, you know, me, my partners.  You wanted qualified people to help protect the ambassador all the way down to the janitor and all the contractors at the facilities, right?
A: Yes.

Doc. 147-34 at 339:4-18; *see also* Doc. 122-47 at 272:4-16 (Testimony of DoS employee Rodolphe Rochez "Q: Isn't it true -- is it your understanding that GardaWorld was being paid by the United States of America, the taxpayers, to -- to provide qualified personnel who were fully trained in accordance with WPS II requirements?  A: Yes.  Q: And that's what you expected to receive as -- as part of the bargain, right?  A: Yes.").

ART was designed to "reinforce the materials taught during pre-deployment training" and covered topics such as "explosive countermeasures," "tactical medicine," "pre-attack indicators," and "first aid."  Docs. 147-2 ¶ 110; 147-62; 149 ¶ 110; 152-1 ¶ 110.  As ITI Bailey stated in an email to his fellow ITIs:

If [the security force] could retain the information we wouldn't have a job.  And we all don't even remember it all and we teach it on a regular basis.

Doc. 128-88.  The purpose of ART was to ensure that the security force was up to speed on the current methods and procedures for protecting and defending the Embassy.  As Manchini testified:

A: **By not doing the daily training or the weekly training or the monthly training or the annual training, they are putting the embassy and the -- anybody at the embassy at risk because they may not react the appropriate way.**  They may not react the way they should.  They may not follow the direction.  They may forget what the direction is supposed to look like in an emergency situation.  And you could have loss of life or damage to property or all kinds of things.

Doc. 147-34 at 275:8-17 (emphasis added).  The essence of the bargain was providing *effective* security to the Embassy, which required GardaWorld to properly train the

security force.  *See* Docs. 122-15 at 138:24-139:2 ("Q: And why is that refresher training important?  A: When you don't actively do something, it's perishable."); 122-27 at 193:15-20 ("But we would talk about it all the time.  Like, 'Dude if they ever attack us here, we're so screwed because it's going to be just a gaggle.  It's going to be a mess. There's only going to be a few people that are going to be able to repel the attack.'").

Thus, the essence of the bargain factor weighs in favor of materiality.

c. Effect on DoS's behavior

Finally, courts look to the government's reaction after learning about violations to determine whether a contract provision was material to the government's payment decision.  "*Escobar* discusses three ways the government might behave upon learning of noncompliance and instructs us on how that behavior factors into the materiality analysis."  *Bibby*, 987 F.3d at 1348 (citing *Escobar,* 579 U.S. at 195).  "First, the government might refuse to pay claims," which suggests materiality.  *Id.* at 1348. Second, the government may pay "a particular claim in full despite its actual knowledge that certain requirements were violated," which is "*very strong evidence* that those requirements are not material."  *Id.* (quoting *Escobar,* 579 U.S. at 195).  "And third is a middle possibility: 'if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.'"  *Id.* (quoting *Escobar,* 579 U.S. at 195).  "Because these three possibilities each hinge on the government discovering the defendant's violations, the logical first step in this analysis is to determine what the government actually knew."  *Id.*

GardaWorld argues that DoS was aware of the alleged problems with ART based on (a) communications with Fahn about the allegations in his complaint and (b) two internal audits of GardaWorld's PDT records.[7]  Docs. 147 at 17-18; 153 at 8:6-21:24.

With regard to the first source, Fahn alerted DoS to the alleged fraud and filed his original complaint under seal in March 2020.  Doc. 3.  DoS investigated the fraud for 17 months before declining to intervene on September 1, 2021, roughly two weeks after the fall of the Kabul Embassy and the United States' withdrawal from Afghanistan.  Doc. 15.  The Eleventh Circuit has "not … addressed whether the government's knowledge of allegations is tantamount to knowledge of violations for purposes of the materiality analysis."  *Bibby*, 987 F.3d at 1349.  However, "[t]he logical answer would seemingly be no because a contrary conclusion would likely compel dismissal on materiality grounds in any case where the government declined to intervene."  *United States ex rel. Permenter v. eClinicalWorks, LLC*, 2022 WL 17478238, at *10 (M.D. Ga. Dec. 6, 2022).

