**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JUSTIN FAHN, <br><br> *Plaintiff,* <br><br> v. <br><br> GARDAWORLD FEDERAL SERVICES, LLC, and AEGIS DEFENSE SERVICES, LLC <br><br> *Defendants.* | Civil Action No. 5:20-CV-00128-MTT |

<u>**DEFENDANT AEGIS DEFENSE SERVICES, LLC'S TRIAL BRIEF**</u>

**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC 20005

**CHARLES E. COX JR., L.L.C.**
484 1st Street, Suite 1
P.O. Box 67
Macon, GA 31202

June 14, 2024                                          *Counsel for Defendant*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

I.     RELATOR'S ONLY REMAINING CLAIM FOR TRIAL IS HIS IMPLIED FALSE
CERTIFICATION CLAIM BASED ON ALLEGED NON-COMPLIANCE WITH
THE ANNUAL REFRESHER TRAINING REQUIREMENT (COUNT I) .....................1

II.    RELATOR MUST PROVE WHICH INVOICES ARE "CLAIMS" ..................................4

III.   RELATOR CANNOT SHOW THAT GARDAWORLD'S INVOICES WERE
"FALSE"...........................................................................................................................5

IV.   RELATOR CANNOT SHOW THAT GARDAWORLD "KNOWINGLY"
SUBMITTED FALSE INVOICES....................................................................................8

V.    RELATOR CANNOT SHOW THE ALLEGED NON-COMPLIANCE WAS
"MATERIAL" TO THE STATE DEPARTMENT'S DECISION TO PAY
GARDAWORLD...............................................................................................................13

        A.    Annual Refresher Training Was Not an Express Condition of Payment...............13

        B.    GardaWorld Fulfilled the Essence of the Bargain by Providing "Effective"
Security ...............................................................................................................15

        C.    The Annual Refresher Training Allegations Had No Effect on the State
Department's Behavior ........................................................................................16

        D.    Relator's Evidence of Non-Compliance Is Minor or Insubstantial ......................18

VI.   RELATOR CANNOT PROVE DAMAGES BY A PREPONDERANCE OF THE
EVIDENCE.....................................................................................................................19

## PRELIMINARY STATEMENT

In this non-intervened *qui tam* False Claims Act ("FCA") case, Relator Justin Fahn alleges Defendant Aegis Defense Services, LLC (d/b/a GardaWorld Federal Services) ("GardaWorld") submitted false claims to the government in connection with security services GardaWorld provided to the U.S. Department of State ("DoS") at and around the U.S. Embassy in Kabul, Afghanistan between February 15, 2018 and August 14, 2021, during the end of the Afghanistan War. Specifically Relator alleges that GardaWorld violated the FCA by submitting invoices for work by security personnel—U.S.-nationals with extensive military and law enforcement experience whose background, education, and training had been vetted by DoS and who had then completed extensive additional training before deploying to Afghanistan. Relator claims these individuals were "unqualified" to provide the security services for which DoS had contracted because they were allegedly out of compliance with a provision of the contract requiring them to complete additional refresher training after they began work in Afghanistan.

But the FCA is "not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract" and Relator cannot succeed on his claim based on immaterial, insubstantial, or technical contract violations, no matter how widespread. *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). In short, Relator must prove that these individuals did not receive the training they needed to provide the effective security services for which DoS had contract. Relator will not be able to do so at trial and GardaWorld will be vindicated.

## I. RELATOR'S ONLY REMAINING CLAIM FOR TRIAL IS HIS IMPLIED FALSE CERTIFICATION CLAIM BASED ON ALLEGED NON-COMPLIANCE WITH THE ANNUAL REFRESHER TRAINING REQUIREMENT (COUNT I)

This case is set for trial on July 22, 2024 on Relator's claim for violation of 31 U.S.C. § 3729(a)(1)(A) under his implied false certification theory based on GardaWorld's alleged non-

compliance with provisions of the WPS II Contract (Doc. No. 122-12) relating to annual in-service refresher training ("Annual Refresher Training" or "ART") (the "Annual Refresher Training Requirement"). *See* Doc. Nos. 155–156. Yet Relator's pre-trial filings and disclosures reveal that Relator is attempting also to try a claim for violation of 31 U.S.C. § 3729(a)(1)(B)—for which he seeks unconstitutionally excessive penalties of *$2–4 billion*—that this Court has dismissed and that Relator, in any event, long ago abandoned.

The operative complaint is the First Amended Complaint (Doc. Nos. 44–45) ("FAC"), which "raise[d] two claims under the FCA: (1) an implied false certification claim under 31 U.S.C. § 3729(a)(1)(A) alleging that GardaWorld 'knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval,' and (2) a make-or-use claim under 31 U.S.C. § 3729(a)(1)(B), alleging that GardaWorld 'knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim.'" Doc. No. 56 ("MTD Order") at 12 (citing FAC ¶¶ 160–68, 169–76).

