UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. JUSTIN FAHN, | CIVIL ACTION NO. |
| Plaintiffs, | 5:20-CV-000128-MTT |
| vs. | |
| AEGIS DEFENSE SERVICES, LLC, | |
| Defendant. | |

### RELATOR'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS

GardaWorld's response makes one thing clear:  GardaWorld's conduct was intentional, and it does not apologize. GardaWorld sent an *ex parte* letter that (1) is litigation advocacy intended to persuade (2) to two representedgovernment trial witnesses on the eve of trial, and GardaWorld argues not only can  GardaWorld do so, but (3) any defendant in any False Claims Act case can do so in any litigation without informing the government witnesses' lawyers and (4) the "disclosure of wrongdoing," can instead be   a full-throated attack on all material issues in the case, as well as the character of the relator and his counsel. In reply, Relator makes the following fact-based observations regarding GardaWorld's response brief:

**First**, GardaWorld's claim that it sent the letter as an "Incident Report" under Section C.10.5.6 (A) of the contract is simply a post hoc justification. The letter states it is being sent "pursuant to FAR 52.203-13(b)(3)(i)" and GardaWorld's code of conduct. Doc. No. 212-1 and Doc No. 212-2. The letter itself does not reference Section C.10.5.6. (A) of the contract. GardaWorld now invokes this contract provision in an after-the-fact scramble to justify its conduct when confronted by the United States Attorneys' Office about the *ex parte* contact, and now falsely represents to the Court this was the reason it tried to tamper with a witness. The rush to this

demonstrably inapplicable post hoc justification, which conflicts with the justification on the face of the letter, is evidence of subjective bad faith.

A further illustration of GardaWorld's subjective bad faith is its selective omission in the block quotation of Section C.10.5.6 (A) in GardaWorld's response brief. GardaWorld quoted the contract to the Court yet chose to use an ellipse to omit a critical cross-reference in the contract. GardaWorld's response brief represents the following to the Court:

> Section C.10.5.6. (A) provides:
>
> The Contractor shall ensure timely notification and submission of an "Incident Report" to the Government officials **. . .** and, if applicable, reporting in the respective post/venue log book by Contractor personnel who are involved in, observe, or suspect the following types of incidents . . . (4) Alleged criminal, dangerous or unauthorized practice or condition, standards of conduct violations, or a violation of security regulations . . .

ECF 239 at 12 (ellipses emphasized after "Government officials"). But what Section C.10.5.6. (A) actually states is the following:

> Section C.10.5.6. (A) provides:
>
> The Contractor shall ensure timely notification and submission of an "Incident Report" to the Government officials ***noted above in section C.10.5.A.3.***, and, if applicable, reporting in the respective post/venue log book by Contractor personnel who are involved in, observe, or suspect the following types of incidents: . . . (4) Alleged criminal, dangerous or unauthorized practice or condition, standards of conduct violations, or a violation of security regulations.

(Doc. No. 147-12, p. 92, WPS II § C.10.5.6.A (emphasis added)).

> Section C.10.5.A.3. makes clear that a contractor making such disclosure under the section must:
>
> Ensure that their personnel sufficiently and timely document the relevant **facts** of the incident, including any after action information, **using the required "Incident Report" form**. Confirm that such report is accurate, fully completed, signed, and dated prior to forwarding it to the Government. Submit the completed "Incident Report" to the Government within twenty-four (24) hours of the conclusion of the incident requiring such reporting, unless otherwise directed by DS/RSO. **Provide the original "Incident Report" to DS/RSO and send an electronic copy to**

**DS/RSO COR and DS/OPO/WPS and GTM**. Provide additional follow up reporting or corrective action(s) as required by DS/RSO or DS/OPO/WPS.

(Doc. No. 147-12, p. 89, WPS II § C.10.5.A.3 (emphasis added)).

As the omitted cross-reference makes clear, GardaWorld did not send an "Incident Report" to the specific and proper recipients identified in the strategically omitted (by ellipses) section, which specifies GardaWorld was to "***Provide the original 'Incident Report' to DS/RSO and send an electronic copy to DS/RSO COR and DS/OPO/WPS and GTM.***" J-1 at 88. Instead of submitting its "report" to these recipients or in this fashion, GardaWorld sent a trial brief to key trial witnesses on the eve of trial. Despite being in regular contact with the Department of Justice and Department of State counsel, GardaWorld neither sent it to the witness' counsel nor asked where GardaWorld should send it. Instead, GardaWorld chose to send it to the *former* Contracting Officer who now holds an entirely unrelated position with Department of State and on whom GardaWorld intended to rely heavily as part of its defense strategy. To be sure, Mr. Twigg did not use any required standardized "Incident Report" form for his letter, he certainly did not send it within twenty-four hours of learning of the allegations in declarations, the missing records, the receipt of Wells' summaries, or anything else that might trigger a duty to complete an "Incident Report form." Nor was the "report" remotely factual.  Attempting to justify their conduct by omitting key terms from its citation of the contract to the Court and defending its conduct on pretext rather GardaWorld actual subjective belief at the time is further evidence of subjective bad faith.