In any event, there is no evidence of what the Government learned during its investigation or why the Government declined to intervene.  What is known is that when Fahn, with the benefit of discovery, presented evidence of alleged fraud to DoS officials, they found it material and were "greatly disturb[ed]."  Doc. 147-34 377:4-12 ("Q: Had

---

[7] GardaWorld also points to a "Compliance Audit" conducted in February 2021 as evidence that DoS was aware of its failure to provide 40 hours of ART.  Doc. 153 at 9:12-11:1.  The audit raised multiple "areas of concern," including (1) that "[s]taffing shortages" had prevented GardaWorld from "maximiz[ing]" the "dedicated training day" and (2) the training tracker "inaccurately" reflected that "non-deployed, non-compliant personnel were on the active deployment roster."  Docs. 147 ¶ 197; 147-182 at 4, 6.  But the failure to "maximize" a dedicated training day is not equivalent to alerting DoS that GardaWorld failed to provide less than 40 hours of ART.  And including non-deployed, non-compliant personnel on the training tracker is not equivalent to alerting DoS that GardaWorld did not have the sign-in sheets to support the ART hours it was recording on the tracker.  Thus, this compliance audit could not have alerted DoS to *Fahn's* allegations of fraud—namely that GardaWorld was not providing all the required ART courses and that GardaWorld was hiding its noncompliance by falsifying sign-in sheets for various ART courses.  If anything, the Compliance Audit bolsters the argument that training and accurate reporting training were material.

they disclosed to you that they were going to do 18 hours of training in a single day, is that something you would have wanted to look into?  A: That would have more than raised my eyebrow.  I would have dug into that like nobody's business.  Q: Why is that? A: Well, it's fraud."), 390:120-15 ("Q: Have you seen some egregious things today?  A: I see some things that greatly disturb me."); *see also* Doc. 147-169 at 312:24-313:17 ("Q: Did anybody at GardaWorld ever disclose that their training staff felt like their own training records of 16 hours a day were, in Mr. Bailey's words, BS?  A: No.  Q: Is that something you feel like should have been disclosed to the Department of State?  A: Yes.").

Furthermore, when DoS learned of GardaWorld's non-compliance with PDT training requirements, DoS took immediate and decisive steps to enforce its contractual rights, emphasized the importance of training, and instructed GardaWorld not to bill for improperly trained employees. And while GardaWorld touts its quick response to DoS's discovery of misconduct at GardaWorld's Perry facility, DoS's decisive action is further evidence of materiality.[8]

DoS employee Manchini reiterated DoS's ability to deduct payment in response to training violations:

> Q: There are training requirements in the contract…. Can you imagine a scenario when – where a contractor only provides, like, 10 percent of the training required, training to 10 percent of its employees?
> A: Well, that should be pretty noticeable pretty quick.
> Q: Okay.

---

[8] GardaWorld argues that because DoS's aggressive response did not include demands for repayment, training issues are not material.  Doc. 147 at 17-18.  However, "a 'finding' of materiality by the 'factfinder' does not require the government to have taken 'the strongest possible action,' only that some enforcement action is taken."  *Permenter*, 2022 WL 17478238, at *11 (quoting *Bibby*, 987 F.3d at 1352). Thus, DoS's decision not to recoup funds for the April 2019 training violations is not dispositive.  In any event, DoS did withhold payment in March 2020 when faced with further violations of the contract training requirements.  Doc. 147-204 at 4 ("Just as a reminder the below listed personnel … were non-billable from the time of their [] initial BOG date until today.").