On January 24, 2024, GardaWorld filed what Relator now describes as its "alleged" Motion for Summary Judgment seeking "entry of summary judgment in favor of Defendants and against Relator *on all counts*." Doc. No. 122 at 1 (emphasis added); *see also* Doc. No. 157 ("MSJ Order") at 11 ("On January 24, 2024, GardaWorld moved for summary judgment on all of Fahn's claims."). The grounds for GardaWorld's Motion were set forth in its Memorandum of Law (Doc. No. 135) and accompanying Statement of Facts (135-1) and exhibits (122-3–228). GardaWorld's Memorandum of Law addressed both Relator's implied false certification claim (Count I) and his make-or-use claim (Count II). *See, e.g.*, Doc. No. 135 at 3 (discussing elements of 31 U.S.C. § 3729(a)(1)(A) *and* (B)); *id.* at 14 (same and arguing "Relator cannot establish that any of

GardaWorld's allegedly false representations, records, and implied certifications are objectively false").

Relator's Response (Doc. No. 136) made no mention of § 3729(a)(1)(B) or of his make-or-use claim. *See generally* Doc. No. 136. At the March 20, 2024 hearing on GardaWorld's Motion, Relator's counsel likewise made no mention of § 3729(a)(1)(B) or his make-or-use claim. *See generally* Doc. No. 153 ("MSJ Hr'g Tr.").

In granting in part and denying in part GardaWorld's Motion, the Court limited Fahn to his "implied false certification theory of liability" based on alleged non-compliance with the Annual Refresher Training Requirement. MSJ Order at 13; *see also id.* (quoting *U.S. ex rel. 84Partners v. Nuflo, Inc.*, 79 F.4th 1353, 1359 (11th Cir. 2023) but omitting discussion of § 3730(a)(1)(B) in quoted sentence); *id.* at 28 n.10 ("As GardaWorld concedes, Fahn relies on an implied false certification theory to establish liability."). As the Court explained:

> Fahn's complaint alleges two FCA claims: an implied false certification claim under § 3729(a)(1)(A) and a make-or-use claim under § 3729(a)(1)(B). *See* Docs. 45 ¶¶ 160-68, 169-76; 56 at 12. GardaWorld focuses on Fahn's implied false certification claim in its motion for summary judgment. Doc. 147 at 7 ("This case is an implied false certification case."). Fahn does not dispute GardaWorld's characterization of his complaint as an implied certification claim. *See* Doc. 125. Furthermore, Fahn does not identify an express false statement by GardaWorld that would be more appropriately analyzed under the make-or-use framework. *Id.* at 18. Accordingly, the Court analyzes Fahn's claims under the implied false certification theory.

*Id.* at 13 n.4.

The fact that Relator abandoned his make-or-use claim and the fact that he failed to identify any express false statement by GardaWorld each provided the Court an independent basis for its dismissal of Count II in its entirety. *See May v. Pritchett*, 2022 WL 16753599, at *7 (11th Cir. Nov. 8, 2022) ("Grounds not raised by a plaintiff in opposing a motion for summary judgment are 'deemed abandoned.'"); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315

(11th Cir. 2011) ("When the non-moving party fails . . . to 'make a showing sufficient to establish' an essential element of its case, summary judgment is appropriate.").  Relator, apparently unhappy with that result, attempts to ambush GardaWorld with a never-before-disclosed computation of damages for his dismissed make-or-use claim "based on at least 144,483 false records or statements, yielding penalties ranging from $2,014,959,918 to $4,030,208,802."  Relator's Ex. A to Joint Proposed Pre-Trial Order; *see generally* Doc. No. 122-228 (Relator's Initial Disclosures omitting any reference to or computation of damages associated with alleged false records or statements).

## II.    RELATOR MUST PROVE WHICH INVOICES ARE "CLAIMS"

The "submission of a claim [is] the *sine qua non* of a False Claims Act violation." *84Partners*, 79 F.4th at 1360 (cleaned up).  The term "claim" means "a request or demand for payment presented to an officer, employee, or agent of the United States."  *Id.* at 1359 (citing 31 U.S.C. § 3729(b)(2)(A)(i)).  The parties agree that the only claims at issue here are invoices presented by GardaWorld to the Department of State ("DoS") for payment under Task Orders 6 and 7 of the WPS II Contract (the "KESF Task Order") in connection with U.S.-nationals working in labor categories "P" and "G" ("U.S. P/Gs") ("Invoices") and that each such Invoice is a claim under the FCA.  *See* MSJ Order at 2; Relator's Attachment A to the Joint Proposed Pre-Trial Order at 2–3.

Relator contends that GardaWorld submitted 67 Invoices in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).  *Id.*  To prove liability as to these purported Invoices, Relator must first prove by a preponderance of the evidence that GardaWorld in fact presented each purported Invoice to DoS for payment.  *See 84Partners*, 79 F.4th at 1360.