**Second**, GardaWorld's attempt to travel under FAR's Mandatory Disclosure Rule proves its subjective bad faith for similar reasons. As GardaWorld concedes, any disclosure under the FAR Mandatory Disclosure Rule should be primarily ***addressed to*** the "agency Office of the Inspector General (OIG)." ECF 239 at 13. But GardaWorld ***did not address this disclosure to the***

*OIG*. Instead, it submitted the advocacy letter directly and exclusively to two trial witnesses GardaWorld knew it intended to call in its defense. In addition, the FAR requires disclosure when a contractor believes there to be "credible evidence," yet GardaWorld's letter describes allegations as "greatly exaggerated, perhaps even fabricated in certain respects." By the plain language of GardaWorld's own words, fabricated allegations are not "credible evidence" requiring a disclosure.[1] GardaWorld's actions make clear it was never traveling under a FAR regulation requiring disclosure to the OIG. Instead, like the post hoc reference to contract "Incident Reports," this regulation was a pretext to justify litigation advocacy to litigation witnesses.

**Third**, GardaWorld's contact with Ms. Mancini and Mr. Mitchell violated Georgia Rule of Professional Conduct 4.2 regardless of the applicability of ABA Opinion 97-408. GardaWorld directly contacted Government-represented witnesses without their counsel's knowledge, permission, or participation. GardaWorld was not authorized by law to do so. In fact, GardaWorld did so for purposes of witness tampering, a per se unlawful purpose. *See* 18 U.S.C.A. § 1512(b); *Weibrecht*, 241 F.3d at 883. Again, setting aside whether the letter was an "Incident Report" or "supplemental disclosure," GardaWorld does not and cannot contend that its letter was not

---

[1] GardaWorld vaguely asserts arguments under Rule 4.2 and because of a "relational expectation." Neither provides a justification. In False Claims Act cases, the Department of Justice has authority to decide and compromise claims. *United States v. Kellogg Brown & Root Servs., Inc.*, No. 412CV04110SLDJEH, 2016 WL 5344419, at *6 (C.D. Ill. Sept. 16, 2016). GardaWorld acknowledges as much by virtue of their continued direct dialogue with the Middle District of Georgia United States Attorney's Office. *See* Doc. 239 at 7 (claiming meeting with DOJ was, in part, for settlement purposes). Likewise, whatever "relational expectation" means does not justify communicating directly with a material witness who the party knew to be represented, knew to have moved to a position unrelated to WPS II, and around the backs of both Department of State counsel and Department of Justice counsel, for the purpose of persuasion. Finally, Defendant's argument that Ms. Mancini testifying she would have looked into the issue before reaching a conclusion somehow meant that GardaWorld should send her an advocacy letter *ex parte* on the eve of her trial testimony is not credible.

4

intended to persuade Ms. Mancini and Mr. Mitchell with respect to their testimony in a gamut of litigation issues and the character and motives of Relator and his legal counsel.

ABA Formal Op. 97-408 is instructive and persuasive. The Georgia Supreme Court has explained that "[t]he persuasiveness of ABA authority for interpreting Georgia rules depends on (1) the similarity to Georgia text of the ABA text being interpreted, and (2) the extent to which the ABA authority is based on an interpretation of the actual text of that similar rule." *In Re Formal Advisory Op. No. 20-1*, 313 Ga. 803, 807 n.6 (2022). ABA Formal Op. 97-408 and its footnotes show the language of ABA Model Rule 4.2 and its relevant comments, when addressed by that opinion,  are almost identical to the relevant language and comments of GRPC 4.2(a). And ABA Opinion 97-408 is based on the text of the rule itself as it addresses what communications "authorized by law" means.  This is particularly reflected in the ABA Formal Opinion 97-408 analysis of "authorized by law" within the context of the legal right to petition one's government. ABA Formal Opinion 97-408 rightfully determined certain safeguards were necessary to protect the attorney-client relationship in the government context and to curtail abuse of Rule 4.2 "[i]n situations where the right to petition has no apparent applicability," such as this case. Thus, ABA Formal Op. 97-408 is persuasive here.

Additionally, GardaWorld's reliance upon the ABA Guide to the Mandatory Enclosure Rule (part of GardaWorld's own submission) explicitly discourages GardaWorld's tampering:

> [C]ontractors may also be interested in addressing certain "legal" issues in disclosures. . . . While the disclosure report **perhaps should not be used as a form of legal brief**, a disclosing contractor should not be constrained from identifying relevant legal issues as part of its disclosure provided it also is meeting the expectations of the receiving agency with respect to the relevant facts.