A: As you saw from the list of deliverables, they have daily, weekly, monthly reporting requirements.  So when -- if they were being truthful and the reporting requirements automatically started showing that people were not being trained, if that issue could not be resolved in a relatively short manner of time, **you would have probably ended up with a cure notice and possibly a termination of the contract**.

…

Q: Had you known that, would you have not paid those invoices?

A: That's a complicated process.  Okay?  **So if we had known about it before invoices got paid, then yes**.  There were times we found out about things after the fact, and we either recouped funds or processed future invoices in another manner.  They would either deduct from those invoices -- self-deduct based on an agreement with the State Department or, you know, we would halt invoices relating to the issue and sort it out before they could invoice.  So it just depends on the series of events on how we would handle it.

Doc. 122-34 at 216:6-217:3, 380:1-14 (emphasis added).

In short, DoS's aggressive response to the PDT violations and Manchini's testimony demonstrate that failure to provide contractually required training significantly impacted DoS's "behavior."[9]  *See Escobar*, 579 U.S. at 195 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.").

Nevertheless, GardaWorld argues that the ART requirements were not material because the Government waived the requirement from March 24, 2020, to January 31, 2021, during the Covid-19 pandemic.  Docs. 147 at 14-18; 147-2 ¶ 147; 149 ¶ 147; 152

---

[9] The continued payment factor may carry less weight due to the unique circumstances of this case.  "The more essential the continued execution of a contract is to an important government interest, the less the government's continued payment weighs in favor of the government knowledge defense." *United States v. Pub. Warehousing Co. K.S.C.*, at *6 (N.D. Ga. Mar. 16, 2017). "To find otherwise could lead to perverse outcomes; the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate the contract (and the less likely the contractor would be held liable)."  *Id.* (quoting *U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*, 600 F. App'x 969, 978 (6th Cir. 2015)). DoS was contracting for security in a war zone and "[a] contract could hardly be more essential to an important government interest than that." *Id*.

at 10-11; 152-1 ¶ 147.  First, almost everything shut down during the early months of the pandemic, including essential, material operations.  A short reprieve because of what was then perceived as a worldwide emergency does not necessarily mean that ART requirements were not material.  Second, this argument cuts both ways.  Notwithstanding the waiver, GardaWorld continued to provide ART during the pandemic and DoS expected GardaWorld to achieve "full contractual compliance for all contract personnel" once the waiver period ended on January 31, 2021.  Docs. 147-2 ¶ 148; 147-110 at 3; 149 ¶ 148; 152-1 ¶ 148.  Thus, GardaWorld's decision to continue providing ART and DoS's decision to reinstate ART supports Fahn's assertion that providing ART was influential in the government's payment decision.

In sum, as the Court ruled at the March 20, 2024 hearing on GardaWorld's motion for summary judgment, the evidence is sufficient to create an issue of fact regarding materiality.  *See* Doc. 153 at 84:11-23.

*3. Falsity*

An "essential element" of a claim under the FCA "is the actual presentment or payment of a false claim."  *United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023).  "Standing alone, a fraudulent scheme, no matter how egregious, is not enough; there must be an actual false claim."  *Id*.  The implied false certification theory "encompasses claims" where contractors "make fraudulent misrepresentations," including "certain misleading omissions."  *Escobar*, 579 U.S. at 187.  Thus, "[w]hen … a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided."  *Id*.

Fahn clearly meets this standard.  GardaWorld submitted claims for payment that certified compliance with the contract.  *See, e.g.*, Doc. 130-9 ("I certify that all payments requested are for the appropriate purposes and in accordance with the agreements set forth in the contract.").  DoS considered personnel that "fail[ed] to complete the annual refresher training as unqualified to perform under the assigned task order," and personnel that were "unqualified" to perform work under the task order were considered unbillable.  Docs. 147-2 ¶ 270; 147-12 at 382; 149 ¶ 270; 152-1 ¶ 270.  Thus, if GardaWorld, as Fahn contends, billed the Government for employees who did not complete ART and were unbillable, GardaWorld's certification that it complied with the contract would be false.  Furthermore, Fahn provides a summary of the invoices that were fraudulently certified and the corresponding government payments.  Docs. 128-1; 128-2.