4

### III.    RELATOR CANNOT SHOW THAT GARDAWORLD'S INVOICES WERE "FALSE"

Relator will not be able to prove by a preponderance of the evidence that any Invoice was false. The "falsity of the claim" is an "essential element[] of an FCA violation." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023). A claim is "false" under the FCA only if it reflects a statement or representation about the goods or services provided that was ***objectively untrue*** at the time the claim was submitted. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297–98 & n.11 (11th Cir. 2019). A claim is thus not false if it is subject to a reasonable difference of opinion or honest mistake. *See id.* at 1297–98.

Relator relies on an implied false certification theory to prove liability. *See* MSJ Order at 13. Under the implied false certification theory, if "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Escobar*, 579 U.S. at 187.

To prevail on an implied false certification theory, Relator must prove that, for each Invoice, (1) GardaWorld made specific representations to DoS and (2) GardaWorld's representations (a) included objective falsehoods in the form of "misleading omissions" regarding "violations of statutory, regulatory, or contractual requirements" that (b) rendered GardaWorld's "representations misleading with respect to the goods or services provided." *Id.*. Furthermore, Relator must "link" GardaWorld's purported false certifications to the "specific" services (i.e., individuals) billed in each Invoice. *AseraCare*, 938 F.3d at 1305; *see also Carrel v. AIDS Healthcare Found.*, 898 F.3d 1267, 1277–78 (11th Cir. 2018) (holding allegations of widespread improper procedures "untethered to any particular transaction or claim" failed to state a claim for an FCA violation); *84Partners*, 79 F.4th at 1360 ("Standing alone, a fraudulent scheme, no matter

how egregious, is not enough; there must be an actual false claim.").

Here, Relator alleges that GardaWorld violated the requirements of the Annual Refresher Training Requirements of the WPS II Contract and then misleadingly omitted information about those violations when it submitted Invoices to DoS. Doc. No. 136 at 18–19. He further argues that such omissions rendered the following language in each Invoice objectively untrue at the time the invoice was submitted: "I certify that all payments requested are for the appropriate purposes and in accordance with the agreements set forth in the contract." *Id.*

Thus, to prove that a claim submitted by GardaWorld was false, Relator must prove by a preponderance of the evidence that, as to each Invoice, at the time GardaWorld submitted the Invoice: (1) the U.S. P/Gs for whom GardaWorld was seeking payment in the Invoice GardaWorld were not in compliance with the Annual Refresher Training Requirement; (2) GardaWorld misleadingly omitted this non-compliance; and (3) GardaWorld's omissions were sufficiently misleading to render the following statement objectively false at the time it was submitted: "I certify that all payments requested are for the appropriate purposes and in accordance with the agreements set forth in the contract."

As an initial matter, 32 of the purported Invoices—for Danger and Hardship Pay—could not have been false, even under Relator's theory. *See generally* Doc. No. 168-1 at 1–4. GardaWorld was entitled to payment of such cost-reimbursable expense regardless of compliance with the Annual Refresher Training Requirement. *See id.*

As to the remaining 35 purported Invoices—for Labor—at trial, Relator will not be able to prove by a preponderance of the evidence that GardaWorld misleadingly omitted non-compliance with the Annual Refresher Training Requirement in a manner that rendered any Invoice objectively false, including because Relator cannot prove the non-compliance with the Annual Refresher

Training Requirement he alleges. Relator's case rests on the theory that none of the 1,017 individuals he identifies as U.S. P/Gs were ever in compliance with the Annual Refresher Training Requirement and that, as a result, every Invoice was false. *See generally* Doc. No. 165-1 at 2–6.

GardaWorld will present evidence and testimony demonstrating that only 306 U.S. P/Gs were ever required to complete Annual Refresher Training; the remaining individuals identified by Relator thus could never have been out of compliance with the Annual Refresher Training Requirement. *See generally id.* at 6–13. Moreover U.S. P/Gs could not have been out of compliance with the Annual Refresher Training Requirement during the Base Year, Option Year 1, and the Covid Waiver Period. *See generally id.* at 13–14. And Invoices for U.S. P/Gs and periods not subject to the Annual Refresher Training Requirement could not be false.

Moreover Relator will not be able to prove by a preponderance of the evidence that any of the 306 U.S. P/Gs subject to the Annual Refresher Training Requirement were ever out of compliance. GardaWorld will present testimony from Relator himself, along with corroborating evidence, that U.S. P/Gs received countless hours of Annual Refresher Training throughout the course of the Contract, including during the Covid Waiver Period. Further, GardaWorld will offer testimony from individuals from whom Relator initially obtained declarations, that each completed Annual Refresher Training during their time in Afghanistan.

GardaWorld will also present evidence and testimony from the Training Team, including the Training Manager and training instructors, that they personally delivered, observed, or oversaw thousands of hours of Annual Refresher Training during the course of the Contract. Moreover, GardaWorld will present evidence and testimony from members of the Training and Project Management Teams, that they worked closely with DoS to implement the Annual Refresher Training requirement, including the types of courses, the instructors that could teach each course,

and the evolving requirements for Annual Refresher Training implemented by each Regional Security Officer ("RSO").