Doc. 239-2 at 12 (emphasis added).

**Fourth**, Defendant appears to concede Relator's counsel did not receive the same metadata that exists on the native file that was received by the Department of Justice. *See* ECF 239-4 at 7 (explaining "custom metadata fields" are not included in production protocols). The metadata GardaWorld provided to Relator stated "Lior Azoulai" was the author of the letter, "GardaWorld" (and not White and Case) was the custodian, and it was created on June 13, 2024. Apparently other metadata existed for the letter which was sent to the witnesses, and that metadata contradicted this information. GardaWorld did not provide Relator with that metadata. *See* ECF 239-4 at 7 (explaining that "custom metadata fields" are not included in production protocols).[2] Suffice to say, the metadata provided by GardaWorld did not disclose counsel's role in the creation or authorship of the letter. GardaWorld likewise did not provide native documents that would have allowed Relator to ascertain information relevant to the same. In short, one set of metadata was in the letter sent to the witnesses on June 13. A different set of metadata was in the letter produced to Relator on June 14. It is unknown to Relator what happened to *change* the associated metadata between the transmission of the letter on June 13 to the witnesses, and the production of the letter on June 14 to Relator.

**Finally**, GardaWorld's ever-evolving representations to the Court about its interactions with AUSAs Swanson and McNeil are further evidence of lack of candor. In a subtle shift, GardaWorld now says Mr. Lerner told AUSAs Swanson and McNeil there would be a disclosure "to the Government," not the State Department. *Compare* ECF 239 at 6 ("As Mr. Lerner discussed and showed Messrs. Swanson and McNeill examples of the ART attestations, he informed them that these attestations—which had not yet been produced to Relator or DoS—had only recently been collected by GardaWorld but would soon be provided ***to the Government*** as part a disclosure

---

[2] Relator previously provided some background on the files it received as the Court requested.

that GardaWorld intended to make shortly thereafter.") with ECF 224 at 8 ("[D]uring the course of that meeting, GardaWorld's counsel expressly informed counsel that GardaWorld would soon be making a "supplemental disclosure *to the State Department*."). GardaWorld then attempts to write off its initial false justification in its filing to the Court as something that can be chalked up to the confusion of AUSAs Swanson and McNeil, suggesting Mr. Lerner's representation was not "understood" by the DOJ. ECF 239 at 17.

GardaWorld notably offers no new under oath declarations as to this conduct. GardaWorld does not explain why it failed to disclose to the Court in its initial response on June 18, 2024, the emails sent by the Department of Justice expressing concerns with the Twigg Letter (contrary to representations in that filing the DOJ knew what GardaWorld intended). GardaWorld does not respond to the fulsome explanation provided by the DOJ as to the true purpose of the meeting and corroborating emails on the same. GardaWorld does not explain why its corporate representative has previously testified its entire justification for sending the letter—a disclosure for a closed-out contract—would never happen. Doc. 150 at 286 Rule 30(b)(6) Depo. of David Watson. Nor does GardaWorld explain why GardaWorld's corporate representative testified the contract was "closed," *id*., but GardaWorld now claims it "remains an open contract," Doc. 228-5, p. 1, and Ms. Lee's filing stated it was "an open contract that is still going through the close-out process," Doc. 224, p. 7 — only to now make no mention of open/closed whatsoever in its response brief. GardaWorld offers no explanation why it waited until the eve of trial, nine months after learning of these allegations, and seven months after production of witness declarations containing allegations (and the close of all discovery) to make its "disclosure." It makes no mention of its claims in open court that undisclosed witness Mr. Daake was merely a summary witness, when in reality he will testify about materiality (and more). And it does not deny that its misconduct

extended to an attempt to deter Mr. Lopezzamora from testifying even after the Court expressed concern and displeasure with witness interference.[3]

## <u>CONCLUSION</u>

GardaWorld's response brief doubles down on its misconduct without contrition or apology. The brief provides more, not less, evidence of subjective bad faith.

Given the admissions in GardaWorld's filing, any questions that remained as to whether this misconduct was the work of outside counsel only or reflects a more serious problem with GardaWorld itself is no longer in doubt. GardaWorld concedes that this decision was made in full consultation with and approval of the Chief Legal Officer, Vice President of Legal and the Chief Financial Officer. *See* ECF 239 at 5-7 ("W&C, together with GardaWorld's in-house counsel, drafted the Disclosure."). Just as White & Case knows and is bound by the Rules of Professional Conduct, so too are GardaWorld's in-house counsel. And, just as with the original decision to send the "disclosure," GardaWorld's continued lack of contrition and lack of candor in its filings speaks to GardaWorld's willing embrace of the litigation strategy employed in this case.