Fahn has sufficient evidence to support his allegations that GardaWorld submitted false claims.

### 4. Damages

"A person who violates the FCA is liable to the United States for '3 times the amount of damages which the Government sustains because of the act of that person.'" *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1304 (11th Cir. 2021) (quoting § 3729(a)(1)).  "But 'there is no set formula for determining the government's actual damages.'" *Id.* (quoting *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988)).  "That is because '[f]raudulent interference with the government's activities damages the government in numerous ways that vary from case to case.'" *Id.* (quoting *United States v. Killough*, 848 F.2d at 1532).

Fahn relies on the "worthless services" theory to establish damages.  Doc. 125 at 19-20.  "In the context of a product or service that is provided *to* the United States, courts have … measured damages by comparing the market value of the delivered product or service with that of the product or service that was promised."  *Yates*, 21 F.4th at 1304 (citing *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976); *United States ex rel. Wall v. Circle C Constr., LLC*, 868 F.3d 466, 470 (6th Cir. 2017); *SAIC*, 626 F.3d at 1278).  "[I]f the value that conforming goods or services would have had is impossible to determine, then the fact-finder bases damages on the amount the government actually paid minus the value of the goods or services the government received or used."  *SAIC*, 626 F.3d at 1279.  "Under this benefit-of-the-bargain framework, the government will sometimes be able to recover the full value of payments made to the defendant, but only where the government proves that it received no value from the product delivered"—i.e., the "worthless services" theory of damages.[10]  *Id*.

GardaWorld contends that Fahn "cannot adduce evidence that the security services GardaWorld … provided to DoS were 'so deficient that for all practical purposes [they were] the equivalent of no performance at all'" because GardaWorld employees did in fact provide security for the Embassy.  Doc. 147 at 22 (citing *U.S. ex*

---

[10] To the extent that GardaWorld argues that the "worthless services" theory is an improper measure of damages, that argument misinterprets the relevant caselaw.  Doc. 147 at 21-23.  While the worthless services theory is an untested method of establishing *liability*, it is an accepted method for calculating *damages*.  *See U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 n.11 (7th Cir. 2014) ("[T]he diminishment in value of a service may be a proper measure of *damages*.  But even this decision does not hold that 'diminished services' can support *liability* under the FCA."); *United States v. Landmark Hosp. of Athens, LLC*, ___ F.Supp.3d ____, 2023 WL 3097948, at *12 (M.D. Ga. Apr. 26, 2023) (distinguishing the worthless services theory of liability from the implied false certification theory of liability).

As GardaWorld concedes, Fahn relies on an implied false certification theory to establish liability.  *See* Doc. 147 at 7.  Thus, Fahn is not attempting to assert *liability* based on GardaWorld's provision of allegedly deficient services.

*rel. Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001)).  GardaWorld's argument ignores the reality that DoS was contracting for *effective* security and by failing to comply with the ART training requirements, GardaWorld employees would be "putting the embassy … at risk."  Doc. 147-34 at 275:8-17.  Thus, in certain "egregious" circumstances—which Fahn argues are present here—"the contractor shouldn't get paid anything[.]"  Docs. 125 at 19; 147-34 at 214:21-215:6; *see also* Docs. 122-15 at 138:24-139:2; 122-27 at 193:15-20; 147-34 at 339:4-12.  This evidence is sufficient to create an issue of fact on damages.[11]

In sum, Fahn has proffered sufficient evidence to raise a genuine issue of material fact as to whether GardaWorld submitted false claims for payment based on GardaWorld's failure to comply with the contract's ART requirements.  Accordingly, GardaWorld's motion for summary judgment on Fahn's ART claim is **DENIED**.