Similarly, GardaWorld will present evidence and offer testimony from DoS's Government Technical Monitors ("GTMs"), Izzy Ortega and Rodolphe Rochez, confirming they regularly observed Annual Refresher Training being delivered, inspected Annual Refresher Training records, and worked closely with GardaWorld's Training and Project Management Teams with regard to the mode and manner of delivering Annual Refresher Training. GardaWorld will also present testimony and evidence from an RSO, Patrick Mitchell, regarding the specifics of the Annual Refresher Training Requirement, his collaboration with the Training and Project Management Teams regarding the implementation of Annual Refresher Training, and his observation of the delivery of Annual Refresher Training to U.S. P/Gs.

Finally, GardaWorld will present evidence and testimony, including from members of the Training and Project Management Teams and from DoS's GTMs and RSO that GardaWorld representations in connection with Invoices were not misleading, because DoS was aware of the purported non-compliance with the Annual Refresher Training Requirement.

## IV.  RELATOR CANNOT SHOW THAT GARDAWORLD "KNOWINGLY" SUBMITTED FALSE INVOICES

Second, Relator will not be able to prove by a preponderance of the evidence that GardaWorld *knowingly*—that is, with "reckless disregard" or "deliberate ignorance"—submitted false or fraudulent Invoices. 31 U.S.C. § 3729(b). The "knowingly" requirement (i.e., scienter) "is rigorous and must be strictly enforced." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1108 (11th Cir. 2020) (citing *Escobar*, 579 U.S. at 191). It is intended to "capture[] 'the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." *Urquilla-Diaz v. Kaplan Univ.*, 780

F.3d 1039, 1058 (11th Cir. 2015) (quoting S. Rep. 99-345, at 21, 1986 U.S.C.C.A.N. 5266, 5286).

FCA liability attaches to "[o]nly those who act in gross negligence"—those who fail "to make such inquiry as would be reasonable and prudent to conduct under the circumstances." *Id.* In other words, "Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, 'into a vehicle either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors rather than a 'limited duty to inquire.'" *Id.* (quoting *United States v. S.A.I.C.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010)). To prove scienter, Relator must prove GardaWorld's "knowledge and subjective beliefs" at the time the claims were submitted, "not [] what an objectively reasonable person may have known or believed." *Schutte*, 598 U.S. at 749.

At trial, Relator will not be able to prove by a preponderance of the evidence that GardaWorld harbored "subjective beliefs" of a "substantial and unjustifiable risk" pertaining to non-compliance with the Annual Refresher Training Requirement, or that it otherwise failed to satisfy its "limited duty to inquire." *Id.* at 749, 751. Several members of GardaWorld's Training and Project Management Teams (including, but not limited to the U.S.-based program manager, the Afghanistan-based operations manager, and the Afghanistan-based training manager) will offer unrefuted testimony that they never asked anyone to falsify training records; that no one ever asked them to falsify such documents; and that if they had become aware individuals were falsifying training records, they would have reported it.

GardaWorld will also present numerous training instructors who, like the management witnesses, will offer unrefuted testimony that they never asked any GardaWorld employee to falsify any training records whatsoever. Nor were they aware of any such conduct taking place. Their testimony will also establish that between 2018 and 2021, the training team administered

hundreds of Annual Refresher Training courses, totaling thousands of hours of instruction, including virtual and in-person Annual Refresher Training during the pandemic Covid Waiver Period (even though the DoS had officially waived the Annual Refresher Training Requirement), and in-person Annual Refresher Training after the waiver period expired up until the termination of the KESF Task Order following the Taliban's takeover of Afghanistan in August 2021.

GardaWorld's Training Team conducted so much Annual Refresher Training that Relator repeatedly complained that the "training [was] getting redundant" and the high frequency of Annual Refresher Training was causing "the guys" to "get[] burned out."  Doc. No. 122-123.  The testimony of GardaWorld's Training Team will also reflect the extent to which GardaWorld actively collaborated with DoS to resolve questions or concerns surrounding the administration of Annual Refresher Training, including specific questions about who could teach Annual Refresher Training, the types of courses that counted, the period for completing Annual Refresher Training, and the length Annual Refresher Training courses.  They will also describe their open and transparent relationship with DoS, typified by their weekly vendor meetings, cooperation with routine program management reviews and audits, and the fact that training records were made freely available to DoS.  GardaWorld will also present DoS witnesses, including the GTMs and RSO, who will corroborate and expand on this testimony.  This open dialogue with DoS about the Annual Refresher Training Requirement and GardaWorld's implementation thereof negates any inference of scienter.  *See, e.g.*, *United States ex rel. Costner v. United States*, 317 F.3d 883, 887 (8th Cir. 2003); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 959 (10th Cir. 2008); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288–89 (4th Cir. 2002); *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995)

Relator attempts to sidestep this reality by building his case-in-chief around the testimony

of a handful of low-ranking former employees who Relator anticipates may testify they were out of compliance with the Annual Refresher Training Requirement.  Such testimony about their purported non-compliance with a contractual requirement of which they have no personal knowledge is not permitted under Fed. R. Evid. 701.  Moreover, many (if not most) of Relator's witnesses were never even required to complete the Annual Refresher Training Requirement because they did not work on the project long enough.  *See generally* Doc. No. 165-1 at 6–13.  Furthermore, Relator's witnesses had no meaningful interaction with GardaWorld's Project Management Team; were not involved in GardaWorld's invoicing or billing practices; and never reported any concerns to GardaWorld or DoS.