---

[3] There may be additional false representations in GardaWorld's response. Relator took note of GardaWorld's representation as to the nature and volume of communications with Ms. Mancini and others. See ECF 239 at 15 (representing GardaWorld "frequently ***corresponds***" (emphasis on present tense), "maintained legacy obligations under WPS II," and that there are "thousands" of emails). Relator does not have access to those communications in discovery. Relator therefore must defer to the Department of Justice and Department of State production that is forthcoming. Relator only notes that if "thousands" of emails exist showing continued Ms. Mancini and Mr. Mitchell's involvement in WPS II continuing through 2024, they were not produced to Relator during discovery.

The issue is whether GardaWorld has a non-tampering reason to communicate ex parte with Ms. Mancini and Mr. Mitchell **in June 2024 as to WPS II compliance**. If GardaWorld made false or misleading representations to this Court as to correspondence about WPS II specifically (as opposed to unrelated contracts), misstated the need to communicate with Ms. Mancini about WPS II **in June 2024** given her new role, or attempted to conflate Mr. Mitchell and Ms. Mancini by lumping them together, then these would constitute additional reasons sanctions are necessary.

As set forth in Relator's motion for sanctions, it is not sufficient for sanctions to be limited to counsel of record in this case. GardaWorld itself should be sanctioned for its role in both the initial decision to tamper with material witnesses, subsequent false statements to the Court to justify that conduct, and stubborn refusal to simply acknowledge the conduct failed to adhere to the standards of professional practice in this district. For all the reasons set out in this reply brief and submitted previously, Relator respectfully submits severe sanctions against GardaWorld and counsel are necessary.

Respectfully submitted, this 14th day of July, 2024.

**CLARK, SMITH & SIZEMORE, LLC**
**BY:**

150 College Street
Macon, Georgia 31201
Telephone: (478) 254-5040
Facsimile: (478) 254-5041
chris@clarksmithsizemore.com
rick@clarksmithsizemore.com

/s/ John Christopher Clark
John Christopher Clark
Georgia Bar No. 127353
Richard L. Sizemore
Georgia Bar No. 649449
***Co-Counsel for Plaintiff***

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. JUSTIN FAHN,** | |
| **Plaintiffs,** | **CIVIL ACTION NO.** |
| **vs.** | **5:20-CV-00128-MTT** |
| **AEGIS DEFENSE SERVICES, LLC,** | |
| **Defendant.** | |

## <u>CERTIFICATE OF SERVICE</u>

This certifies that I have this day served a true and correct copy of the above and foregoing

**RELATOR'S REPLY IN SUPPORT OF MOTION FOR SANCTIONS** upon all counsel of

record by statutory electronic mail, as follows:

Mr. Bradley W. Pratt
Mr. Frank T. Bayuk
Bayuk Pratt, LLC
4401 Northside Parkway, Suite 390
Atlanta, Georgia  30327
*Attorneys for Relator*

Mr. Charles W. Byrd
Mr. J. Thomas Clarkson
Mr. John J. Van Why
Griffin Durham Tanner &
Clarkson, LLC
5400 Riverside Drive, Suite 205
Macon, Georgia  31210
*Attorneys for Relator*

Mr. Bowen R. Shoemaker
Mr. Todd P. Swanson
Mr. W. Taylor McNeill
United States Attorney's Office
P. O. Box 1702
Macon, Georgia  31202
*Attorneys for United States*
*of America, ex rel.*

Mr. Jason C. Pedigo
Ellis Painter
P. O. Box 9946
Savannah, Georgia  31412
*Attorneys for Relator*

Ms. Tara Lee
Mr. Benedict S. Bernstein
Mr. Scott Lerner
Ms. Helin Akcam
Ms. Melissa Taylormoore
Mr. Charles D'Oria
White & Case LLP
701 13th Street, NW
Washington, DC  20005
*Attorneys for Defendant*

Ms. Susan L. Grace
White & Case, LLP
1221 Avenue of the Americas
New York, New York  10020
*Attorneys for Defendant*

Mr. Harold D. Melton
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, Georgia  30308
*Attorney for Defendant*

Mr. Charles E. Cox, Jr.
Charles E. Cox, Jr., LLC
484 1st Street, Suite 1
P. O. Box 67
Macon, Georgia  31202
*Attorney for Defendant*

This 14th day of July, 2024.

**CLARK, SMITH & SIZEMORE, LLC**
**BY:**

150 College Street
Macon, Georgia 31201
Telephone: (478) 254-5040
Facsimile: (478) 254-5041
chris@clarksmithsizemore.com
rick@clarksmithsizemore.com

/s/ John Christopher Clark
John Christopher Clark
Georgia Bar No. 127353
Richard L. Sizemore
Georgia Bar No. 649449
***Co-Counsel for Relator***