## B. Pre-Deployment Training

As a threshold issue, Fahn has effectively abandoned his PDT claim.  Fahn's response brief devotes two sentences to support his allegation that GardaWorld failed to provide PDT to hundreds of GardaWorld employees.  Doc. 125 at 18 ("As to the 290 individuals, there is evidence Defendants' employees did not receive complete pre-deployment training.  Indeed, Defendants' emails even show not everyone received this training.").

---

[11] In any event, damages are not an element of an FCA claim necessary to establish liability.  *See U.S. ex rel. Sanders v. E. Alabama Healthcare Auth.*, 953 F. Supp. 1404, 1412 (M.D. Ala. 1996) ("[T]he Plaintiffs are not required to allege actual injury and their allegation of falsity is sufficient to prevent dismissal of the claims under § 3729(a)(1).  However, absent proof of actual damages to the United States, the Plaintiffs will not be entitled to treble damages and must resort solely to civil penalties."); *see also U.S. ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).

Fahn does not present evidence that each of the 290 individuals named in his original complaint failed to receive PDT.  In fact, other than a brief string citation, Fahn does little to clarify the scope or substance of his PDT claim.  Fahn's failure to address GardaWorld's arguments is sufficient grounds for finding that Fahn abandoned the PDT claim.  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014) ("Abandonment of an issue can also occur when passing references appear in the argument section of an opening brief, particularly when the references are mere 'background' to the appellant's main arguments or when they are 'buried' within those arguments."); *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1209 (11th Cir. 2006) ("Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention.").

Nevertheless, the Court will briefly address Fahn's argument that GardaWorld failed to provide PDT.  Fahn cites the testimony of five individuals—Scott Kay, Marvin Collins, Justin Coufal, Victor Figueroa, and Alexandro Lopezzamora—in support of his contention that GardaWorld "employees did not receive complete pre-deployment training."  Doc. 125 at 18, 18 n.14.  Each of these individuals, except Figueroa, was included in the 2019 audit of GardaWorld's PDT records.  Doc. 147-196.  Thus, DoS was aware these individuals had not completed all the required PDT training and GardaWorld prepared a corrective action plan to obtain attestations from these employees supporting GardaWorld's assertion that these employees had received the PDT training in Perry or retrain the individuals who had not received the proper training.  Docs. 147-2 ¶ 221; 149 ¶ 221; 152-1 ¶ 221.  Notwithstanding this disclosure, Fahn argues that these individuals either signed false attestations or were never retrained.  Doc. 125 at 18.  But that argument is not supported by the cited testimony.

Fahn first cites Kay's deposition arguing that Kay's testimony demonstrates he did not receive "Perry training." Doc. 125 at 18 n.14 (citing Doc. 147-24 at 194:14-195:6). Kay does discuss a missing record attestation with his signature purporting to verify that he took an ARF course as a part of his PDT training in 2018. Docs. 147-24 at 194:14-195:6; 149-12 at 70. As Kay explains in his deposition, he could not have taken the ARF course in 2018 because his PDT training occurred in 2019. Docs. 147-24 at 194:14-195:6; 149-12 at 71. But Fahn ignores Kay's testimony confirming that, despite the incorrect date on the attestation, he did in fact take an ARF course during his PDT. Doc. 147-24 at 194:5-8, 215:19-23. True, Kay mused that the incorrect dates might be evidence of foul play by GardaWorld, but absent evidence that Kay did not take the ARF course, Fahn has merely identified a clerical error. *See* Doc. 125 at 18 n. 14 (citing 147-24 at 215:24-216:18).