To the contrary, unrefuted evidence, including testimony from Relator himself establishes that he and his handful of confederates actively hid their offending conduct from management, privately praising them for "not getting caught" all while commending them for "showi[ing] up for all" Annual Refresher Training.   Doc. No. 122-23.   Another one of Relator's witnesses testified that he did not tell his superiors what he was doing with respect to manipulating the training tracker because that "would expose everything."   Doc. No. 122-8.   Another one of Relator's witnesses testified that the low-level, non-supervisory "Shift Leader would tell us to go to our rooms and keep a low profile so it would not be obvious that we were not in training."  Doc. No. 138-4.  Trial will demonstrate that neither Relator, nor anyone else, ever informed the Training Team or the Project Management Team that individuals were allegedly completing Annual Refresher Training sign-in-sheets for training that had not been completed.  To the extent this happened, it was hidden from GardaWorld by Relator and his subordinates.  Trial will further demonstrate that had the Training Team or the Project Management Team known that Relator (or anyone else) was submitting sign-in sheets for Annual Refresher Training that had been falsified,

they would have immediately reported it.

GardaWorld contends that Relator simply cannot carry his burden of proving scienter under the FCA by establishing that low-level employees unconnected to management or the billing process can create corporate knowledge under the FCA.  While ordinary **torts** vicarious liability may be established by showing that an employee was acting within the scope of employment and for the benefit of the company, that is not sufficient for purposes of the FCA, which is a punitive criminal and civil statute.  *See, e.g.*, *Leggins v. Orlando Hous. Auth.*, 2013 U.S. Dist. LEXIS 33021, at *9 (M.D. Fla. Mar. 11, 2013) ("Congress provided for punitive damages in one section of the False Claims Act"); *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014) ("The FCA's treble damages in combination with the per-claim penalties are punitive").

As the U.S. Supreme Court held in *Schutte*, False Claims Act liability depends on the subjective knowledge of the defendant at the time the claims are submitted.  *See Schutte*, 589 U.S. at 749.  The focus on the defendant's subjective understanding requires clearly established boundaries for whose knowledge may be imputed to a corporation and under what circumstances. The appropriate place to look for such guidance is the Restatement (Second) of Agency.  Indeed, the Supreme Court regularly looks to common law principles when interpreting the False Claims Act.  *See id.* at 750 (applying Restatement (Second) of Torts § 526 and Restatement (Third) of Torts: Liability for Economic Harm § 10); *see also Escobar*, 579 U.S. at 193 (applying Restatement (Second) of Torts § 538, at 80, Restatement (Second) of Contracts § 162(2)).

Specifically, the Restatement (Second) of Agency explains that where, as here, a litigant seeks to recover punitive damages against another, it is not enough to simply show that an employee took certain actions within the scope of his or her employment and for the benefit of the company; instead, the Restatement (Second) of Agency requires that:

(a)  the principal authorized the doing and the manner of the act, or

(b)  the agent was unfit and the principal was reckless in employing him, or

(c)  the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d)  the principal or a managerial agent of the principal ratified or approved the act.

Restatement (Second) of Agency, § 217C.  Because Relator cannot prove by a preponderance of the evidence that any of these conditions were met here, he cannot establish GardaWorld violated the FCA.

## V.    RELATOR CANNOT SHOW THE ALLEGED NON-COMPLIANCE WAS "MATERIAL" TO THE STATE DEPARTMENT'S DECISION TO PAY GARDAWORLD

### A.    Annual Refresher Training Was Not an Express Condition of Payment

First, "[t]he Government's decision to expressly identify a provision as a condition of payment is relevant" to determining whether compliance with a contractual provision is material to the government's payment decision.  *United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021) (quoting *Escobar*, 579 U.S. 194).  Here, the annual refresher training requirement is not expressly identified as a condition of payment in the WPS II Contract.  Specifically, the annual refresher training provision links one's failure to complete annual refresher training to one's ability "***to perform under the assigned task order***"; it does not link it to one's billable or non-billable status.  Doc. No. 122-12 at 382 (emphasis added).