Next, Fahn cites a portion of Collins' deposition testimony where he contends Collins "identif[ies] forged signatures." Doc. 125 at 18 n.14 (citing Doc. 147-14 at 52:3-54:10). In this cited testimony, the questioning attorney reads the course names associated with multiple PDT sign-in sheets. When the attorney finishes reading the course names, Collins testifies that the signature on each sign-in sheet was his and he did in fact take all the courses read into the record. Doc. 147-14 at 55:5-56:17. Obliviously, this testimony does not support Fahn's contention that Collins did not take required PDT courses. Next, Fahn cites Collin's testimony that he cannot recall whether he signed a missing record attestation verifying that he took three PDT courses. Docs. 125 at 18 n. 14 (citing Doc. 147-14 at 227:12-228:3); 149-27 at 2. But Fahn does not cite any evidence that Collins did not take the courses identified in the attestation.

Again, in the absence of testimony that the individual did not take the required course, Fahn has merely identified a record-keeping error.

Fahn also cites Lopezzamora's and Coufal's affidavits testifying that they received PDT from a non-bio-approved instructor in Perry and never received any retraining in Afghanistan. Doc. 125 at 18 n.14 (citing Docs. 126-15 ¶¶ 4-5; 127-10 ¶ 7). During the Perry investigation, GardaWorld disclosed to DoS that Lopezzamora and Coufal took two courses, "Stress Brief" and "ORU/U," that were taught by a non-bio-approved instructor. Doc. 147-196 at 7. The ORU/U course "include[d] vehicle off-road training" which could not be conducted in Afghanistan. Docs. 147-9 at 314:6-19; 147-196 at 3. Thus, GardaWorld informed DoS that individuals missing ORU/U training would need to be retrained in the United States. Doc. 147-196 at 3. Furthermore, when asked about the failure to provide the Stress Brief course in Afghanistan, Lopezzamora clarified that he simply could not "recall whether or not [he] did a stress bio course in Afghanistan." Doc. 147-9 at 313:18-314:5. Coufal testified that he did receive retraining in Stress Brief. Doc. 126-15 ¶ 4.

Finally, Fahn cites Figueroa's deposition testimony. Doc. 125 at 18 n.14 (citing 147-18 at 199:8-202:2). But the cited testimony merely recounts various PDT sign-in sheets where Figueroa was uncertain whether the signature was his. Doc. 147-18 at 199:8-202:2 ("Q: Is that your signature? A: I can't tell."). Fahn does not point to any evidence that Figueroa was taught by a non-bio-approved instructor or that Figueroa did not complete all the required PDT training. Without this evidence, Figueroa's testimony that the signature on the sign-in sheet may or may not be his is inconsequential.

The only citations that support Fahn's proposition that GardaWorld failed to provide all the required PDT are (1) Coufal's testimony that he did not take a "Hostage

Survival/Personnel Recovery" course and (2) a GardaWorld email stating that one currently deployed individual still needed retraining.[12]  Doc. 125 at 18 n. 14 (citing 147-15 at 130:21-131:15; 131-1).  Thus, out of the thousands of hours of PDT training GardaWorld administered to hundreds of employees, Fahn has identified two PDT courses that two individuals did not take.  These alleged violations are insufficient to demonstrate materiality.  *Escobar*, 579 U.S. at 194 ("Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.").

The bottom line is this—DoS caught GardaWorld's misconduct at its Perry training facility and forced GardaWorld to make things right.  While DoS's aggressive action and GardaWorld's decisive response support Fahn's argument that training misconduct is material, the scraps from the Perry PTD misconduct do not give rise to a FCA claim.  GardaWorld's motion for summary judgment on Fahn's PDT claim is **GRANTED**.

### IV. CONCLUSION

The defendants' motion for summary judgment (Docs 122; 147) is **GRANTED in part and DENIED in part.**  Fahn's FCA claim based on GardaWorld's failure to comply with the WPS II contract's PDT requirements is **DISMISSED** but Fahn's ART claim shall proceed to trial.

**SO ORDERED**, this 12th day of April, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[12] The email also states that two currently deployed individuals needed to sign attestations that they received the required training.  Doc. 131-1 at 1.