**10.9 Annual Refresher Training for (P) and (G) Labor Categories**

The Contractor shall ensure that all personnel in "P" labor categories successfully complete at least 40 hours of annual refresher training.  The Contractor shall ensure that all personnel in "G" labor categories successfully complete at least 40 hours of annual refresher training.  The refresher training is in addition to all required firearms training and requalifications contained in SOW – Attachments One, Two, and Three.  *The Government will consider personnel that fail to complete the annual refresher training as **unqualified to perform under the assigned task order**.*  The RSO will specify the content and requirements of the refresher training.  All

costs of refresher training, including labor, are the responsibility of the Contractor. Upon completion of annual refresher training, the Contractor shall notify the COR which individuals have completed the required training and shall update the individual's administrative files accordingly.

*Id.* (emphasis added).

To be sure, the State Department knew how to tie compliance with a contractual training requirement to one's billable status.  Indeed, that its precisely how the State Department treated the related pre-deployment training provisions of the WPS II Contract.  For pre-deployment training, compliance was directly linked to an individual's ***billable status***:

**Section 9 Training Requirements for *Support (S) Positions***

**9.1 Requirements**

A. Contractor personnel filling labor categories designated as "S" shall complete NPSS pre-deployment training as outlined below (see Section 8, PSS Training Requirements, of this attachment for course descriptions).  On a case-by-case basis and with the approval of the COR, NPSS training may be conducted OCONUS.

B. *Any Contractor personnel assigned to a position who has not successfully completed the required training for that position shall be considered **unqualified, and therefore be <u>unbillable</u>***.

**10.1 *Basic Guard Training***

. . .

E. *Any Contractor personnel assigned to a position who has not successfully completed the required training for that position shall be considered **unqualified and therefore be <u>unbillable</u>***.

*Id.* at 365, 373 (emphasis added).

By expressly tying pre-deployment training to billable/unbillable status, and tying annual refresher training to performance, the State Department made clear that annual refresher training was not an express condition of payment.  And to the extent the jury considers annual refresher training contractual language to be ambiguous, State Department regulations require the jury to interpret this language in favor of GardaWorld and against the State Department.  *See* U.S.

Department of State, 14 FAH-2 Contracting Officer's Representative Handbook, Doc. No. 122-173 at § H-512.c ("U.S. Government contracts are subject to the same common law rules of interpretation applied to other contracts[,]" including that "[a]n ambiguous provision subject to more than one interpretation will be interpreted against the party responsible for creating it (in U.S. Government contracts, this is almost always the U.S. Government")).

**B.**     **GardaWorld Fulfilled the Essence of the Bargain by Providing "Effective" Security**

The materiality analysis also "consider[s] the extent to which the requirement that was violated is central to, or goes 'to the very essence of[,] the bargain.'" *Mortg. Inv'rs Corp.*, 987 F.3d at 1347–48 (quoting *Escobar*, 579 U.S. at 193). In this case, the essence of the bargain was, as the Court recognized, "providing *effective* security to the Embassy[.]" MSJ Order at 21. There is no dispute that GardaWorld provided effective security; every witness who was asked, including Relator, testified that GardaWorld provided effective security and that its personnel were qualified.

Critically, all of the State Department witnesses praised GardaWorld's performance on the WPS II Contract. The Contracting Officer (Margaret Mancini), for example, testified that GardaWorld fulfilled its "promise to provide best-in-class" security services. Doc. No. 122-34 at 90:02–05. The Contracting Officer Representative (John McNichols) similarly testified that "GardaWorld effectively protect[ed] State Department personnel." Doc. No. 122-169 at 36:18–20. And a GTM (Rodolphe Rochez) testified that he observed GardaWorld's employees completing training exercises and determined they were "trained effectively." Doc. No. 122-47 at 164:18–165:04.

Even Relator agreed that GardaWorld fulfilled its mission and made sure that "everybody was protected and secured." Doc. No. 122-11 at 355:04–10. So too did his witnesses. Alexandro Lopezzamora, for example, testified that he met GardaWorld's expectations in his job performance

and that GardaWorld satisfied its mission to protect everybody on the compound. Doc. No. 122-9 at 235:03–235:15. Brandon Jakubowski testified similarly that he was adequately trained to complete his job, that he met GardaWorld's expectations for his job, and that he satisfied all of his job requirements. Doc. No. 122-23 at 96:14–96:24. Charles Denison testified there was nothing about his training on the WPS II Contract that would have made him unqualified to provide security on the contract. Doc. No. 122-16 at 124:20-125:09. Jordan Howell testified there was never a time when he felt like he was not able to do his job because of a supposed lack of training. Doc. No. 122-10 at 209:10–15. The list of witnesses who testified similarly goes on. *See, e.g.* Doc. No. 122-21 at 260:12–23 (Marcus Harness); Doc. No. 122-28 at 262:9–263:6 (Patrick VinZant); Doc. No. 122-25 at 98:03–98:21 (Victor Oates); Doc. No. 122-6 at 227:01–07 (Jeffrey Dubasik).

In short, trial will show that GardaWorld fulfilled its mission by providing effective diplomatic security that kept every member of the U.S. State Department stationed at the Embassy in Afghanistan safe and secure for nearly four years, including through the dangerous and chaotic evacuation of the Embassy in August 2021.

### C.    The Annual Refresher Training Allegations Had No Effect on the State Department's Behavior

"The government's reaction to the defendant's violations is also a factor in the materiality inquiry." *Mortg. Inv'rs Corp.*, 987 F.3d at 1348. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. Here, Relator informed the State Department Office of Inspector General ("OIG") on March 18, 2020 that GardaWorld's annual refresher training "documents are missing or forged, most likely because they never conducted the training." Doc. No. 166-4. After indicating that he "ha[d] supporting

documents" to back-up these claims (*id.*), Relator then met with the State Department OIG on two different occasions in the summer of 2020 to discuss the allegations in both his OIG Disclosure and his federal district court lawsuit, which—just like his OIG Disclosure—included allegations of Annual Refresher Training fraud.  Doc. 122-227 at 6.

For the next 15 months, the OIG investigated numerous aspects of Relator's OIG Disclosure and Federal Court Complaint.  MSJ Hr'g Tr. at 8:23–12:9. As part of its sweeping investigation, the OIG requested documents from GardaWorld and met and spoke with GardaWorld witnesses.  *See id.*  GardaWorld, for its part, fully cooperated with the OIG.  *Id.* The OIG also met and spoke with State Department witnesses in Afghanistan.  *See id.*  Ultimately, while the State Department took some limited personnel-related actions against GardaWorld concerning its U.S.-based pre-deployment training program run out of Perry, Georgia, the State Department took *no actions*—punitive or otherwise—pertaining to GardaWorld's annual refresher training activities conducted in Afghanistan. *See id.*

Indeed, the OIG's investigation was remarkably disinterested in these allegations, notwithstanding Relator's offer to provide them with "supporting documents" and GardaWorld's own self-disclosure on March 18, 2021 (in the midst of the OIG investigation) revealing staffing "shortages" that made it difficult to "conduct [] 40 hour[] training." Doc. No. 122-182 at GWFS00074760, 00074766.  Despite this information, the State Department and the OIG did nothing to address Relator's allegations and GardaWorld's disclosures.  This inaction is the definition of lack of materiality.  *See United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017) ("Such very strong evidence becomes compelling when an agency armed with robust investigatory powers to protect public health and safety is told what Relators have to say, yet sees no reason to change its position."); *see also United States ex rel. Thomas v.*

*Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1172 (10th Cir. 2016) (no materiality where "[agency] was aware that the evidence strongly suggested someone at [defendant] had altered documents" but "[n]otwithstanding this information, [the agency] never took any adverse action against [defendant]").

Separately, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195. This too supports a finding of lack of materiality. Specifically, GardaWorld disclosed actual non-compliance with aspects of its pre-deployment training program in March 2020. Doc. No. 122-182 at 4, 10. In response, GardaWorld developed a Corrective Action Plan and had certain limited individuals re-trained. Doc. No. 122-210. Notwithstanding the known non-compliance concerning a training deliverable ***that was designated as a condition of payment***, the State Department never requested nor sought any type of recoupment or deduction for the work GardaWorld performed by supposedly "unqualified" personnel. For this additional reason, Relator cannot prove that GardaWorld's alleged non-compliance with the Annual Refresher Training Requirement (of which the State Department was aware, and which concerns a provision of the WPS II Contract ***that is not designated as a condition of payment***) was material to the State Department's decision to pay GardaWorld's invoices.

### D.  Relator's Evidence of Non-Compliance Is Minor or Insubstantial

"Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." *Escobar*, 579 U.S. at 194. Here, Relator's evidence of non-compliance is both minor and insubstantial. As the Court has acknowledged, "the sheer scope of the GardaWorld workforce in comparison with the small number of employees identified by the complaint casts doubt on whether Fahn's claims can ultimately prevail." Doc No. 56 at 27. More specifically, the Annual

Refresher Training Requirement only applied to just 306 U.S. national P/Gs of the 989 such individuals who worked on the Project.  Doc. No. 165-5 ¶ 14.a. Of these 306 individuals, Relator has adduced evidence from only nine individuals—***three of whom will be testifying at trial as GardaWorld's witnesses***.  Even assuming Relator can convince the remaining six individuals to come to Macon to testify on his behalf (doubtful), that would still not be enough evidence to move these alleged violations from minor to substantial.  In fact, it would reflect a mere 2% of GardaWorld's U.S. national P/G workforce—and even smaller percentage of GardaWorld's overall workforce if you include the local nationals and third-country nationals who were also required to complete annual refresher training.

## VI.   RELATOR CANNOT PROVE DAMAGES BY A PREPONDERANCE OF THE EVIDENCE

Relator "relies on the 'worthless services' theory to establish damages" (Doc. No. 157 at 28 (citing Doc. 125 at 19–20)), pursuant to which he seeks to recover $586,203,194.16 million— that is, the full value of the labor and associated costs that were paid by the State Department for GardaWorld's P/G personnel on the WPS II Contract.  This theory—and the massive amount of damages he seeks thereunder—is unsupported and cannot be proved at trial by a preponderance of the evidence.

As an initial matter, Relator cannot pursue damages from the U.S. national P/Gs who were not required to complete Annual Refresher Training.  But Relator seeks damages associated with the work performed by 711 individuals who were never required to complete Annual Refresher Training.  Relator must be limited to pursuing damages from the 306 U.S. national P/Gs who were required to complete Annual Refresher Training.  And even for these limited people, Relator should not be permitted to seek or recover damages for the periods of time when Annual Refresher Training was either not required or had been waived (i.e., the Base Year, Option Year 1, and the

Covid Waiver Period). All in all, Relator should be limited to pursuing the amount associated with the 306 U.S. national P/Gs who needed to complete Annual Refresher Training in the relevant time periods, which Relator (mis)calculates as $21,313,044.94. *See* Doc. 165-1. These issues are discussed in great detail in GardaWorld's accompanying Motion *in Limine* addressing Relator's "worthless services" theory and Jason Wells' Damages Summary. *See* Doc. No. 165-1.

Furthermore, under Relator's "worthless services" theory of damages, he can only "'recover the full value of payments . . . where the government proves that it received no value from the [services] delivered[.]'" *Id.* (quoting *SAIC*, 626 F.3d at 1279). Thus, for Relator to sustain his burden of proof on damages, he is required to show that GardaWorld's security services had "no value" to the State Department. Relator cannot make this showing. As discussed, State Department witnesses have already testified that GardaWorld fulfilled its "promise to provide best-in-class" security services (Doc. No. 122-34 at 90:02–05), "effectively protect[ed] State Department personnel," (Doc. No. 122-169 at 36:18–20) and were "trained effectively" (Doc. No. 122-219 at 164:18–165:04). Put simply, no witness—not even Relator—will testify that GardaWorld's services were worthless. Indeed, in a rare moment of honesty during Relator's deposition, he freely conceded "***I don't think the***[ ***services***] ***were worthless, no***." Doc. No. 122-11 at 353:08–18 (emphasis added).

Given the insurmountable hurdle Relator faces trying to prove "worthless services" damages, GardaWorld anticipates Relator will, at trial, attempt to prove damages based on a new and still undisclosed theory of damages, pursuant to which Relator will try to prove damages by attempting to calculate the difference in the value between what GardaWorld promised to deliver to the State Department and what GardaWorld actually delivered to the State Department. But as discussed in GardaWorld's Motion *in Limine* regarding damages (Doc. No. 165-1 at 2–6), this

theory of damages—nor any other theory of damages except "worthless services"—was never disclosed to GardaWorld.  Nor was discovery on this topic every taken or provided.

GardaWorld repeatedly pressed Relator to make damages disclosures and, in fact, sought the Court's assistance on this topic on several occasions, including on November 14, 2023 and November 22, 2023.  In response, Relator committed and recommitted to his "worthless services" theory.  Allowing Relator to switch to a new, undisclosed damages theory on the eve of trial would not just cause grave prejudice to GardaWorld, it would violate Federal Rule of Civil Procedure 26(e).  Not only that, but it would also simply invite guesswork from the Contracting Officer who repeatedly testified that she would need "to know all the facts" before making any contract-related decisions and that she did ***not*** have all the facts.  Doc. No. 122-34 at 344:18–345:19, 346:5–15, 352:6–14, 381:20–382:13. 398:14–18; *United States v. Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988) ("speculation and guesswork should not be the basis for ascertaining damages" in FCA cases).

Dated: June 14, 2024

Respectfully submitted,

/s/ *Tara M. Lee*

Charles E. Cox, Jr.
CHARLES E. COX JR., L.L.C.
484 1st Street, Suite 1
P.O. Box 67
Macon, GA 31202
Telephone: + 1 478 757 2990
charles@cecoxjr.com Macon, Georgia

Tara M. Lee (admitted *pro hac vice*)
Scott Lerner (admitted *pro hac vice*)
Melissa Taylormoore (admitted *pro hac vice*)
Benedict S. Bernstein (admitted *pro hac vice*)
Blair E. Trahan (admitted *pro hac vice*)
Helin Akcam (admitted *pro hac vice*)
**WHITE & CASE**LLP
701 Thirteenth Street, NW
Washington, D.C. 20005
Telephone:      + 1 202 626 3600
Facsimile:      + 1 202 639 9355
tara.lee@whitecase.com
scott.lerner@whitecase.com
melissa.taylormoore@whitecase.com
benedict.bernstein@whitecase.com
blair.trahan@whitecase.com
helin.akcam@whitecase.com

*Counsel for Defendant*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 14, 2024, I caused a true and correct copy of the foregoing

Trial Brief to be served on all counsel of record by filing it on the Court's CM/ECF system.


 /s/ *Tara M. Lee*             
Tara M. Lee